# *REDACTED VERSION*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KYLE PIPPINS, JAMIE SCHINDLER, and EDWARD
LAMBERT, Individually and On Behalf of All Others
Similarly Situated,

                        Plaintiffs,

                 -against-

KPMG LLP,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**11 CV 0377 (CM)(JLC)**

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR
## <u>CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE</u>

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Tel.:  (212) 839-5300
Fax:  (212) 839-5599

*Attorneys for Defendant KPMG LLP*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT .............................................................................1

PROCEDURAL BACKGROUND..........................................................................3

FACTUAL BACKGROUND ..................................................................................5

I.     KPMG's Policies Regarding The Exempt Work It Expects Its Audit Associates To Perform Are Clear And Driven By Regulatory And Professional Standards Applicable To The Practice Of Auditing ..........................5

     A.     KPMG's Job Postings, Job Descriptions And Performance Evaluation Documents Reflect That Audit Associates Are Expected To Perform Exempt Work ..........................................................................6

     B.     KPMG Has Rigorous Hiring Criteria To Ensure That Its Audit Associates Have Obtained Advanced Knowledge To Enable Them To Perform Their Exempt Duties And Responsibilities ..............................9

     C.     KPMG's Expectations For Audit Associates Are Consistent With Relevant Regulatory And Professional Standards ....................................10

     D.     KPMG's Continuing Professional Education And Audit Resources Are Consistent With The Professional Role Played By Audit Associates ................................................................................................11

II.     KPMG's Audit Associates Apply Advanced Technical Knowledge And Exercise Judgment In The Course Of Performing Audit Work.............................13

III.     Plaintiffs.................................................................................................................14

ARGUMENT .........................................................................................................14

I.     PLAINTIFFS ARE NOT "SIMILARLY SITUATED" TO OTHER AUDIT ASSOCIATES. ...................................................................................................14

     A.     Plaintiffs Are Not "Similarly Situated" To Other Audit Associates Because Their Allegations Are Inconsistent With The Professional Interests, And Previous Sworn Statements, Of The Members Of The Proposed Collective ..................................................................................15

*(cont'd on next page)*

i

# TABLE OF CONTENTS
## (continued)

B.    Plaintiffs Have Not Met Their Burden To Establish That They Are "Similarly Situated" To Other Audit Associates With Respect To Their Allegation That Their Primary Duties Involved Non-Exempt Work ...................................................................................................17

    1.    KPMG's Audit Associate Job Description Is Facially Lawful......20

    2.    KPMG's Mere Classification Of Audit Associates As Exempt Is Not Sufficient To Carry Plaintiffs' Burden Of Showing A Common Violation Of Law ........................................20

    3.    Plaintiffs Have Not Met Their Burden Of Showing That Other Audit Associates Primarily Performed Non-Exempt Duties Consistent With Their Own Allegations Of Such Duties ............................................................................................22

    4.    The Evidence Shows That Plaintiffs Are Not Similarly Situated To Other Potential FLSA Opt-Ins With Respect To Their Actual Job Duties .................................................26

    5.    Plaintiffs' Manufactured Disputes Related To KPMG's Exemption Defenses Provide No Support To Their Contention That They Are "Similarly Situated" To Others..........30

II.    PLAINTIFFS' PROPOSED NOTICE IS DEFECTIVE. ......................................32

A.    Plaintiffs' Proposed Notice Is Objectionable..............................................32

B.    Plaintiffs' Request For Private Data Concerning Potential Opt-Ins Is Unexplained And Unwarranted; Any Notice Should Be Disseminated By A Third-Party Administrator ........................................33

C.    Plaintiffs' Request For Postings At KPMG Job Locations Is Unexplained And Unwarranted .................................................................34

CONCLUSION.....................................................................................................................35

## TABLE OF AUTHORITIES

Page(s)

CASES

*Amendola v. Bristol-Myers Squibb Co.*,
   558 F. Supp. 2d 459 (S.D.N.Y. 2008)....................................................................................15

*Bolduc v. Nat'l Semiconductor Corp.*,
   35 F. Supp. 2d 106 (D. Me. 1998) .........................................................................................30

*Campbell v. PricewaterhouseCoopers,LLP*,
   No. 09-16370, 2011 U.S. App. LEXIS 12062 (9th Cir. June 15, 2011).......................1, 28, 32

*Cohen v. Gerson Lehrman Group*,
   686 F. Supp. 2d 317 (S.D.N.Y. 2010)...............................................................17, 18, 20, 33

*Creten-Miller v. Westlake Hardware, Inc.*,
   No. 08 Civ. 2351, 2009 WL 2058734 (D. Kan. July 15, 2009).............................................26

*Cruz v. Hook-Superx, LLC*,
   No. 09 Civ. 7717, 2010 WL 3069558 (S.D.N.Y. Aug. 5, 2010) ...........................................26

*Damassia v. Duane Reade Inc.*,
   No. 04 Civ. 8819, 2006 WL 2853971 (S.D.N.Y. Oct. 5, 2006) ...........................17, 18, 21, 25

*Davis v. J.P. Morgan Chase & Co.*,
   587 F.3d 529 (2d Cir. 2009).............................................................................................31, 32

*Dybach v. Florida Dep't of Corrections*,
   942 F.2d 1562 (11th Cir. 1991) ............................................................................................30

*Eng-Hatcher v. Sprint Nextel Corp.*,
   No. 07 Civ. 7350, 2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009) ................18, 23

*Fasanelli v. Heartland Brewery, Inc.*,
   516 F. Supp. 2d 317 (S.D.N.Y. 2007)...................................................................................34

*Fiore v. Goodyear Tire & Rubber Co.*,
   No. 09-cv-843, 2011 WL 867043 (M.D. Fla. March 10, 2011) .............................................26

*Francis v. A & E Stores, Inc.*,
   No. 06 Civ. 1638, 2008 WL 4619858 (S.D.N.Y. Oct. 16, 2008) ...........................................26

*Guillen v. Marshalls of MA, Inc.*,
   750 F. Supp. 2d 469 (S.D.N.Y. 2010)............................................................................ passim

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Hallissey v. Am. Online, Inc.*,
  No. 99-Civ-3785, 2008 WL 465112 (S.D.N.Y. Feb. 19, 2008) ............................20, 21, 22, 32

*Hamm v. TBC Corp.*,
  345 Fed. Appx. 406 (11th Cir. 2009).....................................................................................34

*Hinterberger v. Catholic Health Sys.*,
  No. 08-CV- 380S, 2009 U.S. Dist. LEXIS 97944 (W.D.N.Y. Oct. 21, 2009) .................34, 35

*Hoffmann v. Sbarro, Inc.*,
  982 F. Supp. 249 (S.D.N.Y. 1997)...........................................................................................15

*Hoffmann-La Roche Inc. v. Sperling*,
  493 U.S. 165 (1989).................................................................................................................33

*Holbrook v. Smith & Hawken, Ltd.*,
  246 F.R.D. 103 (D. Conn. 2007)..............................................................................................21

*Holt v. Rite Aid Corp.*,
  333 F. Supp. 2d 1265 (M.D. Ala. 2004) ..................................................................................24

*In re FedEx Ground Package Sys.*,
  662 F. Supp. 2d 1069 (N.D. Ind. 2009) ...................................................................................15

*Indergit v. Rite Aid Corporation*,
  No. 08 Civ. 9361, 2010 WL 2465488 (S.D.N.Y. June 16, 2010).........................17, 18, 21, 25

*J.S. v. Attica Cent. Schools*,
  No. 00-CV-513S, 2006 U.S. Dist. LEXIS 12827 (W.D.N.Y. Mar. 7, 2006) ..........................33

*Jackson v. Papa John's USA, Inc.*,
  No. 08 Civ. 2791, 2009 WL 385580 (N.D. Ohio Feb. 13, 2009) ......................................21, 26

*Jacobsen v. Stop & Shop Supermarket Co.*,
  No. 02 Civ. 5915, 2003 WL 21136308 (S.D.N.Y. May 15, 2003)..........................................26

*Laroque v. Domino's Pizza, LLC*,
  557 F. Supp. 2d 346 (E.D.N.Y. 2008) .....................................................................................23

*Lewis v. Wells Fargo & Co.*,
  669 F. Supp. 2d 1124 (N.D. Cal. 2009) ...................................................................................33

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Lynch v. United Servs. Auto. Ass'n*,
491 F. Supp. 2d 357 (S.D.N.Y. 2007)........................................................................26

*Morales v. Plantworks, Inc.*,
No. 05 Civ. 2349, 2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. Feb. 1, 2006) ..............23

*Morrison v. Ocean State Jobbers, Inc.*,
No. 09-cv-1285, 2010 WL 1991553 (D. Conn. May 17, 2010) ..............................26

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010)..............................................................................14, 18

*Nerland v. Caribou Coffee Co.*,
564 F. Supp. 2d 1010 (D. Minn. 2007)....................................................................25

*Pendlebury v. Starbucks Coffee Co.*,
No. 04-cv-80521, 2005 WL 84500 (S.D. Fla. Jan. 3, 2005)....................................26

*Reich v. Wyoming*,
993 F.2d 739 (10th Cir. 1993) .................................................................................30

*Saleen v. Waste Mgmt., Inc.*,
649 F. Supp. 2d 937 (D. Minn. 2009) ......................................................................19

*Shajan v. Barolo, Ltd.*,
No. 10 Civ. 1385, 2010 WL 2218095 (S.D.N.Y. June 2, 2010)...............................35

*Stillman v. Staples, Inc.*,
No. 07 Civ. 849, 2008 WL 1843998 (D.N.J. Apr. 22, 2008) ..................................26

*Wal-Mart Stores, Inc. v. Dukes*,
No. 10-277, ___ U.S. ___, 2011 U.S. LEXIS 4567 (June 20, 2011)...............1, 2, 19

*White v. Osmose, Inc.*,
204 F. Supp. 2d 1309 (M.D. Ala. 2002) ..................................................................15

### FEDERAL AND STATE REGULATIONS

29 C.F.R. 541.301(e)(5)..................................................................................................31

29 C.F.R. § 541.200 et seq................................................................................................4

29 C.F.R. § 541.201(a)....................................................................................................31

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

29 C.F.R. § 541.201(b) ...................................................................................31

29 C.F.R. § 541.300 et seq. .............................................................................4

29 C.F.R. § 541.301(b) ...................................................................................30

29 C.F.R. § 541.301(c) ...................................................................................30

29 C.F.R. § 541.301(d) ...................................................................................30

29 C.F.R. § 541.301(e)(5) ..........................................................................10, 31

29 C.F.R. § 541.703 .........................................................................................5

29 C.F.R. § 541.708 .........................................................................................4

Conn. Agencies Regs. § 20-280-24(e)(1)-(3) (2011) ...................................16

Ga. Comp. R. & Regs. 20-3-.08(2) (2010) ...................................................16

Haw. Code R. § 16-71-21(c) (2011) .............................................................16

22 Tex. Admin. Code § 511.121(a) ...............................................................16

22 Tex. Admin. Code § 511.122 ....................................................................16

Or. Admin. R. 801-010-0065(3) (2011) ........................................................16

04-030-010 Vt. Code R. § 5.9(B)-(C) (2011) ..............................................16

Wash. Admin. Code § 4-30-070(3) (2011) ....................................................16

**ADMINISTRATIVE MATERIALS**

DOL Op. Ltr., FLSA 2006-26, 2006 WL 2792440 (July 24, 2006) .............31

DOL Op. Ltr., 1998 WL 852738 (Feb. 27, 1998) .........................................31

DOL Op. Ltr., 1998 WL 852713 (Feb. 19, 1998) .........................................31

DOL Op. Ltr., 1997 WL 998018 (June 30, 1997) .........................................31

DOL Op. Ltr., WH-376, 1976 WL 41728 (Mar. 5, 1976) ............................31

Defendant KPMG LLP ("KPMG"), by and through its counsel, Sidley Austin LLP, respectfully submits this memorandum of law in opposition to Plaintiffs' Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b) of the FLSA (the "Motion").

## PRELIMINARY STATEMENT

Plaintiffs seek conditional certification of an expansive nationwide collective action of all current and former KPMG accounting professionals known as "Audit Associates."  Two very recent decisions in analogous factual and legal settings – one from the Ninth Circuit in *Campbell v. PricewaterhouseCoopers,LLP*, No. 09-16370, 2011 WL 2342740 (9th Cir. June 15, 2011), and one from the United States Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, No. 10-277, ___ U.S. ___, 2011 WL 2437013 (June 20, 2011) – illustrate the substantial impediments to this case proceeding as a representative action and underscore why, under the legal principles governing collective FLSA actions, discussed in detail further below, Plaintiffs' motion should be denied.

In *Campbell*, the Ninth Circuit recognized that evaluating the exempt status of unlicensed entry-level associates in a Big Four accounting firm's attest (*i.e.* audit) practice necessarily "will require a fact-specific inquiry into whether the unlicensed accountant meets [statutory] benchmarks . . . [because of] significant differences in skill level, responsibility, and experience" among the putative group.  *Campbell*, 2011 WL 2342740, at *6.  And just this week in *Dukes*, the Supreme Court rejected a comparable effort to stitch together factually diverse claims by holding that in order to give "cause to believe that all their claims can productively be litigated at once," plaintiffs must "demonstrate that the class members 'have suffered the same injury'" so that resolution of a "common contention" "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 2011 WL 2437013 at *7.  Thus, *Campbell* recognizes that the inquiry at the heart of this case – the exempt status of KPMG Audit

Associates – can be decided only through an individualized, fact-intensive inquiry, while *Dukes* underscores the necessity for plaintiffs seeking to litigate the claims of others to present a central issue that is truly common to each of the claims.

In their Motion, Plaintiffs have failed to meet the distinct but similar requirements of Section 216(b) because they cannot establish that they are "similarly situated" to the proposed collective of thousands of Audit Associates.  Plaintiffs' Motion should be denied for two reasons.

<u>First</u>, by alleging that they primarily performed "routine, low-level clerical and physical tasks" (Pls. Br. at 1), Plaintiffs demonstrate that their interests in prosecuting this action for pecuniary gain are antagonistic to and inconsistent with the professional interests of the majority of the proposed collective who have in the past, or intend in the future, to rely on their work experience at KPMG to support their licensure as Certified Public Accountants ("CPAs").  This unique and novel circumstance distinguishes this case from the authorities relied upon by Plaintiffs, none of which involved a comparable professional setting, and precludes any finding that they are "similarly situated" to the proposed collective.  *See* Section I.A, *infra* at 15-17.

<u>Second</u>, Plaintiffs have not made even a "modest factual showing" that they are "similarly situated" to the proposed collective.  As explained below, when a plaintiff points to a common policy that is lawful – such as a job description describing an exempt position – but nevertheless argues that he or she did not perform exempt job duties, then the plaintiff has not made the necessary showing of a common violation of law.  Here, Plaintiffs' characterizations of the menial tasks they allegedly performed at KPMG are fundamentally inconsistent with KPMG's stated descriptions and performance expectations of the Audit Associate role, as reflected in KPMG's job postings, job descriptions, and performance review documents, all of which describe exempt work.  Indeed, KPMG's facially lawful policy of classifying Audit

Associates as exempt is buttressed both by the legal, regulatory and professional standards governing the performance of the audits on which the Audit Associates worked, and the testimony of numerous current and former Audit Associates illustrating their exempt duties. Critically, Plaintiffs' contention that Audit Associates work under a common job description and receive common training simply does not establish that the character of their actual work was common across the thousands of Audit Associates in the proposed nationwide collective, and this lack of evidence sharply distinguishes this case from those in which this Court and other District Courts have granted conditional certification. *See* Section I.B.1-3, *infra* at 17-26.

In sum, the evidence shows that if Plaintiffs' Motion were granted and others were to join this lawsuit, the Court would have to conduct an individualized, fact-specific inquiry to determine whether the work each Audit Associate performed qualified them for the professional and/or the administrative exemption under the FLSA. Such an individualized inquiry is simply not appropriate for collective treatment, and, therefore, Plaintiffs' Motion should be denied.

## PROCEDURAL BACKGROUND

Plaintiffs Kyle Pippins and Jamie Schindler filed this action on January 9, 2011, challenging KPMG's treatment of its Audit Associates as exempt employees under the FLSA and seeking to represent a nationwide collective of individuals who worked for KPMG as Audit Associates at any time on or after January 9, 2008. Plaintiffs' proposed collective includes all Audit Associates nationwide regardless of whether they actually were or became licensed CPAs while working as Audit Associates. On April 25, 2011, Plaintiffs Pippins and Schindler filed an Amended Complaint, adding Edward Lambert as a Named Plaintiff and adding claims under New York law on behalf of a putative class of current and former Audit Associates in New

York.[1]  Despite asserting a claim under New York law, Plaintiffs have not sought certification of a Rule 23 New York state class nor have they sought conditional certification of a proposed FLSA collective of Audit Associates who worked in New York state.[2]

Among other defenses, KPMG contends that Plaintiffs' claims fail in their entirety because Plaintiffs worked in a bona fide professional or administrative capacity, or a combination of both exemptions.  (Answer, Dkt. #28 (Third Defense).)  *See also* 29 C.F.R. § 541.708 ("Employees who perform a combination of exempt duties as set forth in the regulations in this part ... may qualify for exemption.").  Whether Plaintiffs were exempt from the FLSA's overtime requirements turns on whether their individual "primary duties" involved "the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction," and/or, "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers, including the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.300 et seq. (professional exemption); 29 C.F.R. § 541.200 et seq. (administrative

---

[1]  Two additional plaintiffs (Samuel Bradley and Keeley Young) filed opt-in notices with the Court.  In addition to their own declarations, Plaintiffs also rely on the declaration of Mark Litchfield, a former Audit Associate who left KPMG in mid-2004.  Mr. Litchfield's declaration was previously filed in support of his motion for certification of a class of unlicensed Audit Associates in KPMG's Seattle Office, in which he argued that certification was proper under Washington state law on the ground that such unlicensed Audit Associates were legally barred from qualifying for the professional exemption.  Mr. Litchfield did not argue that certification was proper based on any alleged uniformity of job duties.

[2]  In the event that Plaintiffs argue on reply for conditional certification of an FLSA collective limited to certain Audit Associates, such as Audit Associates in New York, KPMG respectfully requests that Plaintiffs be required to file a new motion, and that KPMG be afforded a right to submit a response.

exemption).[3]  As is apparent from the foregoing regulatory guidance, whether an employee's

primary duties establish that the employee is exempt necessitates an individualized, fact-

intensive inquiry into the character of the actual work performed by that employee.

### FACTUAL BACKGROUND

I.   **KPMG's Policies Regarding The Exempt Work It Expects Its Audit Associates To Perform Are Clear And Driven By Regulatory And Professional Standards Applicable To The Practice Of Auditing**

KPMG provides audit, tax, and advisory services to public and private clients throughout

the United States.  Named Plaintiffs Pippins, Schindler, and Lambert and Opt-in Plaintiffs

Bradley and Young (collectively, "Plaintiffs") were employed by KPMG as Audit Associates.

The objective of a financial statement audit is to obtain reasonable assurance that the

financial statements are free of material misstatement, and to issue an audit report.  During such

an audit, both licensed and unlicensed Audit Associates collect and critically evaluate audit

evidence.  Governing professional standards require all members of an engagement team,

including Audit Associates, to be technically proficient and to perform all audit procedures with

due professional care, which includes the constant application of professional skepticism and

judgment.  (*See* Declaration of William H. Holder[4] ("Holder Decl.") ¶ 28-41, 53-54, 56-57, 65-

---

[3]  Also significant are the United States Department of Labor's regulations providing that tasks that might be considered non-exempt when considered in a vacuum may be considered part of exempt work for the "primary duty" analysis when those tasks are "directly and closely related" to exempt duties.  *See* 29 C.F.R. § 541.703 ("'directly and closely related' work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly").

[4]  Professor Holder is the incoming Dean of the Levanthal School of Accounting at the University of Southern California.  He has served as an accounting professor for 36 years, chaired the Board of Examiners of the American Institute of Certified Public Accountants ("AICPA"), and received the AICPA's Gold Medal for Distinguished Service, the highest award granted by the AICPA.  (Holder Decl. ¶¶ 3-4, 6, 96.)

73; *see also* Declaration of KPMG Audit Partner David Butler ("Butler Decl.") ¶¶ 15, 18, 20-21, 28-29.)

KPMG's audit practice, like that of all of the major accounting firms, is subject to a broad range of federal, state, and professional oversight, designed to assure the quality of audits. Accordingly, to meet the expectations of the profession and its regulators, KPMG has clearly articulated expectations for the Audit Associates it hires, including the expectation that its Audit Associates will arrive at the Firm armed with the advanced knowledge of accounting and auditing provided in their college and graduate level academic coursework, that they will approach their work with appropriate professional skepticism, and that they will apply judgment and due professional care in their work**.**  (Butler Decl. ¶¶ 7-11, 27-34, 36-37.)  In short, KPMG's policy is that Audit Associates are expected to perform work on audits that would qualify them as exempt under the professional and/or administrative exemptions.

A.    **KPMG's Job Postings, Job Descriptions And Performance Evaluation Documents Reflect That Audit Associates Are Expected To Perform Exempt Work**

KPMG's job postings – repeatedly cited by Plaintiffs – establish rigorous requirements and expectations for the Audit Associate position.  The job postings expressly require applicants to possess an "[a]pplied working knowledge of U.S. Generally Accepted Accounting Principles (GAAP) and accounting procedures."  (Swartz Decl. Ex. G)  The responsibilities of Audit Associates described in the postings, which can only be understood in the context of applicable professional standards, include:  (1) "Execute the day-to-day activities of audit engagements of various clients, including Securities and Exchange Commission (SEC) registrants"; (2) "Identify performance improvement opportunities"; (3) "Interact with clients to help ensure the information flow from the client to the audit team is efficient"; and (4) "Understand and utilize KPMG's audit methodology."  (*Id.*)  Nothing in the job postings remotely suggests that KPMG

expects its Audit Associates to primarily perform the "routine, low-level clerical and physical tasks" alleged by Plaintiffs.  (Pls. Br. at 1).

In addition, KPMG's Job Level Description for Audit Associates goes even further in establishing the exempt nature of the work Audit Associates are expected to perform.  (Butler Decl. Exs. A, B.)  For example, KPMG's Audit Associate Job Level Description provides that Audit Associates are "[p]rimarily responsible for preparing work papers in accordance with Firm and professional standards" and "typically expected to [w]ork closely with the client and deliver timely and quality services."  (Butler Decl. Ex. A.)  Further, in contrast to Plaintiffs' conclusory claims that their primary duties consisted of "routine, low-level clerical and physical tasks" (Pls. Br. at 1) that were "never free from the immediate direction or supervision of the more senior" personnel (Pippins Decl. ¶ 11; Schindler Decl. ¶ 11; Bradley Decl. ¶ 11; Lambert Decl. ¶11; Young Decl. ¶ 11), Audit Associates' Key Accountabilities identified in the Job Level Description include:

- "Consistent with the Firm's quality and client service standards as well as all audit and accounting standards, execute engagements and perform audit procedures effectively – demonstrate a thorough understanding of KAM [KPMG Audit Manual], financial statements and related footnote disclosures, addressing all significant financial statement balances and disclosures, properly identifying and testing key controls…."

- "Ensure appropriate professional skepticism is exercised throughout audit engagements."

- "Identify potential accounting and audit issues and appropriately document the issues and their conclusions and consult with appropriate Firm members as necessary."

- "Develop industry knowledge to complement functional skills."

- "Demonstrate basic understanding of clients' business, products, performance and accounting policies."

- "Develop and build client relationships."

(Butler Decl. Ex. A.)  Similarly, the Role Summary/Expectations of the Audit Associate position

published on KPMG's internal Human Resources website provides that an Audit Associate's

Marketable Skills include "[t]echnical ability – to recognize potential accounting issues" and

"[d]etailed understanding of auditing and accounting, and industry technical knowledge

including a proficient analysis of financial data."  (Butler Decl. Exs. C, D.)

Finally, the Audit Associate Baseline Goals (Butler Decl. Exs. F, G, H, I) and Audit

Associate Engagement Review Goals (Butler Decl. Exs. J, K) that KPMG disseminated to Audit

Associates in connection with its review process provide that Audit Associates are expected

primarily to perform technical accounting work, including to:

- "Demonstrate an understanding of KPMG's audit methodology by proactively embracing, learning and using [KPMG audit tools]; tak[e] ownership for effectively completing and documenting assigned engagement responsibilities; and exercise[e] appropriate professional skepticism (e.g., follow up when facts appear incomplete, inconclusive or contradictory)."  (Baseline Goals)

- "Work with senior associate to fulfill day-to-day audit engagement activities, which include anticipating and resolving issues, reporting status, and delivering highest quality results within time and budgetary constraints." (Baseline Goals)

- "Demonstrate[] thorough understanding of the importance of professional skepticism (e.g., through inquiries made and extent of corroborating audit evidence obtained and documented to support audit conclusions.  Exercises appropriate professional skepticism throughout all audit activities." (Engagement Review Goals)

- "Review[] accounting and auditing literature, including specialized industry and/or regulatory requirements, relevant to assigned areas of responsibility, and demonstrates an appropriate understanding of applicable professional literature." (Engagement Review Goals)

- "Demonstrate[]strong analytical skills when reviewing financial and other engagement-relevant information."  (Engagement Review Goals)

(Butler Decl. Ex. G (Baseline Goals); Ex. K (Engagement Review Goals); *see also* Butler Decl.

Exs. F, H, I, J.)  Far from supporting Plaintiffs' characterization of the primary duties of Audit

Associates as "routine, low-level clerical and physical tasks" (Pls. Br. at 1), all of the relevant job

postings, job descriptions, and performance evaluation documents depict a position that requires

the application of advanced, technical knowledge and the exercise of analytical skills, judgment, and professional skepticism.[5]

   B.   KPMG Has Rigorous Hiring Criteria To Ensure That Its Audit Associates Have Obtained Advanced Knowledge To Enable Them To Perform Their Exempt Duties And Responsibilities

Plaintiffs erroneously claim that KPMG does not require Audit Associates to have an advanced degree or to have completed an advanced course of study. (Pls. Br. at 5.) The falsity of Plaintiffs' claim is demonstrated, by, *inter alia*, the very job postings on which Plaintiffs rely.

Every single one of the job postings cited by Plaintiffs confirms that KPMG seeks to hire Audit Associates who are "CPA eligible." (Swartz Decl. Ex. G.) This means that KPMG's Audit Associates have completed a specialized course of study at a college or university that is necessary for them to become licensed as CPAs.[6] While the precise educational requirements vary from state-to-state, most states require a baccalaureate or higher degree with an accounting concentration or the equivalent, within a course of study totaling at least 150 semester hours. (Holder Decl. ¶¶ 106-07; *see* Hoffman Decl. ¶ 21 and Ex. T.) The 150-hour requirement exceeds the standard requirement for obtaining a bachelor's degree at most colleges and universities.

_____

[5] In a resume he testified was accurate, Plaintiff Pippins described his service as an Audit Associate in terms consistent with KPMG's expectations: ███████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (Pippins Dep. at 41:18-42:2; 47:19-48:2; 51:24-52:7 and Ex. 19, attached as Exhibits A, F to the Declaration of Eric G. Hoffman, Esq. ("Hoffman Decl.").)

[6] While KPMG will occasionally make an exception to its policy of requiring Audit Associates to be CPA eligible, such exceptions are limited to situations in which the recruit has satisfied nearly all of the educational requirements to be CPA eligible, and there is a specific plan in place pursuant to which the recruit will become CPA eligible in very short order. (Butler Decl. ¶ 8.)

(Holder Decl. ¶¶ 107.)[7]  Further, KPMG generally focuses its recruiting on the top accounting

programs, and typically hires Audit Associates who have at least a four-year degree in

Accounting or a related, specialized field.  In addition, approximately 40 percent of KPMG's

Audit Associates have Master's degrees in accounting, finance or business administration.

KPMG imposes these rigorous educational requirements in order to ensure that its Audit

Associates have the advanced knowledge of accounting and auditing that is necessary for them to

perform the job of an Audit Associate as expected.[8]  (Butler Decl. ¶¶ 7-13.)

### C. KPMG's Expectations For Audit Associates Are Consistent With Relevant Regulatory And Professional Standards

KPMG's hiring standards, expectations for Associates, and evaluation standards are

grounded in the obligation of accounting firms to have a system of quality control (including

hiring, assignment, and advancement policies) to promote audit quality and in order to provide

assurance that KPMG's audits are conducted in a manner that meets professional standards.  The

Public Company Accounting Oversight Board ("PCAOB"), which regulates KPMG's Audit

practice as it relates to public companies, has adopted the AICPA Auditing Standards Board's

Statements on Quality Control Standards.  Among other things, those standards require KPMG

to adopt policies and procedures providing reasonable assurance that the professionals it hires

---

[7] Each Plaintiff declares that KPMG did not require them, or anyone else, to be licensed as a CPA in order to perform the duties of an Audit Associate.  (Pippins Decl. ¶ 3; Schindler Decl. ¶ 3; Bradley Decl. ¶ 3; Lambert Decl. ¶ 3; Young Decl. ¶ 3).  This is, at best, a red herring, as licensure is indisputably not required for the exemption to attach.  *See, e.g.*, 29 C.F.R. § 541.301(e)(5).

[8] Consistent with KPMG's expectations, Plaintiffs Schindler and Lambert obtained Master's degrees in Accounting, and Plaintiffs Pippins and Young obtained Bachelor's degrees in accounting.  (Schindler Dep. at 30:3-24; 97:4-98:2 and Ex. 7 (*at* Hoffman Decl. Exs. B, H); Lambert Dep. at 124:22-125:19 and Ex. 59 (*at* Hoffman Decl. Exs. C, K); Pippins Dep. at 8:5-7 (*at* Hoffman Decl. Ex. A); Young Dep. at 60:6-61:23 (*at* Hoffman Decl. Exs. E).)  Bradley obtained a Bachelor's degree in Business Administration, with concentrations in accounting and information systems.  (Bradley Dep. at 107:8-14; 108:16-20 and Ex. 68 (*at* Hoffman Decl. Exs. D, M).)

"possess the appropriate characteristics to enable them to perform competently" (which includes academic requirements); that such professionals "participate in general and industry-specific continuing professional education that enables them to fulfill responsibilities assigned", and that audit work is "assigned to personnel having the degree of technical training and proficiency required in the circumstances".  (Holder Decl. ¶¶ 48-50, 56-57; Butler Decl. ¶¶ 7-8, 28.)

Relevant professional standards for the performance of audits require all members of an engagement team, including Audit Associates, to possess and apply advanced knowledge and to consistently exercise professional judgment in their work.  (Butler Decl. ¶¶ 21, 37.)   For example, the professional standards provide that:

- Every member of the engagement team must be technically proficient.

- Every member of the engagement team must meet the standards of independence.

- Every member of the engagement team must perform his/her work with due care, including professional skepticism.

- Every member of the engagement team must exercise professional judgment in accumulating and reviewing audit evidence, and in complying with the applicable audit documentation standards.

- Supervision is required of all accountants assisting on the audit, but it does not diminish the requirement that all members of the engagement team must use professional judgment throughout the engagement – including Audit Associates.

(Holder Decl. ¶¶ 32, 39-41, 48-57, 65-72, 74-79; *see also* Butler Decl. ¶¶ 4-5, 18-21, 23, 26, 44, 48, 56, 58.)

### D.    KPMG's Continuing Professional Education And Audit Resources Are Consistent With The Professional Role Played By Audit Associates

Plaintiffs claim that KPMG provides uniform training and guidance to all Audit Associates that purportedly instructs them how to perform step-by-step audit procedures that are identical for each audit.  (Pls. Br. at 3-4).  But the reality is that, in addition to a small number of required courses, KPMG makes available a wide variety of training courses from which its Audit

Associates may choose, and the training and guidance provided by KPMG emphasizes the need for judgment in all aspects of audit engagements.  (Declaration of KPMG Audit Partner Eileen M. Walsh ("Walsh Decl.") ¶¶ 10-15 (explaining that between January 2008 and the present, KPMG permitted Audit Associates to choose from nearly 500 continuing education courses offered at the national level and more than 1,000 courses offered in local offices).)

Moreover, the initial training that KPMG provides to Audit Associates does not consist of "step by step" instructions on the performance of rote tasks devoid of critical thinking.  KPMG's week-long in-person training course, entitled "Audit Fundamentals," introduces new Audit Associates to KPMG's audit methodology and prepares them to function as audit professionals, as the procedures they will perform will be determined by the unique circumstances of the particular engagement they work on and will require them to apply professional skepticism and judgment in their work.[9]  (Walsh Decl. ¶ 8; Holder Decl. ¶¶ 58-61.)  Furthermore, KPMG expects newly hired Audit Associates to have advanced knowledge in accounting and auditing before they arrive at the Firm.  (Walsh Decl. ¶ 7; Butler Decl. ¶¶ 7-13, 28.)

Finally, KPMG makes available audit guidance materials (*e.g.*, the KPMG Audit Manual ("KAM")) for its professionals to use in performing audit engagements.  These materials are not "cookbooks" or lists of required procedures; rather, they provide a framework within which engagement teams exercise their judgment in deciding how to perform an audit that meets professional standards.  (Butler Decl. ¶¶ 22-26; Holder Decl. ¶¶ 85-88.)

---

[9]  Of course, it defies logic to suggest that KPMG would fly every one of its Audit Associates to Orlando for a week of full day training, covering a wide range of substantive accounting, auditing, and professional responsibility topics, if their role as Associates was expected to be limited to the highly routinized, uncritical, clerical tasks Plaintiffs claim they performed.  A review of the materials for the Audit Fundamentals training course makes clear that Plaintiffs (and all Audit Associates) were expected to do much more.  (Holder Decl. ¶ 61.)

II.   KPMG's Audit Associates Apply Advanced Technical Knowledge And Exercise
      Judgment In The Course Of Performing Audit Work

 KPMG has submitted declarations from 13 current and former Audit Associates

regarding the work they performed at KPMG.  These Audit Associates confirm that, consistent

with KPMG's expectations, job descriptions, and performance evaluation documents, and the

applicable professional standards, and armed with their advanced, specialized education, they

perform complex and substantive audit work, requiring the exercise of professional care,

discretion, and judgment.  For instance, Audit Associates:



---

[10] Each of the declarations of Audit Associates submitted by KPMG can be found as an exhibit
to the Declaration of Jennifer Altfeld Landau, Esq., submitted herewith, and are cited herein by
reference solely to the last names of the declarants for brevity and distinction.



Equally important, in all their work – from interviewing client personnel to reviewing and analyzing accounting documentation – KPMG Audit Associates used professional judgment and skepticism, on the basis of what they saw as well as what they did not see, in identifying issues to be raised and discussed with client representatives and the engagement team.  (Smith ¶ 18; Catania ¶ 20; Chan ¶ 18; Kruskol ¶ 18.)

III.    Plaintiffs

Plaintiffs were employed by KPMG as Audit Associates for a period of time that ranged from approximately eight to eighteen months.  Plaintiff Young was terminated in March 2008, and the other Plaintiffs were terminated in or around April 2009.  (Butler Decl. ¶ 15 n.1.)  All of the Plaintiffs but one left the field of public accountancy following their terminations from KPMG.  (Bradley Dep. at 25:12-16; Lambert Dep. at 41:12-42:2; Schindler Dep. at 115:5-116:8; Young Dep. at 254:15-255:13 (*at* Hoffman Decl. Exs. B-E).)

<u>ARGUMENT</u>

I.    PLAINTIFFS ARE NOT "SIMILARLY SITUATED" TO OTHER AUDIT ASSOCIATES

While Plaintiffs seek "conditional certification," courts in this Circuit have made it clear that "[t]he act of 'certifying' a collective action means only that this Court has exercised its discretionary power to facilitate the sending of notice to potential class members."  *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 475 (S.D.N.Y. 2010) (internal alterations omitted) (*citing Myers v. Hertz Corp.*, 624 F.3d 537, 555 n.9 (2d Cir. 2010).  Notice should issue only if the Court makes a "preliminary determination that the employees who will be receiving the

notice are ***similarly situated*** to the plaintiff." *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 467 (S.D.N.Y. 2008) (emphasis added).

**A.    Plaintiffs Are Not "Similarly Situated" To Other Audit Associates Because Their Allegations Are Inconsistent With The Professional Interests, And Previous Sworn Statements, Of The Members Of The Proposed Collective**

While Section 216(b) contains no formal requirement that Plaintiffs demonstrate that they are adequate representatives of the proposed collective, the Court has an interest in ensuring that the potential opt-ins are adequately represented.  *See Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 263 (S.D.N.Y. 1997) (Sotomayor, J.) ("FLSA collective actions are still representative actions and, given that individuals who 'opt in' to this proceeding will most likely be represented by the named-plaintiffs' counsel, the Court has an equitable interest in ensuring that they are adequately represented."); *see also In re FedEx Ground Package Sys.*, 662 F. Supp. 2d 1069, 1081-82 (N.D. Ind. 2009) ("Although the requirements of Rule 23 generally don't apply to certification of an FLSA collective action, inadequacy of representation is nevertheless an equitable consideration at issue in determining whether to certify a putative class."); *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002) (limiting conditional certification where there was an "inherent conflict of interest between the two groups" of potential plaintiffs, one of which supervised the other) (*citing Hoffmann*).

Here, Plaintiffs' allegations conflict with the interests of many – if not most – of the members of the proposed nationwide collective.  That is because adopting Plaintiffs' characterization of their work as "routine, low-level clerical and physical tasks" (Pls. Br. at 1) would require the proposed collective members to denigrate their work experience in a manner that could undermine their current or contemplated licenses as CPAs.

Most states require CPA applicants to certify that they have obtained certain work experience before they may be licensed.  Although the particulars of the experience that must be

shown vary from state-to-state,[11] most states require one to two years of substantive public accounting experience or other accounting work that affords the CPA applicant the opportunity to demonstrate the performance of technical accounting skills and the exercise of judgment.  (*See* Hoffman Decl. ¶¶ 29-20 and Exs. R, S; Holder Decl. ¶ 124.)  Plaintiffs' contentions regarding their work experience are utterly inconsistent with the sworn representations that thousands of Audit Associates have made – and will be required to make – with respect to their performance of work at KPMG.

In Texas, for example, where Plaintiff Pippins worked, the required work experience "must be of a non-routine accounting nature which continually requires independent thought and judgment on important accounting matters."  22 Tex. Admin. Code § 511.122; *see also* 22 Tex. Admin. Code § 511.121(a) (CPA candidate must have "demonstrated high standards of professional competence, integrity, independence, and learning").[12]  Indeed, Pippins recently

---

[11] Although the CPA Examination is uniform across every state, each state has its own set of specialized education and experience requirements that individuals must meet to sit for the CPA Examination and to become certified to practice as a CPA.  (*See* Hoffman Decl. ¶¶ 19-23 and Exs. R-V) (attaching demonstrative depicting differences in laws across the country regarding experience and educational requirements for CPA licensure, and the fact that some of the laws in some of the states changed during the relevant period, as defined by Plaintiffs); Holder Decl. ¶¶ 106, 126.)  The different statutory and regulatory requirements for CPA licensure provide yet a further impediment to conditional certification of a nationwide collective.

[12] Other states similarly emphasize the substantive nature of the required qualifying work experience.  *See, e.g.,* Conn. Agencies Regs. § 20-280-24(e)(1)-(3) (2011) (same); 04-030-010 Vt. Code R. § 5.9(B)-(C) (2011) (same); Haw. Code R. § 16-71-21(c) (2011) (same); Or. Admin. R. 801-010-0065(3) (2011) (applicant must demonstrate the achievement of certain "competencies," including, *inter alia*, "[s]kills in decision making, problem solving, critical analytical thinking including the ability to evaluate and interpret sufficient relevant data in a variety of engagements and settings"); Wash. Admin. Code § 4-30-070(3) (2011) (same); Ga. Comp. R. & Regs. 20-3-.08(2) (2010) ("The qualifying experience of a candidate for certification must be meaningful"; and "must involve the application of appropriate technical and behavioral standards such as standards contained in the Code of Professional Conduct, Generally Accepted Auditing Standards (GAAS), Statements on Standards for Attestation Engagements (SSAE), Statements on Standards for Accounting and Review Services (SSARS)

testified ████████████████████████████████████████████████████

(Pippins Dep. at 56:18-57:21 (*at* Hoffman Decl. Ex. A).)  How he intends to do so in light of his

declaration in this case that his "primary duties did not involve the exercise of discretion or

independent judgment" (Pippins Decl. ¶ 20) is an open question.  But there is no question that, in

their zeal to elevate their uniquely personal grievances to the level of a nationwide collective, the

Plaintiffs would invite thousands of accountants, including thousands who have become licensed

CPAs, to opt in to this litigation and thereby adopt characterizations of their job duties that either

would undermine their ability to make a certification regarding their work at KPMG in the

future, or would effectively admit that they have submitted a false certification.  The Court

should not enable this.

> **B.    Plaintiffs Have Not Met Their Burden To Establish That They Are "Similarly Situated" To Other Audit Associates With Respect To Their Allegation That Their Primary Duties Involved Non-Exempt Work**

Even if Plaintiffs could overcome the conflicting professional issues that counsel against

collective treatment, they have not carried their evidentiary burden on this motion.  At this

preliminary stage, plaintiffs must make a "modest factual showing that they and the other

putative collective action members were victims of ***a common policy or plan that violated the***

***law***." *Cohen v. Gerson Lehrman Group*, 686 F. Supp. 2d 317, 326 (S.D.N.Y. 2010) (quoting

*Amendola*) (internal quotations omitted) (emphasis added); *see also Guillen*, 750 F. Supp. 2d at

475 (same); *Indergit v. Rite Aid Corporation*, No. 08 Civ. 9361, 2010 WL 2465488, at *3

(S.D.N.Y. June 16, 2010) (same); *Damassia v. Duane Reade Inc.*, No. 04 Civ. 8819, 2006 WL

2853971, at *3 (S.D.N.Y. Oct. 5, 2006) (same).  "This standard is met where a plaintiff has

offered substantial allegations of a ***factual nexus between named plaintiffs and potential opt-in***

---

. . . or other such standards as designated by policy statements of the Board."). (*See also* Hoffman Decl. ¶ 20 and Ex. S; Holder Decl. ¶¶ 124-130.)

**plaintiffs with regard to their employer's alleged FLSA violation**." *Indergit*, 2010 WL

2465488, at \*3 (emphasis added); *Guillen*, 750 F. Supp. 2d at 475-76 (same); *Cohen*, 686 F.

Supp. 2d at 326 (same).[13]

Where a plaintiff merely points to a common policy that is **lawful** but nevertheless argues

that his or her treatment was **unlawful** under the FLSA, then the plaintiff has not shown that he

or she is similarly situated to others subjected to the same lawful policy. *See Guillen*, 750 F.

Supp. 2d at 477-80 (denying conditional certification where plaintiff failed to show that he was

similarly situated to others employees in the same position across all 50 states where he alleged

that "he was not given job duties in conformity with" the employer's "facially lawful policies"

and submitted only five affidavits from employees who worked in nine of 820 stores

nationwide); *Eng-Hatcher v. Sprint Nextel Corp.*, No. 07 Civ. 7350, 2009 WL 7311383, at \*3

(S.D.N.Y. Nov. 13, 2009) (denying conditional certification where plaintiff did not present

sufficient evidence to support her argument that, despite employer's facially lawful

compensation policy, defendant employed a "nationwide *de facto* policy" where individual

---

[13] Despite otherwise relying heavily on *Cohen*, *Damassia*, *Indergit* and other District Court opinions that discuss the relevant legal standard set forth above, Plaintiffs have misleadingly proposed a different standard to the Court. In particular, Plaintiffs quote *dicta* from the Second Circuit's decision in *Myers* – a case involving an appeal of a Rule 23 class certification decision which explicitly held that the FLSA conditional certification issues raised by the plaintiff in *Myers* were not before it. (Pls. Br. at 8-9 (quoting *Myers*)). *See Myers*, 624 F.3d at 557 (declining to exercise pendent appellate jurisdiction over "any district court rulings in this case other than the specific July 24, 2007 class certification opinion" and noting that "our decision not to exercise pendent appellate jurisdiction over the Collective Action Order should not be taken as bearing on that order's merits one way or the other"). In fact, the touchstone elements of "a common policy or plan that violated the law," and "a factual nexus between named plaintiffs and potential opt-in plaintiffs with regard to their employer's alleged FLSA violation," that appear in virtually every case cited by Plaintiffs barely make an appearance in Plaintiffs' Brief. The Second Circuit in *Myers* did not suggest it was altering the standard for conditional certification, so this deliberate choice by Plaintiffs suggests that Plaintiffs are shying away from the usual formulation of the standard because they know their threadbare evidence cannot meet it.

managers compelled employees to work "off the clock"); *see also Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 940-41 (D. Minn. 2009); *cf. Dukes,* 2011 WL 2437013, at *7 (holding that Wal-Mart's lawful policy of giving managers complete discretion over employment decisions did not create a common issue to support class certification of thousands of individual gender discrimination claims; "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury'.").[14]  Thus, where the employer's stated expectations for the duties to be performed in a given position would ordinarily result in the application of an exemption, and the alleged misclassification arose only because the plaintiff's actual duties were inconsistent with the employer's policy, then the plaintiff, without more, has not shown that he or she is "similarly situated" to other members of the proposed collective.  *See Guillen*, 750 F. Supp. 2d at 476-77 (plaintiff "must show that he is similarly situated to the proposed plaintiffs with respect to his allegation that he spent most of his time performing non-managerial tasks").

Here, as in *Guillen*, Plaintiffs' evidence of "a common policy or plan that violated the law" or "a factual nexus between named plaintiffs and potential opt-in plaintiffs with regard to their employer's alleged FLSA violation" is "extremely thin" and does not warrant conditional certification.  *Id.*, at 475-77.  Plaintiffs chiefly rely on the following evidence to make the required showing that they are similarly situated to others:  (1) the uniformity of KPMG's job postings for Audit Associate positions; (2) the facts that all of the potential FLSA opt-in plaintiffs share the same title (Associate), work in the same line of service (Audit) at KPMG, and were classified as exempt; and (3) Plaintiffs' five declarations that contain virtually identical and conclusory testimony that "they all performed essentially the same job duties and were subject to

---

[14] While Plaintiffs will undoubtedly seek to distinguish *Dukes* because it was a Rule 23 case, the fact that *Dukes* dispatched the putative class on the "commonality" prong of Rule 23 makes its analysis particularly relevant here since Plaintiffs' burden on their Motion is to show a **common violation** of the FLSA.

the same compensation policies as Audit Associates at KPMG." (Pls. Br. at 10.) As explained

below, this evidence is insufficient to constitute even a "modest factual showing that [Plaintiffs]

and the other putative collective action members were victims of a common policy or plan that

violated the law." *Cohen*, 686 F. Supp. 2d at 326.

### 1.      KPMG's Audit Associate Job Description Is Facially Lawful

As in *Guillen*, Plaintiffs' conclusory characterizations of the work they performed, even

if accepted at face value, are flatly inconsistent with KPMG's description of the position. As

explained above, KPMG's job postings (cited by Plaintiffs), job descriptions, and performance

evaluation documents all require the performance of analytically challenging, substantive job

duties that would satisfy the requirements of the professional or administrative exemption.

Indeed, while Plaintiffs cite the various job postings as evidence of a lack of geographic

variation in the job description of an Audit Associate, they make no serious attempt to argue that

the job postings, descriptions, and performance evaluation documents depict or describe the

performance of non-exempt duties. (*See* Pls. Br. at 5, 6, 10, 12, 16.) Nor could they; those

documents only reflect KPMG's expectations that Audit Associates primarily perform audit

work of a nature that would qualify for exemption. (*See supra* at 6-9.) Accordingly, Plaintiffs'

bald contention that they performed "routine, low-level clerical and physical tasks" (Pls. Br. at 1)

is simply inconsistent with KPMG's facially lawful job descriptions and job postings.

### 2.      KPMG's Mere Classification Of Audit Associates As Exempt Is Not Sufficient To Carry Plaintiffs' Burden Of Showing A Common Violation Of Law

Contrary to Plaintiffs' intentionally oversimplified argument, the mere fact that KPMG

classifies all Audit Associates as exempt does not make Plaintiffs similarly situated to all Audit

Associates "with respect to their allegations that the law has been violated." *Guillen*, 750 F.

Supp. 2d at 475; *see also Hallissey v. Am. Online, Inc.*, No. 99-Civ-3785, 2008 WL 465112, at

*2 (S.D.N.Y. Feb. 19, 2008) (same).  If all that Plaintiffs were required to show was that all Audit Associates held the same position and all were classified as exempt, then the "modest factual showing" of *a common violation of law* would be superfluous.  *See Guillen*, 750 F. Supp. 2d at 476 (holding that because defendant's job description was "facially lawful," it was "not sufficient for Guillen to show that he and the proposed class of ASMs operated under the same job description").[15]

Indeed, the decisions from this District cited by Plaintiffs (*see* Pls. Br. at 11-12) do not support this illogical proposition.  *See Indergit*, 2010 WL 2465488, at *5 (finding that plaintiff satisfied his burden, not through mere exempt classification, but by demonstrating through "affidavits and Rite Aid's internal corporate documents" that "he and other Rite Aid store managers ... have been subjected to an allegedly unlawful nationwide corporate policy of shifting the work of non-exempt workers to store managers"); *Damassia*, 2006 WL 2853971, at *5 n.9 (finding that plaintiff satisfied burden based on admission by defendant's representative that the actual work performed by managers was essentially the same at all stores); *see also Hallissey*, 2008 WL 465112, at *2 (case involved "volunteers" rather than employees; no exemption was at issue).[16]  If anything, Plaintiffs' argument in favor of eliminating the need for any real proof of a

---

[15] For the same reasons, KPMG's prior statements that Audit Associates "share the same title" and "work in the same audit function" have no bearing on whether the job duties of Plaintiffs or other Audit Associates were similar.  (*See* Pls. Br. at 13.)

[16] To the extent that the case of *Holbrook v. Smith & Hawken, Ltd.*, 246 F.R.D. 103, 106 (D. Conn. 2007), can be read to have decided that an employer's decision to classify workers across a job title as exempt is enough to warrant conditional certification, then that case was wrongly decided, and the sparse and conclusory analysis in *Holbrook* is neither controlling nor persuasive here.  Indeed, another case cited by Plaintiffs, *Jackson v. Papa John's USA, Inc.*, No. 08 Civ. 2791, 2009 WL 385580 (N.D. Ohio Feb. 13, 2009), thoughtfully rejected the same argument, holding that a plaintiff must show more than simply a common job title and a common exempt classification and "must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class."  *See Jackson*, 2009 WL 385580, at *5.

common violation of law underscores the fundamental lack of evidence to suggest that they are similarly situated to others "with respect to their allegations that the law has been violated." *Guillen*, 750 F. Supp. 2d at 475; *see also Hallissey*, 2008 WL 465112, at *2 (same).

   3.   Plaintiffs Have Not Met Their Burden Of Showing That Other Audit Associates Primarily Performed Non-Exempt Duties Consistent With Their Own Allegations Of Such Duties

Plaintiffs' boilerplate declarations stating that their job duties were limited to "routine, low-level clerical and physical tasks," such as photocopying documents and entering data into Excel spreadsheets, are insufficient to establish that they are similarly situated to other Audit Associates working under KPMG's lawful, exempt job description.  (Pls. Br. at 1, 6.)  While there is substantial reason not to credit this testimony,[17] even if Plaintiffs' contentions are accepted for purposes of this Motion, Plaintiffs still have not shown that they are "similarly

---

[17] *See, e.g.,*



situated" to the nationwide collective they seek to represent.  Plaintiffs' description of their work

demonstrates that they did *not* perform the duties that KPMG expects its Audit Associates to

perform (according to KPMG's descriptions of the position and the requirements of the

profession) – and the work that other Audit Associates do, in fact, perform.  (*See supra* at 13-14;

*infra* at 26-29.)

Critically, Plaintiffs' conclusory declarations do not make out the required showing that

their work experience at KPMG was typical of all Audit Associates.  While Plaintiffs ***argue*** that

"Audit Associates' primary duties do not vary from office to office," (Pls. Br. at 6), the only

***evidence*** they offer is the repetitive conclusory statement that:  "Based on my observations of

other Audit Associates, I believe that all Audit Associates performed the same or very similar

primary duties."  (Pippins Decl. ¶ 24; Schindler Decl. ¶ 24; Bradley Decl. ¶ 24; Lambert Decl.

¶ 24; Young Decl. ¶ 24.)  Because this conclusory statement lacks any foundation or supporting

details that would give it any substance, it deserves very little weight.  *See Guillen*, 750 F. Supp.

2d at 477 n.2 (noting that hearsay statements that other employees "performed 'substantially

similar' work tasks" were likely not admissible, but considering them "inasmuch as our

consideration of them does not affect the motion's outcome," and collecting cases holding that

such statements are not admissible for purposes of approving a suit as a collective action).[18]

In fact, Plaintiffs were located in only 5 of KPMG's 87 offices, and Plaintiffs have

admitted that █████████████████████████████████████████████████████

---

[18] *See also Eng-Hatcher*, 2009 WL 7311383, at *3 n.5 (S.D.N.Y. Nov. 13, 2009) (discounting "general statements" offered to support claim that other employees are similarly situated to plaintiff); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 355-56 (E.D.N.Y. 2008) (holding that plaintiffs' offer of hearsay and generalized statements did not justify broad collective action); *Morales v. Plantworks, Inc.*, No. 05 Civ. 2349, 2006 WL 278154, at *3 (S.D.N.Y. Feb. 1, 2006) (holding that conclusory allegations "offered nothing of evidentiary value," and were insufficient to show others were similarly situated).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ (Schindler Dep. at 277:18-278:1, 279:24-280:17, 304:5-15 (*at*

Hoffman Decl. Ex. B); Pippins Dep. at 85:3-86:11, 277:20-278:10 (*at* Hoffman Decl. Ex. A);

Young Dep. at 89:5-91:10, 108:18-110:6, 168:3-6, 259:21-261:25 (*at* Hoffman Decl. Exs. E);

Bradley Dep. at 78:7-81:11 (*at* Hoffman Decl. Exs. D).)[19]

Because KPMG's description of the Audit Associate position describes exempt work, and

Plaintiffs' allegations, at most, merely suggest that they did not perform work in accordance with

that exempt job description, their inability to establish a factual nexus with the thousands of other

Audit Associates is fatal to their motion for conditional certification. *See Guillen*, 750 F. Supp.

2d at 477 ("the fact that ASMs were responsible for performing non-exempt tasks in

contravention of their written job requirements in nine stores in a particular metropolitan area,

out of 820 stores nationwide, provides little basis to believe that Guillen is similarly situated to

ASMs throughout the country with respect to his claim regarding ASM job responsibilities.");

*see also Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004) ("Evidence before

the court of the formal, written job descriptions of Store Managers and Assistant Store Managers

contains many managerial tasks.  It is only once the Plaintiffs testify as to the degree to which

---

[19] Plaintiff Lambert repeatedly speculated in his deposition that ███████████████████
██████████████████████████ (Lambert Dep. 273:21-280:16 (*at* Hoffman Decl.
Ex. C).)  As explained above, *supra* at 11-12, KPMG makes a wide variety of training courses
available to its Audit Associates (Walsh Decl. ¶¶ 11-15 and Ex. F), and the few courses that
were taken by all Audit Associates do not suggest that Audit Associates are primarily
performing routinized, non-exempt work. *See* Guillen, 750 F. Supp. 2d at 477 (rejecting
plaintiff's argument that "standardized operational practices," including a "standardized
management training program," suggested the plaintiff was similarly situated to others because
it did not speak to "the claim that Marshalls' ASMs are required to perform non-exempt tasks
for a majority of their workweek").

other tasks are performed that the application of the exemption becomes questionable.").

As in *Guillen*, Plaintiffs' fundamental lack of evidence of any factual nexus with the claims of the thousands of other employees in the proposed collective sharply distinguishes this matter from the precedents upon which Plaintiffs rely. To begin, the *Guillen* court explicitly distinguished *Damassia, Indergit, Nerland* and many of the other decisions cited by Plaintiffs, because the "similarly situated" showing in those cases was premised on significant non-exempt job duties within uniform job descriptions or admissions by the defendant that the work being performed was common across the proposed collective – evidence that was absent in *Guillen* and is absent here. *Guillen*, 750 F. Supp. 2d at 476-77, 479 n.4; *see also Indergit*, 2010 WL 2465488, at *5 (finding that plaintiff satisfied his burden, not through mere exempt classification, but by "demonstrating that he and other Rite Aid store managers . . . have been subjected to an allegedly unlawful nationwide corporate policy of shifting the work of non-exempt workers to store managers, and then denying these managers overtime compensation"); *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1019 (D. Minn. 2007) (relying on job description setting forth non-exempt duties and explicitly distinguishing situations where job descriptions describe an exempt position); *Damassia*, 2006 WL 2853971, at *5 (relying on admissions by defendant that the work of managers was essentially the same at all stores).

Indeed, all of the authorities cited by Plaintiffs are easily distinguished based on the evidence present in those cases as compared to the total lack of evidence here. Thus, Plaintiffs' citation to those cases merely highlights the fact that they have not made the required "modest factual showing." In many of the decisions upon which Plaintiffs rely, the courts found that conditional certification was appropriately based on common evidence of non-exempt job duties, such as job descriptions or work rules that, rather than describing a facially lawful exempt

position, described non-exempt duties.[20]  Moreover, in the other cases cited by Plaintiffs, the

courts found that plaintiffs satisfied their burden through admissions by the defendant regarding

the similarity of job duties in the proposed collective.[21]  No such evidence exists here.

> **4.      The Evidence Shows That Plaintiffs Are Not Similarly Situated To Other Potential FLSA Opt-Ins With Respect To Their Actual Job Duties**

Plaintiffs' characterizations of their work are inconsistent with declarations of numerous

current and former Audit Associates at KPMG, each of whom describes the nature of his or her

job duties in a manner that is consistent with the requirements of the profession and the

expectations of KPMG, as reflected in job postings, job descriptions, and performance evaluation

documents.  This evidence reinforces the conclusion that Plaintiffs are not challenging a common

---

[20] *See Fiore v. Goodyear Tire & Rubber Co.,* No. 09-cv-843, 2011 WL 867043, at *3 (M.D. Fla. March 10, 2011) (employer's job description was inconsistent with classification of position as exempt); *Cruz v. Hook-Superx, LLC,* No. 09 Civ. 7717, 2010 WL 3069558, at *2 (S.D.N.Y. Aug. 5, 2010) (employer assigned employees clerical, non-exempt job duties, including shelving, loading trucks and working at the cash register); *Morrison v. Ocean State Jobbers, Inc.*, No. 09-cv-1285, 2010 WL 1991553, at *3 (D. Conn. May 17, 2010) (job description supported employees spending 80 percent of their time performing manual labor); *Jackson*, 2009 WL 385580, at *5 (job description of pizza store assistant manager in national training materials supported conditional certification); *Pendlebury v. Starbucks Coffee Co.*, No. 04-cv-80521, 2005 WL 84500, at *2 (S.D. Fla. Jan. 3, 2005) (Starbucks' description of the store manager position supported claim that the position was non-exempt); *Jacobsen v. Stop & Shop Supermarket Co.*, No. 02 Civ. 5915, 2003 WL 21136308, at *2 (S.D.N.Y. May 15, 2003) ("Stop & Shop records can be read to indicate that no more than 15% of a manager's time is allocated to managerial tasks such as the supervision of others").

[21] *See Francis v. A & E Stores, Inc.*, No. 06 Civ. 1638, 2008 WL 4619858, at *3 n.1 (S.D.N.Y. Oct. 16, 2008) (defendants' deposition that all ASMs performed the same duties supported collective certification); *Stillman v. Staples, Inc.*, No. 07 Civ. 849, 2008 WL 1843998, at *4 (D.N.J. Apr. 22, 2008) (defendant admitted that all Assistant Store Managers "had the same duties and responsibilities throughout the company"); *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 359-61, 370 (S.D.N.Y. 2007) (finding that uniform policies applicable to investigators' job duties and admissions by defendant's witnesses established that the alleged misclassification did not vary across the collective); *see also Creten-Miller v. Westlake Hardware, Inc.*, No. 08 Civ. 2351, 2009 WL 2058734, at *1 (D. Kan. July 15, 2009) (defendant "concede[d] that plaintiff has satisfied her light burden of alleging that the putative class members were together the victims of a single decision, policy or plan").

policy of KPMG that violates the law but, rather, claiming that their own unique set of circumstances violated the FLSA.

Further, and consistent with professional standards that provide that each audit must be planned and performed in accordance with the unique circumstances thereto and the exercise of judgment and professional skepticism, there are a number of important variables that contribute to the differences in work performed by KPMG's Audit Associates. Those variables include: the size of the client; the industry of the client; the complexity of the financial statements; the location of the office; the size of the engagement team; the management style of the Senior, Manager and Partner; the nature of the client (*e.g.*, whether or not it has overseas operations, subsidiaries, etc.); the relative knowledge and talent of the Associate; the specific audit area; and any particular accounting issues arising during the audit that may require the application of new or developing accounting literature. (Butler Decl. ¶¶ 38-58.).

The variability of job duties is further illustrated by the 13 declarations of current and former Audit Associates submitted by KPMG. Those declarations show that the work performed by KPMG's Audit Associates varies significantly from assignment-to-assignment, and from Associate-to-Associate, with the only common denominator being the exempt nature of the work. For example,

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████ These are just a

few examples.  Viewed in their entirety, these declarations demonstrate that there is significant

variation in the work performed by KPMG's Audit Associates throughout the country.  *See, e.g.,*

*Campbell*, 2011 WL 2342740, at *6 (recognizing the "significant differences in skill level,

responsibility, and experience between [PwC's Audit] associates and senior associates" and the

"potential for substantial variance" as to whether unlicensed accountants may qualify for the

professional exemption under California law).

Nor would sub-classing based on geographic lines ameliorate the problem, because the

declarations also confirm that even the work performed by Audit Associates within a single state

vary considerably.  For example, the declarations demonstrate that two Audit Associates in

Texas had very different job duties and experiences.  ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

██████ A review of Miller's and Totah's declarations illustrates that their assignments, job

duties, and work performed were very different.

The same is true with respect to three Associates in New York. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████ Again, a review of Catania's, Vick's, and Wake's declarations demonstrates

that their job duties and work experiences were quite varied and distinct from each other, and

from that of Plaintiff Lambert, who also worked in New York and claims that his "primary duties

consisted of conducting basic reviews of client documents and financial records, conducting

inventory counts, photocopying client documents and records, and entering data into Excel

spreadsheets," which he described as "routine physical and clerical tasks" that "did not involve

the exercise of discretion or independent judgment." (Lambert Decl. ¶¶ 13, 20).

5.    **Plaintiffs' Manufactured Disputes Related To KPMG's Exemption Defenses Provide No Support To Their Contention That They Are "Similarly Situated" To Others**

Having failed to show that their job duties make them similarly situated to other Audit Associates, Plaintiffs argue that other issues related to the application of the professional exemption and the administrative exemption "turn[] on common issues that are not individual to each employee."  (Pls. Br. at 12.)   These arguments misconstrue the FLSA.

First, Plaintiffs correctly observe that, pursuant to 29 C.F.R. § 541.301(d), "the professional exemption is restricted to 'professions where specialized academic training is a standard prerequisite for entrance into the profession.'"  (*Id.*)   They also contend, however, that KPMG does not require Audit Associates to have an "advanced degree" (*Id.* at 6) and suggest that, as a result, conditional certification is proper.  (*Id.* at 12.)   Contrary to Plaintiffs' claim, however, the requirement of advanced knowledge is satisfied on the undisputed facts of this case. Under the FLSA, the advanced knowledge requirement is satisfied through a bachelor's degree in a specialized course of study.  29 C.F.R. § 541.301(d); *see* 29 C.F.R. § 541.301(b) ("Advanced knowledge cannot be attained at the high school level."); 29 C.F.R. § 541.301(c) (specifically providing that accounting is a learned profession because its members have acquired knowledge of an advanced type); *see also Dybach v. Florida Dep't of Corrections*, 942 F.2d 1562, 1565 (11th Cir. 1991) (to be an exempt professional, "the duties of th[e] position must call for a person who is in a learned profession with at least a college degree in a specialized type of learning"); *Reich v. Wyoming*, 993 F.2d 739, 741 (10th Cir. 1993) ("a baccalaureate degree in wildlife management, wildlife biology, or a closely related field" constituted an "advanced specialized degree"); *Bolduc v. Nat'l Semiconductor Corp.*, 35 F. Supp. 2d 106, 114 (D. Me. 1998) ("The core requirement of the learned professional exemption is that the duties of the position call for a person who is in a 'learned profession' with at least a college

30

degree in a specialized type of learning.").[22]   As noted above, KPMG hires Audit Associates who

are CPA-eligible, which requires substantial college and/or graduate-level academic study in a

specialized field, and approximately 40% of KPMG's Audit Associates actually have Master's

degrees.  (Butler Decl. ¶¶ 7-11.)  Each of these degrees plainly qualifies as the specialized course

of intellectual instruction necessary to qualify for the professional exemption.  As a result,

whether or not a given Audit Associate is within the professional exemption – and, therefore,

whether a given plaintiff can succeed on his or her claim at all – will turn on the actual job duties

performed by that individual, not on this purported common issue that Plaintiffs have

manufactured.  *See* 29 C.F.R. 541.301(e)(5) (noting that CPAs are generally exempt and whether

other accountants are exempt turns on their actual job duties).

Second, Plaintiffs argue that the "production/administrative dichotomy" discussed in

*Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531-32 (2d Cir. 2009), presents a common

issue for all Audit Associates because they "performed the same 'job function'..."  (Pls. Br. at

12.)  This argument, too, misses the point.  The accounting services provided by KPMG's Audit

Associates may qualify for the administrative exemption as "the performance of work directly

related to the management or general business operations of the employer or ***the employer's***

***customers***."  29 C.F.R. § 541.201(a) (emphasis added); *see also* 29 C.F.R. § 541.201(b) (listing,

*inter alia*, "accounting" and "auditing" as examples of "[w]ork directly related to management or

---

[22] *Accord* DOL Op. Ltr., 1998 WL 852738 (Feb. 27, 1998) ("A 'prolonged course [of] study' has
generally been held to include only those employees who have acquired at least a baccalaureate
degree or its equivalent which includes an intellectual discipline in a particular course of study
as opposed to a general academic course otherwise required for a baccalaureate degree.");
DOL Op. Ltr., FLSA 2006-26, 2006 WL 2792440 (July 24, 2006) (no exemption where "four
years of specialized post-secondary school instruction is not a standard prerequisite for entry
into the field"); DOL Op. Ltr., 1998 WL 852713 (Feb. 19, 1998) (requiring "a baccalaureate
degree or its equivalent"); DOL Op. Ltr., 1997 WL 998018 (June 30, 1997); DOL Op. Ltr.,
WH-376, 1976 WL 41728 (Mar. 5, 1976).

general business operations"). *Davis* simply has no application here. That case involved mortgage loan underwriters, and the employer's customers were ***individuals*** seeking mortgages, not businesses. Thus, there could have been no argument in *Davis* that the mortgage underwriters were performing work "directly related to the management or general business operations of . . . the employer's customers." On the contrary, *Davis* decided that the underwriting work at issue was not related to the ***employer's*** "management or general business operations," and instead constituted production work. *Davis*, 587 F.3d at 535. *See also Campbell*, 2011 WL 2342740, at *11 (whether PwC's audit associates qualify for the administrative exemption is an "intensely factual" question precluding resolution on summary judgment).

In sum, neither of these two "issues" supports Plaintiffs' attempt to show that they are "similarly situated with respect to their allegations that the law has been violated." *Hallissey*, 2008 WL 465112, at *2.

## II.   PLAINTIFFS' PROPOSED NOTICE IS DEFECTIVE

As set forth above, Plaintiffs' Motion for Conditional Certification should be denied, and no notice should issue to the proposed nationwide collective. However, in the event the Court decides to permit notice to any other Audit Associates, any such notice should not take the form of Plaintiffs' Proposed Notice. Further, any notice should be disseminated by a third-party notice administrator rather than by Plaintiffs' counsel. Finally, Plaintiffs' request for the posting of notice at KPMG office locations is unwarranted.

### A.   Plaintiffs' Proposed Notice Is Objectionable

Plaintiffs' Motion contains virtually no discussion of the content of their proposed notice or their unexplained request for personal data (such as phone numbers and Social Security Numbers) of the proposed collective, simply concluding, without explanation, that the "Proposed

Notice is 'timely, accurate, and informative." (Pls. Br. at 18.) Because Plaintiffs have not

explained any relevant features of their Proposed Notice, KPMG respectfully submits that the

Proposed Notice should be rejected and that the parties should be ordered to meet-and-confer

concerning the content of any notice the Court may order.[23] *See, e.g., Cohen*, 686 F. Supp. 2d at

331-32 (directing parties "to confer and to make a good-faith effort to agree to the text of the

proposed notice to opt-ins").

    **B.    Plaintiffs' Request For Private Data Concerning Potential Opt-Ins Is
Unexplained And Unwarranted; Any Notice Should Be Disseminated By A
Third-Party Administrator**

    The United States Supreme Court held in *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S.

165 (1989), that District Courts have a substantial interest in managing communications to

potential plaintiffs because of "the potential for misuse of the class device, as by misleading

communications . . ." *Hoffman-La Roche,* 493 U.S. at 170-71. Accordingly, courts have

recognized the value of using third-party administrators, rather than plaintiffs' counsel, to

provide notice to potential class members. *See, e.g., J.S. v. Attica Cent. Schools*, No. 00-CV-

513S, 2006 WL 581187, at *7 (W.D.N.Y. Mar. 7, 2006) (ordering use of impartial third party to

mail notice to potential class members); *Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124,

1129-30 (N.D. Cal. 2009) (same). The use of third-party administrators protects the privacy of

---

[23] Contrary to Plaintiffs' unsupported assertion that their Proposed Notice is "accurate" and "informative," it contains numerous defects. Chief among the problems presented by the Proposed Notice is that it does not adequately inform potential plaintiffs that opting in to the litigation may affect their current or contemplated accounting license(s). *See supra* at 15-17. The Notice also misleadingly suggests that the individuals receiving notice must act because this "collective action lawsuit may affect your legal rights." While this statement might be appropriate in a class action context, it is misplaced here. Also troubling is Paragraph 15, which inappropriately advises potential opt-in plaintiffs not to seek other counsel. These and other issues, coupled with Plaintiffs' failure to address the content of the Proposed Notice in their Motion, strongly counsel in favor of rejecting the Notice and ordering the parties to meet-and-confer in the event that the Court determines that any notice should be issued.

the potential opt-ins, but fully ensures that adequate notice, if appropriate, is provided.  Plaintiffs

would not be prejudiced by the use of a neutral third-party administrator, and, indeed, their

Motion is devoid of any discussion of the issue.  Therefore, KPMG respectfully submits that, in

the event that any notice is ordered, the parties should also be ordered to meet-and-confer

regarding a third-party administrator to handle any required notice.

Additionally, Plaintiffs have not provided any argument, much less authority, to support

their expansive request for personal data such as telephone numbers and Social Security numbers

of the potential opt-in Plaintiffs.  Such information is completely unnecessary for sending out

notice and could only be used to further solicit others to join this lawsuit, ██████████████

██████████████████████████ (*see* Pippins Dep. at 43:7-47:7; Schindler Dep. at

304:20-306:23; Lambert Dep. at 261:6-16, 262:16-263:4; Bradley Dep. at 8:14-21; Young Dep.

at 6:24-9:20 (*at* Hoffman Decl. Exs. B-E)), █████████████████████

███████  *See, e.g., Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 324 (S.D.N.Y.

2007) (holding that defendant should not provide private information such as Social Security

numbers, telephone numbers, work location and dates of employment for notification purposes);

*see also Hinterberger v. Catholic Health Sys.*, No. 08-CV- 380S, 2009 WL 3464134, at *11

(W.D.N.Y. Oct. 21, 2009) ("The Court agrees that, in the interest of privacy, CHS need not

produce phone numbers, social security numbers, dates of birth, and e-mail addresses.").[24]

C.    Plaintiffs' Request For Postings At KPMG Job Locations Is Unexplained
       And Unwarranted

Plaintiffs also request an order requiring KPMG to post the Proposed Notice "at all

locations where Collective Members work."  (Pls. Br. at 18-19.)  Again, Plaintiffs make this

---

[24] The Shavitz law firm has previously been sanctioned for improper telephonic solicitation
efforts.  *See Hamm v. TBC Corp.*, 345 Fed. Appx. 406 (11th Cir. 2009).

34

request without any discussion, much less any authority.  Posted notice, however, is inappropriate because it is both overbroad in that it would reach individuals who are not potential opt-ins, and under-inclusive in that it would not reach former employees.  For this reason, courts have held that first-class mailing of notice to opt-ins is the preferred method and that posted notice is ordinarily unnecessary. *See, e.g., Shajan v. Barolo, Ltd.*, No. 10 Civ. 1385, 2010 WL 2218095, at *2 (S.D.N.Y. June 2, 2010) ("Since all current employees will be receiving the notice [via mail], there is no need to require defendants to post the notice in the workplace."); *Hinterberger*, 2009 WL 3464134, at *12-13 (same).

## CONCLUSION

For the foregoing reasons, KPMG respectfully requests that the Court deny Plaintiffs' Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b) of the FLSA, together with such other and further relief as the Court may deem just and proper.


Dated:  New York, New York
        June 24, 2011

                            SIDLEY AUSTIN LLP


                            By:_____/s/  Andrew W. Stern_____
                                Andrew W. Stern
                                Eric G. Hoffman
                                787 Seventh Avenue
                                New York, New York 10019
                                Tel.:  (212) 839-5300
                                Fax:  (212) 839-5599
                                Email:  astern@sidley.com
                                Email:  eghoffman@sidley.com

                                Michael C. Kelley (*pro hac vice*)
                                Jennifer Altfeld Landau  (*pro hac vice*)
                                555 West Fifth Street, Suite 4000
                                Los Angeles, California 90013
                                Tel: (213) 896-6000
                                Fax: (213) 896-6600

Email:  mkelley@sidley.com
Email:  jlandau@sidley.com

Steven T. Catlett  (*pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
Email:  scatlett@sidley.com

*Attorneys for Defendant KPMG LLP*