**OUTTEN & GOLDEN LLP**
Justin M. Swartz
Rachel Bien
Elizabeth Wagoner
Dana Sussman
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000

**SHAVITZ LAW GROUP, P.A.**
Gregg Shavitz (admitted *pro hac vice*)
Keith Stern (admitted *pro hac vice*)
Susan H. Stern (admitted *pro hac vice*)
1515 S. Federal Highway, Suite 404
Boca Raton, Florida 33432
Telephone: (456) 447-8888

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

KYLE PIPPINS, JAMIE SCHINDLER, and
EDWARD LAMBERT, individually and on
behalf of all others similarly situated,

               Plaintiffs,

    v.

KPMG LLP,

               Defendant.

**No. 11 Civ. 0377 (CM)(JLC)**

## PLAINTIFFS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................... 1

PROCEDURAL HISTORY.................................................................................... 2

STATEMENT OF FACTS ..................................................................................... 2

I.   Independent Financial Statement Audits and the Auditor's Report Are the
     "Deliverables" that KPMG's Audit Function Provides to its Clients. ......................... 2

II.  Associates Are Entry-Level Employees ...................................................... 3

III. Audit Associates Are at the Bottom of the Engagement Team Hierarchy ................. 4

     A.   Partners Are in Charge of the Entire Audit............................................ 4

     B.   The Roles of the Engagement Team Members................................................ 5

          1.   Planning the Audit ...................................................... 5

          2.   Conducting the Audit ....................................................... 6

               a.  The Role of Engagement Partners .................................... 6

               b.  The Role of Senior Managers and Managers.............................. 6

               c.  The Role of Senior Associates ...................................... 7

                    i.   The "in charge" is usually a Senior Associate ............... 8

                    ii.  Audit Associates are rarely in-charges ......................... 8

               d.  The Role of Audit Associates ...................................... 8

               e.  The Role of First-Year Audit Associates...................................... 10

          3.   Completing the Audit........................................................ 12

IV.     KPMG Sets Goals for Engagement Team Members ................................................. 12

V.      The Exercise of Professional Judgment, Professional Skepticism, and Due
        Professional Care ................................................................................................ 13

VI.     The First Year Is Primarily a Learning Year ............................................................. 15

        A.      KPMG's Formal Training Programs ................................................................ 15

        B.      On the Job Training ................................................................................. 16

VII.    KPMG Requires a Very Limited Accounting Background....................................... 17

        A.      KPMG's Hiring Criteria Do Not Require a Prolonged Course of Study
                in Accounting........................................................................................... 17

        B.      KPMG Encourages Audit Associates to Study for the CPA Exam Only
                as a Matter of Convenience.......................................................................... 19

VIII.   Audit Associate Is Traditionally an Overtime Eligible Position ................................ 19

IX.     KPMG Arrogantly Ignored the Overtime Laws ....................................................... 20

ARGUMENT ................................................................................................................... 22

I.      The FLSA Is a Remedial Statute that is Construed in Favor of Employees............... 22

II.     KPMG Cannot Prove the Elements of the Professional Exemption With
        Respect to First-Year Associates ................................................................................ 23

        A.      KPMG Cannot Prove that First-Year Associates' Primary Duty
                Requires "Advanced Knowledge" .................................................................. 24

                1.      The Knowledge that First-Year Associates Require Is Basic, Not
                        Advanced ........................................................................................ 24

                2.      First-Year Associates Do Not Perform Predominantly
                        Intellectual Work or Consistently Exercise Discretion and
                        Judgment ........................................................................................ 25

        B.      Prolonged Specialized Intellectual Instruction Is Not Required to
                Perform First-Year Associates' Primary Duty .............................................. 29

        1.      First-Year Associates Learn their Primary Duty On the Job ............. 29

        2.      The Coursework that KPMG Requires Is Not "Specialized" ............. 30

    C.      Audit Associates Do Not Perform Work Similar to that of KPMG's
            Licensed CPAs ............................................................................................. 31

III.   KPMG Cannot Prove that Associates' Primary Duty Is Directly Related to
       Management or General Business Operations of KPMG or Its Customers with
       Respect to Any Associates .......................................................................................... 32

    A.      Associates Are Production Workers Whose Primary Duty Is Not
            Directly Related to Management or General Business Operations .......... 32

    B.      Associates Are Directly Involved in Producing Financial Statement
            Audits and Audit Opinions ...................................................................... 33

    C.      KPMG Evaluates Associates Based on Their Productivity ..................... 33

    D.      Associates Do Not Determine Strategy or Direction of KPMG's
            Business or Its Clients Business .............................................................. 33

IV.    KPMG Cannot Prove Its Good Faith Defense to Liquidated Damages................ 34

CONCLUSION .................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Birkemose-Hansen v. Zwanenberg Food Group (USA), Inc.*,
   No. 09 Civ. 203, 2010 WL 2854128 (S.D. Ohio July 19, 2010) ............................................25

*Bollinger v. Residential Capital, LLC*,
   No. 10 Civ. 1123, 2012 WL 1945033 (W.D. Wa. May 30, 2012) .........................................33

*Brady v. Deloitte & Touche LLP*,
   No. 08 Civ. 00177 (N.D. Cal.) ................................................................................................21

*Brock v. National Health Corp.*,
   667 F. Supp. 557 (M.D. Tenn. 1987) ......................................................................................27

*Campbell v. PriceWaterhouse Coopers, LLP*,
   No. S-06 Civ. 2376 (E.D. Cal.) ...............................................................................................21

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................................................22

*Copantitla v. Fiskardo Estiatorio, Inc.*,
   788 F. Supp. 2d 253 (S.D.N.Y. 2011) .....................................................................................34

*Cotten v. HFS-USA, Inc.*,
   620 F. Supp. 2d 1342 (M.D. Fla. 2009) ..................................................................................28

*Davis v. J.P. Morgan Chase & Co.*,
   587 F.3d 529 (2d Cir. 2009) .........................................................................................22, 32, 34

*De Jesus-Rentas v. Baxter Pharmacy Servs. Corp.*,
   400 F.3d 72 (1st Cir. 2005) ......................................................................................................25

*Hashop v. Rockwell Space Operations Co.*,
   867 F. Supp. 1287 (S.D. Tex. 1994) ........................................................................................28

*Hendricks v. J.P. Morgan Chase Bank, N.A.*,
   677 F. Supp. 2d 544 (D. Conn. 2009) ...............................................................................23, 27

*Herman v. RSR Sec. Servs. Ltd.*,
   172 F.3d 132 (2d Cir. 1999) ....................................................................................................34

*Ho v. Ernst & Young, LLP*,
   No. 5:05 Civ. 04867-JF (N.D. Cal.) .........................................................................................21

*In re Deloitte & Touche LLP Overtime Litigation*,
   No. 11 Civ. 02461 (S.D.N.Y.) ..................................................................................................21

*In re Novartis Wage and Hour Litig.*,
   611 F.3d 141 (2d Cir. 2010)..................................................................22

*Kress v. PriceWaterhouse Coopers, LLP*,
   No. S-08 Civ. 965 (E.D. Cal.)..............................................................21

*Lambert v. KPMG LLP*,
   No. ESX L 5225 11 (N.J. Super. Ct.) ...................................................21

*Le v. PriceWaterhouse Coopers, LLP*,
   No. S-08 Civ. 997 (E.D. Cal.)..............................................................21

*Litchfield v. KPMG*,
   Case No. 07-2-11179-4-SEA (Wash. Sup. Ct.) ...................................21

*Pippins v. KPMG LLP*,
   No. 11 Civ. 0377, 2012 WL 19379 (S.D.N.Y. Jan. 3, 2012)................1

*Reich v. S. New Eng. Telecommc'ns. Corp.*,
   121 F.3d 58 (2d Cir. 1997)..................................................................35

*Reiseck v. Universal Commc'ns of Miami, Inc.*,
   591 F.3d 101 (2d Cir. 2010)................................................................33

*Smith v. Frac Tech Servs., LLC*,
   No. 09 Civ. 679, 2011 WL 96868 (E.D. Ark. Jan. 11, 2011) .............33

*Solis v. Washington*,
   656 F.3d 1079 (9th Cir. 2011) ..............................................23, 29, 30, 31

*Sutherland v. Ernst & Young, LLP*,
   No. 10 Civ. 3332 (S.D.N.Y.) ..............................................................21

**STATUTES**

29 U.S.C. § 202(a) ......................................................................................22

29 U.S.C. § 216(b) ......................................................................................34

Del. Code. Ann. tit. 24, § 107(a)(2) ...........................................................18

Idaho Code Ann. § 54-208 ..........................................................................18

Me. Rev. Stat. Ann. tit. 32, § 12228(3)(B) ................................................18

N.H. Rev. Stat. Ann. § 309-B:5(III)(b).......................................................18

**REGULATIONS**

29 C.F.R. § 541.200 ................................................................................................32

29 C.F.R. § 541.201 ................................................................................................32

29 C.F.R. § 541.202 ............................................................................................25, 26

29 C.F.R. § 541.301 ..............................................................23, 24, 25, 29, 30, 31

29 C.F.R. § 541.700 ................................................................................................23

02-280 Me. Code R. § 5(3) ......................................................................................18

24 Del. Admin. Code § 100-4.1.4.2 ........................................................................18

**RULES**

Fed. R. Civ. P. 56(c) ...............................................................................................22

**OPINION LETTERS**

U.S. Dep't of Labor Opinion Letter, 1986 WL 1171119 (Aug. 11, 1986) ..................25

U.S. Dep't of Labor Opinion Letter, 1999 WL 33210909 (Nov. 2, 1999) ..................28

U.S. Dep't of Labor Opinion Letter, 2000 WL 34444354 (July 14, 2000) ................29

U.S. Dep't of Labor Opinion Letter, 2006 WL 2792440 (July 24, 2006) ..................23

U.S. Dep't of Labor Opinion Letter, 2007 WL 506578 (Feb. 1, 2007) ......................26

**OTHER AUTHORITIES**

Merriam-Webster Online Dictionary, available at http://www.merriam-
   webster.com/dictionary/predominant (last visited June 7, 2012) ..........................26

## PRELIMINARY STATEMENT

For many years, KPMG LLP ("KPMG") paid its entry-level Audit Associates ("Associates") time-and-a half premium pay for their overtime hours, consistent with its obligations under the Fair Labor Standards Act ("FLSA").  In 1997, KPMG stopped paying overtime to Associates (called "assistant accountants" and "staff accountants" until 2001), not because their duties changed or because of any change in the law, but simply because KPMG's competitors did so.  In response to this lawsuit, KPMG claims that Associates, the lowest level members KPMG audit teams, are exempt "professionals" and "administrators" under the FLSA.

KPMG claims that Associates' status as exempt professionals is "axiomatic" even though KPMG requires them to have no prior work experience, no particular academic degree, and no professional license in order to be hired.  KPMG believes that Associates' exempt status is as obvious as the "sky is[] blue," notwithstanding that it requires them to follow templates, it reviews all of their work at least twice, it makes sure that they are "very closely supervised," it allows them almost no role (if any) in planning meetings, and assigns them many audit tasks that KPMG itself labels "non-judgmental."  KPMG even classifies *first-year* Associates ("First-Years" or "First-Year Associates"), who know little or nothing about conducting an audit, as exempt even though the first year is a training year, which KPMG calls "a learning experience."

KPMG's own company-wide documents and generally-applicable admissions eliminate any genuine factual issue as to whether all Associates are properly "classified as exempt, without regard to their personal situations."  *Pippins v. KPMG LLP*, No. 11 Civ. 0377 (CM) (JLC), 2012 WL 19379 (S.D.N.Y. Jan. 3, 2012).  The Court should grant Plaintiffs' motion for partial summary judgment that: (1) First-Year Associates are non-exempt under the professional

exemption; (2) <u>all Associates</u> are non-exempt under the administrative exemption; and (3) KPMG did not act in "good faith" when it classified <u>all Associates</u> as exempt.

## PROCEDURAL HISTORY

Plaintiffs Kyle Pippins and Jamie Schindler filed this lawsuit on January 19, 2011, bringing collective action claims under the Fair Labor Standards Act ("FLSA").  ECF No. 1.  On April 25, 2011, Plaintiffs amended their complaint, adding Edward Lambert as a Plaintiff and class claims under the New York Labor Law.  ECF No. 51.  Defendant Answered Plaintiffs' First Amended Complaint on February 17, 2012.  ECF No. 140.

On April 6, 2011, Plaintiffs moved for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b) of the FLSA, ECF No. 33.  The Court granted Plaintiffs' motion on January 3, 2012, ECF No. 129, and ordered that "discovery relating to the issue of why all Audit Associates are classified as exempt, without regard to their personal situations, be conducted on an expedited basis, with an eye to having someone (probably Plaintiffs) move for summary judgment by April 27, 2012."  *Id*. at *27.  Notice issued on January 28, 2012.  As of today, more than 1,300 individuals have joined this action as FLSA opt-in Plaintiffs.

## STATEMENT OF FACTS

**I.      Independent Financial Statement Audits and the Auditor's Report Are the "Deliverables" that KPMG's Audit Function Provides to its Clients.**

KPMG's Audit function performs a discrete service for its clients—independent financial statement audits.  Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("SOF") ¶ 4.  The resulting "deliverable" is an Auditor's Report, the end-product of a financial statement audit.  *Id*. ¶¶ 5, 60.  KPMG executes engagement letters with its clients that set forth the "service" they hire KPMG to perform, the amount they will pay, and the period that the audit will cover.  *Id*. ¶¶ 11-13.  An Auditor's Report is a "standard report" that is generally

2

one page and describes the scope of the completed audit and sets forth the firm's conclusion as to whether or not the client's financial statements are accurately presented in all material respects. *Id*. ¶¶ 6, 10.  The Auditor's Report must be signed by a partner on behalf of the firm.  *Id*. ¶ 8. Associates may not sign an Auditor's Report, or bind the firm in any other way.  *Id*. ¶ 14.

KPMG's clients need independent financial statement audits for various reasons, including meeting their statutory and regulatory obligations.  SOF ¶¶ 15, 17.  KPMG's audit clients cannot audit their own financial statements because auditors are required to be "independent" of management.  *Id*. ¶¶ 18-19, 28.  As an independent registered public accounting firm, KPMG cannot participate in the management of the clients that they audit, in their operations, or in the running of their business.  They cannot perform clients' back office functions, serve as clients' internal accountants, have an ownership interest in clients, or be engaged in an employer-employee relationship with clients.  *Id*. ¶¶ 20-27, 29-30.

KPMG's Audit function makes money by billing clients for work that Associates and other engagement team members do.  *Id*. ¶¶ 18-19.  The business is predicated upon doing "chargeable" and collectable work to generate revenue for KPMG's objective of making a profit. *Id*. ¶ 53.  KPMG sets predetermined "utilization rates" that require Associates to bill clients for a high percentage of their work time.  *Id*. ¶¶ 47-49.  KPMG measures them against their utilization rate goals as part of their performance evaluations.   *Id*. ¶¶ 50-51.  It does so because the more chargeable work performed, the more revenue KPMG generates.  *Id*. ¶ 53.  Over the past four years, Associates charged clients between 86% and 90% of their time.  Swartz Decl. Ex. KK.

## II.   Associates Are Entry-Level Employees.

KPMG does not require Associates to have any prior work experience in order to be hired and most are hired right out of college.  SOF ¶ 251.  Associates are typically in their role for two

years before being considered for promotion to Senior Associate.  *Id.* ¶ 36.  Senior Associates are

typically in their role for three years before being considered for promotion to Manager.  *Id.* ¶ 37.

KPMG categorizes Associates and all other engagement team members as Client Service

Delivery ("CSD") personnel because they do work that KPMG charges to clients.  *Id.* ¶ 35.

KPMG employees in support functions, such as human resources, legal, and finance, are Client

Service Support ("CSS") personnel because they support the work that CSD performs.  *Id.*

## III.    Audit Associates Are at the Bottom of the Engagement Team Hierarchy.

KPMG audit engagement teams are leveraged operations with a few decision-makers at

the top of the pyramid and many workers below them.  Some audit teams have over a hundred

members.  *Id.* ¶ 45.  Partners are at the top of the hierarchy and Audit Associates are at the

bottom, unless the engagement also has interns.  *Id.* ¶¶ 38, 40.  Between them are three levels of

management and supervision – senior managers, managers, and senior associates.  *Id.*

### A.    Partners Are in Charge of the Entire Audit.

Every audit has an Engagement Partner who is responsible for the audit from before the

client hires KPMG until the Auditor's Report is issued.  SOF ¶¶ 55-58, 60, 67-68, 71, 81-82, 92,

94.  The Engagement Partner is the final decision-maker in all respects, including with respect to

planning the audit.  *Id.* ¶¶ 60, 71, 81-82, 94.  Only the Engagement Partner can sign an Auditor's

Report.  *Id.* ¶¶ 7-8.  The engagement partner, along with the manager, leads the due diligence

process for approving new clients.  *Id.* ¶¶ 66-68.  Only the engagement partner may commit the

firm by signing a client engagement letter.  *Id.* ¶ 14.

## B.      The Roles of the Engagement Team Members.

### 1.      Planning the Audit

The engagement partner is responsible for planning the engagement from beginning to end.  *Id*. ¶ 71.  During the planning process, which occurs before the actual audit begins, important decisions are made that affect the nature, timing, and extent of audit procedures that will be performed during the audit.  *Id*. ¶¶ 72, 77, 80, 82-83, 85.  Some of these important decisions include: assessing the risks of material misstatement of the clients' financial statements, including risks of error and fraud; developing the audit strategy in response to the risks; and planning the audit approach for significant accounts and disclosures.  *Id*.

The Engagement Partner, with assistance from the Manager and sometimes the "in-charge" of the audit, is responsible for making these important decisions.  *Id*. ¶¶ 60, 71, 75-76, 81-82, 94.  Based on their decisions, the Engagement Partner, with assistance from the Manager, is responsible for developing the audit plan, which consists of a timeline and the key steps of the audit.  *Id*. ¶ 82.

Associates' primary duties do not include making the decisions that are part of the planning process.  They do not determine the audit program steps that will be performed on the client's financial statements, make decisions regarding the nature, timing, and extent of the audit procedures that should be performed in areas involving high levels of risk, or determine what could go wrong with respect to the client's process activities that the audit should address.  SOF ¶¶ 71, 74, 78-80, 84, 87, 89, 94.  In fact, Associates are not necessarily even invited to attend engagement planning meetings, including the "kick off" meeting at which "key" engagement members discuss their perspectives on how the audit should be approached.  *Id*. ¶¶ 83, 85-89.  All of the decisions that are made at kick-off meetings can be made without Associates' input

and often are.  *Id*. ¶¶ 87-89.  When Associates do participate, it is to provide them with an opportunity to practice their speaking skills in a "non-threatening" environment outside the presence of KPMG's clients.  *Id*. ¶ 91.  Sometimes Associates gather materials for a meeting, but even then are not necessarily invited to attend.  *Id*. ¶¶ 87-89, 93.

2.   <u>Conducting the Audit</u>.

In addition to planning the audit, Partners and managers oversee multiple audits at once. *Id*. ¶ 43.  Senior Associates and Associates are usually assigned to one audit at a time.  *Id*. ¶ 44. Partners and Managers are pulled off of engagement teams much less frequently than Associates because of client expectations and so as not to disrupt the engagement.  *Id*.

a.   *The Role of Engagement Partners*

Partners have ultimate responsibility for ensuring that the audit procedures that audit team members perform are properly carried out.  *Id*. ¶ 60.  They also make important decisions regarding how the procedures are carried out.  For example, partners choose the locations where audit procedures over the client's inventory, called "inventory observations," are conducted and may personally review the work papers that are prepared depending on the significance of the inventory observation to the overall audit.  *Id*. ¶ 95.  Partners also review and approve all deliverables and form the audit opinion.  *Id*. ¶¶ 7-10, 55-57, 60, 129, 190.

b.   *The Role of Senior Managers and Managers*

Managers are responsible for ensuring that the audit plan is appropriately carried out by the engagement team.  *Id*. ¶¶ 61, 96.  Managers spend time in the field with the audit team ensuring that they carry out their tasks properly.  For example, managers are present during complex inventory observations to supervise the work and also approve the instructions that are

6

given to those who carry out the inventory observation steps. *Id*. ¶¶ 107, 109. Managers also determine which team members should be present during inventory observations. *Id*. ¶ 108.

In accordance with professional auditing standards, KPMG requires Managers to review all of the working papers that are drafted during the audit. *Id*. ¶¶ 61, 97-99, 197. Working papers are where engagement team members document their performance of the audit procedures that they are assigned. *Id*. ¶ 106. Professional standards mandate that all working papers must be reviewed by a person other than the preparer who has more experience than the preparer. *Id*. ¶¶ 62, 130-31. KPMG believes that Managers are in a position to be effective reviewers of work papers because they have experience in the preparation and review of work papers, which was gained on the job and in trainings during their employment at KPMG. *Id*. ¶¶ 98, 101-102. Managers keep Partners informed on the progress of the engagement, monitor the progress of the engagement against the deadlines that have been set and the budget, resolve issues with engagement team members as they arise and discuss them with the Partner, and supervise and direct the engagement team. *Id*. ¶ 61.

*c.    The Role of Senior Associates*

Senior Associates' primary duty is executing audit procedures. Like Associates, they are expected to understand and perform the tasks assigned to them, prepare work papers and make them available for senior members of the engagement team to review, and inform the Partner or Manager of issues or problems as they arise. *Id*. ¶ 63.

Senior Associates also may provide on the job training to Associates, including helping them understand procedures that they are assigned, walking them through procedures, monitoring the status of their work, and asking them if they have questions. *Id*. ¶¶ 114-119.

7

i.      The "in-charge" is usually a Senior Associate

On all audits, one team member is designated as the "in-charge."  The in-charge serves as

the day-to-day operator or "control desk" of the audit in the field.  *Id*. ¶¶ 120-21.  In-charges

report the day-to-day progress of audits to the manager and may walk junior team members

through their audit procedures, answer their questions, and provide a first review of their work.

*Id*. ¶¶ 147-48, 170, 173, 175, 199, 298.  On almost all audits, in-charges are Senior Associate

because they have experience working on audits.  *Id*. ¶¶ 122-125.

ii.      Audit Associates are rarely in-charges.

Serving as the in-charge is not part of the primary duty of Audit Associates.  First-year

Associates are designated as the in-charge "very infrequently"—"between 0% and 5% of the

time"—and only on audits that are "smaller and less complex."  *Id*. ¶¶ 124-126.  Second-year

Associates are designated as the in-charge only about 20 percent of the time.  *See* SOF ¶ 122.

Serving as the in-charge on an audit is not a performance goal that KPMG sets for Associates.

*Id*. ¶ 210.  KPMG's training on being an in-charge, called "In-Charge Auditor" or "ICA," is not

even provided to Associates until the end of their second year, when they are preparing to be

promoted to Senior Associates.  *Id*. ¶¶ 293-295.  ICA training is intended to train Associates on

the procedures they are likely to perform as Senior Associates.  *Id*. ¶ 294.

d.      *The Role of Audit Associates*

The core role of Audit Associates is to execute audit procedures learned in KPMG

training and on the job.  First- and second-year Associates are the same in most respects—they

have the same performance goals, the same engagement review goals, and the same job

descriptions—and have the same primary duty, according to KPMG.  *Id*. ¶¶ 127, 192; Swartz Ex.

O (Engagement Review Goals: Associate), Ex. S (Goal Statements: Audit Associate), Decl. Ex.

JJ (Resp. Interrog. No. 8), Ex. FFF (Skills, Assessment, and Development – Audit).

Associates perform the lowest-level tasks on the audit team.  *See id.* ¶¶ 38, 40, 128-129,

138-139, 151-153, 203, 217, 219, 221.  Most of the tasks that Associates perform are set out for

them in steps that describe the procedures that they must complete to gather audit evidence.  *Id.* ¶

155.  It is not their role to spend time determining the problem and objectives of the audit

procedures they are assigned or the possible alternatives that were considered by the partner or

manager in selecting the particular procedures that they are assigned.  *Id.* ¶ 156.  Those factors

were already considered by more experienced team members during the planning process.  *Id.*

One procedure that Associates frequently perform on audits is an inventory observation.

*Id.* ¶¶ 140-41.  An inventory observation generally involves: (1) physically counting the client's

inventory; (2) evaluating the results; and (3) observing and reviewing "cutoff."  *Id.*  Physically

counting inventory means re-counting the client's inventory at the client's premises or watching

the client's personnel count it.  *Id.* ¶ 142.  Evaluating the results means comparing the results of

the count with the information on the client's records and looking for any discrepancies.  *Id.* ¶

143.  The observation of cut-off means observing whether inventory has been received or

removed from the client's premises during the physical count of inventory and obtaining the

client's records to make sure that inventory was accurately counted.  *Id.* ¶ 144.

Another procedure that Associates frequently perform on audits is a walkthrough.  A

walkthough generally involves: (1) obtaining the client's documentation of the controls that they

have in place; (2) asking the client's personnel to explain what they do to carry out their controls;

(3) comparing what the client's personnel says to what their documentation says; (4) asking the

client's personnel about any variances that their controls identified and for documentation to cite as audit evidence; and (5) documenting the steps in work papers. *Id*. ¶ 149.

Consistent with its obligations under professional standards, KPMG supervises Associates throughout the audit, from the assignment of work through its completion. *Id*. ¶¶ 131, 133-34, 137. This supervision includes answering Associates' questions and ensuring that they understand the audit procedures they are assigned, including the reason that the procedure is being performed and how long it should take to perform it. *Id*. ¶ 134.

All of the work that Associates perform is first reviewed by a more experienced team member and then by the Manager. *Id*. ¶¶ 97, 136, 202, 204-205. They are expected to produce clear and concise audit documentation that they self-review before they turn it in to be checked. *Id*. ¶¶ 198-99. KPMG provides Associates with a "WorkPaper Review Checklist" to use as a tool as they complete their work. *Id*. ¶ 200. During the audit, Associates are expected to communicate with more senior team members to understand the status of the audit, client deadlines, and any new or open issues, and assist with additional tasks. *Id*. ¶ 215. Associates do not review audit evidence that has been compiled for each section of the audit, analyze the evidence, or draw conclusions from it regarding the overall audit. *Id*. ¶ 129. This is done by Senior Associates, Managers, and Partners. *Id*. ¶¶ 129, 190.

Associates also perform a host of clerical tasks related to their primary duty of executing audit procedures. They make copies, compile binders, organize and fax documents, populate spreadsheets, update working papers by inserting client information. *Id*. ¶ 152.

e.     *The Role of First-Year Audit Associates.*

The first year of an Associate's career at KPMG "is a learning experience." *Id*. ¶ 239. "Listen. Watch. Learn." is among KPMG's "Keys to Success" for first-year Associates. *Id*. ¶

245.  Others are: (1) "Keep your workplace organized;" (2) "Keep detailed pending lists and update them regularly;" (3) "Refer back to your notes;" (4) "Keep the senior informed of any issues that arise during your testwork;" (5) "Let the senior know in advance when you are running our of work or when the work seems to be taking longer than expected;" (6) "Be prepared for the unexpected . . . [i.e.] working on last minute reports;" and (7) "Know the priority of your tasks, what needs to be completed first." *Id*. ¶ 246.  KPMG has the same expectations of first-year Associates that most employers have of their entry-level employees. For example, KPMG tells new hires that they should be accurate by "recounting the number of pages in a document, proofing something for the 3rd time, or calling to make sure a . . . package arrived on schedule." *Id*. ¶ 243.  It also tells them that they should volunteer, so that "[i]f someone is making copies or sending a fax," they should "offer to do it for them." *Id*. ¶ 244.

KPMG has labeled certain procedures as "non-judgmental," including confirmations, reconciliations, recalculations, and certain procedures over financial statements. *Id*. ¶¶ 181-86. All of these are tasks that First-Year Associates are likely to perform. *Id*. ¶¶ 250, 261, 279.

Like second-year Associates, First-Year Associates do not make important decisions regarding the nature, timing, and extent of the audit procedures that they are assigned. *Id*. ¶ 128. For example, First-Year Associates do not assess the Risk of Material Misstatement for audits; do not determine the level of substantive procedures that must be performed to reduce audit risk to an acceptable level; do not determine the suitability of using substantive analytical procedures; do not determine what constitutes the amount of difference from an expected result that can be accepted without further investigation; and do not decide which sampling method should be used when performing substantive sampling techniques. *Id*. ¶¶ 161, 163-64, 166-69, 171-72, 174,

11

176-77.  When First-Year Associates encounter a difference from the expectation, they are

required to bring it to the attention of the in-charge or Manager.  *Id*. ¶¶ 119, 147-48, 170, 173.

> 3.     Completing the Audit.

Associates do not play a major role in the completion of the audit after all of the audit

evidence has been gathered and documented.  Members of the engagement team that are more

senior to them are responsible for evaluating the findings of the audit, finalizing adjustments

with the client, conducting the client exit interview or debrief, and producing the Auditor's

Report.  *Id*. ¶ 190.  First-Year Audit Associates typically make sure that all audit documentation

has been signed off by more senior team members, clear review comments made by more senior

team members, and complete checklists.  *Id*. ¶ 189.

## IV.    KPMG Sets Goals for Engagement Team Members.

KPMG provides its "staff" employees, including Senior Associates and Associates, with

"Engagement Review Goals" and provides Managers, Senior Associates, and Associates with

"Goal Statements" both of which set forth broad statements of the primary job duties of each job

level.  The goals have largely remained consistent from year to year.  *Id*. ¶¶ 191-93.

The goals illustrate important differences in the responsibilities of each job level.   For

example, Associates are expected to "work with my senior associates/managers to complete my

assignments within established timelines and deadlines."  *Id*. ¶ 195.  Senior Associates are

expected to "[c]onduct the audit" and Managers are expected to "[m]anage, review and

document the audit[.]"  *Id*. ¶¶ 196-97.

Associates are expected to "[p]repare clear and concise audit documentation;" while

Senior Associates are expected to "review audit documentation prepared by others[,] [e]nsure

review comments are appropriately cleared," and "[w]ork towards the goal of not receiving

repetitive review comments of the same nature, as well as not receiving review comments in expected areas of proficiency at the senior associate level." *Id.* ¶¶ 198, 204.  Managers are expected to "[e]nsure audit documentation has been reviewed . . . and all outstanding comments have been cleared before submission to partners." *Id.* ¶ 205.

The goals for both Managers and Senior Associates—but not Associates—involve taking ownership of certain issues on audits, although Managers' goals are far more extensive.  For example, Senior Associates: "Take responsibility for issue identification and resolution[,]" "Proactively suggest improvements or refine the current process to continually raise the level of quality service and deliverables[,]" "Research, address, or demonstrate a proactive response or action plan to issues[,]" and  "Communicate circumstances that will jeopardize deadlines." *Id.* ¶ 220.  Managers: "Take responsibility for comments/issues identified as a result of partner or senior manager review[,]" "Oversee identification and resolution of accounting issues with engagement and reviewing partners[,]" "Create engagement plan[s] including detailed budget[s], rate per hour, project scope, fee collection schedule, and means to capture out-of-scope activities[,]" and be responsible with the Partner for ensuring quality control and "profitability." *Id.* ¶¶ 206, 208, 224.  None of these is a goal for Associates.  *Id.* ¶¶ 203, 221.

## V.   The Exercise of Professional Judgment, Professional Skepticism, and Due Professional Care.

The concepts of professional judgment, professional skepticism, and due professional care describe a philosophical mindset and a thoughtful approach to work.  "Professional judgment," at KPMG, is simply the exercise of good judgment. *Id.* ¶¶ 227, 233, 238. KPMG does not assign First-Year Associates to perform the complicated parts of audit tasks that require judgment and discretion.  For example, during an inventory observation, an Associate might physically observe old inventory, such as boxes that are dated 2007 or that do not appear

13

to have been recently moved or cleaned, and based on that observation, ask the client's personnel what the boxes are.  *Id.* ¶ 230.  According to KPMG's 30(b)(6) witness, asking what the boxes are because they look old or outdated is an example of how Associates exercise professional judgment on an audit.  *Id.*

In fact, Associates are discouraged from exercising judgment and discretion.  They are told to consult with more senior team members when they encounter anything out of the ordinary, when they lack experience or expertise, when they do not understand why a procedure is being performed, or when "something just does not 'feel right.'"  *Id.* ¶ 231.  KPMG believes that professional judgment is acquired with experience.  *Id.* ¶ 232.

Unlike Associates, partners and managers make many decisions that do require judgment and discretion, such as during the planning process when they determine the extent and types of audit procedures that will be performed on the audit, *id.* ¶¶ 71, 72; during the audit, when they review all work papers to ensure they meet professional standards, ensure the engagement stays within budget, and resolve unexpected issues that arise on the audit, *id.* ¶ 60-61; and, at the conclusion of the audit, when they evaluate the audit evidence to produce the report.  *Id.* ¶ 190.

Professional skepticism is also not the exercise of judgment and discretion.  It is a philosophical mindset, *id.* ¶ 234, often associated with Renaissance thinker Michel de Montaigne who challenged his readers to ask, "What do I know?"  At KPMG, the exercise of professional skepticism simply means having a questioning mind, being objective, and not blindly trusting that the client's information is correct without checking it.  *Id.* ¶¶ 235-36.  For example, when an Associate is performing an audit procedure and comes across something inconsistent with expectations, the Associate exercises "professional skepticism" by noting the inconsistency (instead of just accepting it) and raising it with the in-charge or Manager.  *Id.* ¶ 237.

14

Due professional care is not the exercise of judgment and discretion either.  For Associates, it means understanding the purpose of the audit procedure that they were assigned and following the procedure correctly and carefully.  *Id.* ¶ 238.

## VI.     The First Year Is Primarily a Learning Year.

Associates learn the basics of being a KPMG employee and an audit team member during their first year through formal trainings and on the job training.  The first year is a "learning experience."  SOF ¶¶ 239-41.

### A.     KPMG's Formal Training Programs

Associates take two mandatory training courses, one before they begin working called "Audit Fundamentals," and the other near the end of their first year called "Advanced Auditing for Associates."  SOF ¶¶ 248, 291.  These two trainings are the entry-level installments in KPMG's training series, each of which is designed to teach Associates what they will need to know during the following year.  *Id.* ¶¶ 250-51, 291.  At the end of their second year, Associates take mandatory In-Charge Auditor ("ICA") training, which teaches them the procedures they are likely to perform as Senior Associates.  KPMG does not provide ICA training to new Associates because they are not in a position to be in-charges on engagements.  *Id.* ¶¶ 293-95.

Audit Fundamentals is a combination of approximately 10 hours of web-based "self-study" trainings and live classroom trainings that new hires are required to attend before being sent into the field.  *Id.* ¶¶ 250-51, 258.  KPMG believes that Associates require this extensive training or else they will not be able to perform their primary duty of performing audit procedures.  *Id.* ¶¶ 250-90.  KPMG believes it would be "negligent" to send a new Associate into the field to perform audit procedures without Audit Fundamentals training.  *Id.* ¶¶ 281-82.

Audit Fundamentals provides training on audit concepts, such as what an audit is, what "GAAP" stands for, what audit working papers are, and why companies need to undertake audits, as well as training on how to apply the concepts to the audit procedures that Associates are most likely to perform during their first year.  SOF ¶¶ 250-51, 258, 265-280.  KPMG re-trains Associates on audit concepts to refresh the memories of some new hires and to introduce the concepts to other new hires who do not know what is involved in an audit or what financial statements look like before they take Audit Fundamentals.  *Id*. ¶¶ 250-53, 257, 260, 267-78, 282.  Although most new Associates begin their employment with "at least a perception" of what an audit is, KPMG provides training on it because it would not be "realistic" to assume that all new hires remember what an audit is before taking Audit Fundamentals.  *Id*. ¶¶ 267-74.

Associates are also taught to use KPMG's proprietary software program, eAudit, which is a computer program that is used to execute audits.  eAudit consists of a series of screens that walk users through the audit steps that must be completed for each area of the audit.  eAudit embeds guidance from KPMG's Audit Methodology ("KAM") through "Knowledge" buttons that users can click to show them how to apply KAM and other KPMG manuals and guidance to perform the audit steps they are assigned.  *Id*. ¶¶ 283-90.

**B.      On the Job Training**

Associates receive extensive on the job training at KPMG.  On the job training enables Associates to understand everything that is required to do their job and more, including what they are doing, why they are doing it, how to evaluate audit evidence, how to evaluate the results of audit procedures, how to identify exceptions, and how to document the results of their work.  SOF ¶ 296.  Associates receive frequent feedback and guidance from Managers and/or in-

16

charges who answer their questions and ensure that they understand the procedures they are assigned. *Id*. ¶ 297-99.

In order to meet its professional obligations, KPMG believes that it is appropriate for more senior team members to show more junior members how to do particular procedures that they have not performed before by walking them through the procedures. *Id*. ¶¶ 298-300.  For example, an Associate might be assigned the task of reviewing the resumes of the client's internal audit personnel to assist more senior team members determine whether they are competent.  In walking the Associate through the assignment, the Manager would: (1) make sure the Associate understood what the procedure was for; (2) discuss the role of internal audit personnel in the client's system of internal controls; (3) review a few resumes with the Associate to show him or her the things to look for; (4) go through the remainder of the steps to make sure the Associate understood them and to respond to any questions; and (5) review the work that the Associate documented in the working papers, including the resumes themselves. *Id*. ¶¶ 301-02.  Other procedures that Associates are assigned are so simple that they can learn how to perform them by reading a written description of the steps they are supposed to take.  For example, Associates would not need to be walked through an inventory count or counting cash because their task is simply to count.  *Id*. ¶ 300.

**VII.   KPMG Requires a Very Limited Accounting Background.**

    **A.   KPMG's Hiring Criteria Do Not Require a Prolonged Course of Study in Accounting.**

KPMG does not require Associates to have any particular degree.  *Id.* ¶¶ 303-04.  It does not require a graduate degree at all.  *Id.* ¶ 317.  KPMG does require an undergraduate degree but does not require that it be in accounting or any particular major.  *Id.* ¶¶ 303, 317.  Of the 1,096

individuals who had joined this case as of mid-May, almost 19% did not have accounting

degrees when they were hired.  *Id.* ¶ 320.

KPMG does not require Associates to have a CPA license to be hired or to be promoted

to Senior Associate.  *Id.* ¶¶ 338-39.  KPMG does not even require new Associates to be *eligible*

*to take* the CPA exam.   KPMG only requires new recruits to be "near CPA-eligible" with a

"clear plan" to become CPA-eligible.[1]  *Id.* ¶ 303, 342.  The minimum qualification to be hired as

an Associate is the fewest number of credits necessary to be CPA-eligible or near CPA-eligible

*in any state*.  *Id.* ¶ 318.  Some states require very few credits to be CPA-eligible.  For example,

New Hampshire requires 12 hours (4 courses) of accounting credits; Maine requires 15 hours (5

courses) of accounting credits; Idaho requires 20 (6-7 courses) hours of accounting credits; and

Delaware requires 21 hours (7 courses) of accounting credits.[2]  KPMG regularly hires Associates

who have taken 8 accounting courses.  SOF ¶ 311.

The accounting knowledge that KPMG expects Associates to have is "foundational"

knowledge.  *Id.* ¶ 307.  KPMG does not require Associates to have taken a course in auditing to

be hired.  *Id.* ¶ 313.  Associates who have not taken auditing can obtain the skills they need to

perform their auditing duties through the training that KPMG provides and through experience

on the job.  *Id.* ¶ 314.  Even Associates who have taken coursework in auditing require KPMG

training and on the job experience in order to effectively perform their duties.  *Id.* ¶ 315.

---

[1]    KPMG's 30(b)(6) witness on hiring criteria could not explain what a "clear plan to
become CPA-eligible" is or provide an example of one.  KPMG does not have a specific policy
with respect to how long an Associate can be near CPA-eligible and still be employed at KPMG.
*Id.* ¶ 330.

[2]    *See* N.H. Rev. Stat. Ann. § 309-B:5(III)(b); N.H. Code Admin R. Ann. Ac §§ 301.02(a),
302.02(a)(3); Me. Rev. Stat. Ann. tit. 32, § 12228(3)(B);  02-280 Me. Code R. § 5(3); Idaho
Code Ann. § 54-208; Idaho Admin. Code r. 105.02; Del. Code. Ann. tit 24, § 107(a)(2); 24 Del.
Admin. Code § 100-4.1.4.2.

B.    **KPMG Encourages Audit Associates to Study for the CPA Exam Only as a Matter of Convenience.**

KPMG does not require employees to have a CPA license until they are promoted to Manager.  *Id.* ¶¶ 336, 338-39.  Under the professional standards, having a license is necessary to be qualified to practice public accountancy.  *Id.* ¶ 343.  KPMG requires Managers to be licensed because of the functions they perform, including reviewing all work papers, supervising all staff members, and working directly with the Partner.  *Id.* ¶ 336.  Most Associates cannot become licensed while they are Associates because most states require two years of experience on the job in order to obtain a license.  *Id.* ¶ 337.  While KPMG encourages Associates to pass the CPA exam early in their careers, it is not because their duties require them to be licensed but because it believes that Associates have more time to study and prepare for the CPA exam than they will when they become Senior Associates.  *Id.* ¶ 340.  KPMG does not prohibit Associates who have failed the auditing section of the CPA exam from being promoted to Senior Associate.  *Id.* ¶ 335.

VIII.  **Audit Associate Is Traditionally an Overtime Eligible Position.**

For many years, the Associate position (previously called "Assistant Accountant" or "Staff Accountant") was an overtime-eligible position.  SOF ¶¶ 344-47, 380.  Until 1997, KPMG paid all Associates (and Senior Associates) overtime premiums of time-and-one-half of their regular rates of pay for all overtime hours they worked.[3]  *Id.* ¶¶ 345, 372, 380.  No change in Associate job duties or new legal standard prompted KPMG to stop paying Associates overtime in 1997.  *Id.* ¶¶ 345, 377-79, 404-05.  In fact, the job duties of the Associate position have not changed since at least 1977.  *Id.* ¶ 127.

---

[3]    At the March 2, 2012 conference, KPMG allowed the Court to believe that "[t]hrough [the Court's] entire professional life, everybody has 'understood,' in quotes, that these people were not overtime employees."  *See* Swartz Decl. Ex. SS at 12-13 (According to KPMG, "[t]ime immemorial, certainly prior to the enactment of the FLSA.")

KPMG stopped paying Associates overtime simply because its competitors did.  In the early 1990's, the other major accounting firms, which had also traditionally treated their staff accountants as overtime-eligible, stopped paying them overtime.  In 1996, KPMG decided to eliminate overtime and raise base salaries to incorporate the average number of overtime hours that Associates worked during the previous two years.  This way, KPMG would be more attractive to college recruits because they would see a higher base salary.  SOF ¶¶ 373-74, 376.

KPMG spent considerable time preparing to manage the message it would present when it announced the elimination of overtime, and refining the calculation by which it would attempt to roll some of the overtime a typical Associate worked into the new base salaries.  KPMG knew that some Associates worked many more hours than the new salaries would compensate them for.  *Id*. ¶¶ 370-71, 378, 404.

## IX.    KPMG Arrogantly Ignored the Overtime Laws.

KPMG never looked back after it eliminated overtime for its staff accountants.   It did not seek any legal advice or take any other steps to determine whether eliminating overtime would violate the law.  *Id*. ¶¶ 355, 365, 369, 371, 377, 381-94, 397, 404-07.  It closed its eyes to its own past practice and adopted the belief that staff accountants' exempt status was "axiomatic," and that questioning that view is akin to asking "whether the sky isn't blue?"  *Id*. ¶¶ 365, 386-87.

In 2001, KPMG engaged in a "re-titling" project in order to make its low-level job titles sound more important.  As part of this project, it folded the "assistant accountant" position and the "staff accountant" position into the Audit Associate job title.  *Id*. ¶¶ 366-68, 381-82.  By doing so, KPMG sought to brand the staff accountant and assistant accountant jobs in a way that would equate with jobs in other industries, such as law, in the minds of college students in terms of prestige.  *Id*. ¶¶ 367-68.  It also sought to keep up with other major accounting firms that had

made similar changes for recruiting purposes. *Id.* Despite re-writing the staff accountant job description, "it never occurred to anybody" at KPMG to rethink its decision not to pay staff accountants overtime just five years earlier. *Id.* ¶ 382.

In 2003, one of KPMG's competitors expressed concern that new proposed FLSA regulations would put the staff accountant exemption at risk. KPMG's own human resources department considered whether it should join an industry-wide campaign to clarify the regulations in a way that would protect the industry status-quo. SOF ¶ 383-85. In 2007, KPMG briefly considered the possibility of paying Associates overtime again but did not despite the stated view that it might pay them more "fairly" for their work. *Id.* ¶¶ 406-07. Even as staff accountants sued each Big Four accounting firm,[4] including KPMG, for unpaid overtime, KPMG did not consider starting to pay Audit Associates overtime again or reevaluate its exemption decision. *Id.* ¶¶ 355, 365, 369, 371, 377, 381-94, 397, 404-07.

In 2011, in order to stem turnover, KPMG put in place a program called "Above and Beyond" that "paid [Associates and Senior Associates] more for working . . . additional hours." SOF ¶¶ 348-49. KPMG did not consider paying Associates overtime again because it believed that this bonus program was "the most appropriate way" to compensate them for overtime hours "as opposed to any other way," including statutory overtime compensation. *Id.*

---

[4]     *See e.g.*, *In re Deloitte & Touche LLP Overtime Litigation*, No. 11 Civ. 02461 (S.D.N.Y.); *Brady v. Deloitte & Touche LLP*, No. 08 Civ. 00177 (N.D. Cal.); *Litchfield v. KPMG*, Case No. 07-2-11179-4-SEA (Wash. Sup. Ct.); *Lambert v. KPMG LLP*, No. ESX L 5225 11 (N.J. Super. Ct.); *Sutherland v. Ernst & Young, LLP*, No. 10 Civ. 3332 (S.D.N.Y.); *Ho v. Ernst & Young, LLP*, No. 5:05 Civ. 04867-JF (N.D. Cal.); *Campbell v. PriceWaterhouse Coopers, LLP*, No. S-06 Civ. 2376 (E.D. Cal.); *Kress v. PriceWaterhouse Coopers, LLP*, No. S-08 Civ. 965 (E.D. Cal.); *Le v. PriceWaterhouse Coopers, LLP*, No. S-08 Civ. 997 (E.D. Cal.).

By 2012, KPMG's belief that Associates were exempt as a universal truth was so deeply engrained that its human resources corporate representative called a lawsuit seeking the same overtime compensation KPMG stopped paying to its staff accountants just 15 years ago "ridiculous" at his sworn deposition.  *Id.* ¶ 397.

## ARGUMENT

### I.     The FLSA Is a Remedial Statute that Is Construed in Favor of Employees.

Congress enacted the FLSA in 1938 to combat "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a).  The FLSA's "overtime requirements . . . were meant to apply financial pressure" on employers to hire more workers and to recognize the burden of working a workweek "beyond the hours fixed in the [A]ct."  *See Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009) (internal quotation marks omitted).  KPMG's policy to work Associates long hours without overtime is contrary to the FLSA's goals.

Because the FLSA is a "remedial law," its exemptions are "narrowly construed against employers and their application limited to [employees] plainly and unmistakably within their terms and spirit."  *In re Novartis Wage and Hour Litig.*, 611 F.3d 141, 150 (2d Cir. 2010). KPMG bears the burden of proving that Associates are "plainly and unmistakably" exempt.  *Id*.

The Court should grant summary judgment where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Because KPMG bears the burden of proving its exemption defenses, the Court should grant summary judgment to Plaintiffs if the record fails to support *any element* of KPMG's defenses.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

In order to meet its burden, KPMG must demonstrate that Associates' "primary duty" consists of exempt work.  29 C.F.R. § 541.700(a).  Primary duty means the "principal, main, major or most important duty that the employee performs."  *Id*.  The primary duty is determined "with the major emphasis on the character of the employee's job as a whole."  *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 677 F. Supp. 2d 544, 552 (D. Conn. 2009).

Here, KPMG has stated its view of Associates' primary duty: "to perform audit work" as the most junior members of KPMG's engagement teams.  Swartz Decl. Ex. JJ.  While this does not answer the exemption question by itself, KPMG's own documents and corporate witness testimony leave no room for dispute that when Associates are performing this primary duty, they are performing non-exempt work.

## II.    KPMG Cannot Prove the Elements of the Professional Exemption With Respect to First-Year Associates.

To establish its professional exemption affirmative defense, KPMG must prove three elements with respect to First-Year Associates' "primary duty": (1) that they "perform work requiring advanced knowledge;" (2) that the knowledge is "in a field of science or learning;" and (3) that the knowledge is "customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.301; *Solis v. Washington*, 656 F.3d 1079, 1084 (9th Cir. 2011). Plaintiffs are entitled to summary judgment on the first and third prongs with respect to First-Year Associates.  "[A]n individual may work in 'a field of science or learning' but still not meet the requirements for the learned professional exemption because the *occupation* does not require knowledge 'of an advanced type . . . customarily acquired by a prolonged course of specialized intellectual instruction.'"  U.S. Dep't of Labor Opinion Letter, 2006 WL 2792440, at *2 (July 24, 2006) (emphasis in original).

### A. KPMG Cannot Prove that First-Year Associates' Primary Duty Requires "Advanced Knowledge."

KPMG cannot meet its burden to prove that First-Year Associates' primary duty requires "advanced knowledge." 29 C.F.R. § 541.301(a)(1). Work requiring "advanced knowledge" must be "predominantly intellectual in character" and involve "the consistent exercise of discretion and independent judgment." *Id*. at § 541.301(b). Work that involves the performance of "[r]outine mental . . ." tasks does not require "advanced knowledge." *Id*.

### 1. The Knowledge that First-Year Associates Require Is Basic, Not Advanced.

First-Year Associates' primary duty does not require "advanced" accounting knowledge. Only general, "foundational" knowledge is required. SOF ¶ 307. KPMG's own hiring criteria preclude it from proving otherwise. The small number of accounting courses that KPMG requires for new Associates to be hired highlights the fact that only basic knowledge is required. KPMG does not require new hires to have an accounting degree, to have taken any specific number of accounting courses in college, or to have ever taken an auditing course. SOF ¶¶ 303-04, 313, 317. KPMG only requires new hires to be "near CPA-eligible" in "any state." SOF ¶ 318. This is a very low bar because some states require as few as four or five accounting courses to be CPA-eligible. *See* Part VII.A. *supra*. "Near CPA-eligible" could mean even fewer. Because First-Year Associates' primary duty does not vary from state to state, SOF ¶¶ 127, 192, Ex. JJ (Resp. Interrog. No. 8), the minimum qualification necessary to do the First-Year Associate job is the smallest number of credits necessary to be CPA-eligible (or near CPA-eligible) in the state with the lowest requirements. SOF ¶ 318.

The fact that new First-Year Associates from some states take more than four or five courses to meet their home states' requirements does not raise the bar for what is actually

required to do the job and is not relevant to the exemption determination.  Although KPMG may

*prefer* that First-Year Associates take more accounting courses, the exemption does not apply

because the additional coursework is not "require[d]."  *See* 29 C.F.R. § 541.301.  "[A]n

overqualified employee will not be exempt based solely on his academic . . . history."

*Birkemose-Hansen v. Zwanenberg Food Group (USA), Inc.*, No. 09 Civ. 203, 2010 WL

2854128, at *6 (S.D. Ohio July 19, 2010); *see* U.S. Dep't of Labor Opinion Letter, 1986 WL

1171119 (Aug. 11, 1986) (agricultural inspectors with bachelor's degrees in agriculture or

biological science, but whose primary duties include inspections, compliance audits, and

enforcement of regulatory standards, are not exempt).

> **2.      First-Year Associates Do Not Perform Predominantly Intellectual
>          Work or Consistently Exercise Discretion and Judgment.**

KPMG's own corporate-level documents – especially documents describing job

expectations and training documents – and its generally applicable admissions prevent it from

proving that First-Year Associates' primary duty is predominantly intellectual or that it requires

the consistent exercise of discretion and judgment.  "The phrase 'work requiring advanced

knowledge' means work which is predominantly intellectual in character, and which includes

work requiring the consistent exercise of discretion and judgment, as distinguished from

performance of routine mental, manual, mechanical or physical work."  29 C.F.R. § 541.301

(emphasis added).  The exercise of discretion and judgment "implies that the employee has

authority to make an independent choice, free from immediate direction or supervision."  29

C.F.R. § 541.202(c).[5]  It "must be more than the use of skill in applying well-established

---

[5]     Because the phrase "discretion and judgment" is not specifically defined in the
professional exemption regulations, courts look to the administrative exemption's definition of
"independent discretion and judgment."  *See De Jesus-Rentas v. Baxter Pharmacy Servs. Corp.*,
400 F.3d 72, 74 n.4 (1st Cir. 2005).

techniques, procedures or specific standards described in manuals or other sources."  29 C.F.R. §

541.202(e).   It "does not include clerical . . . work, recording or tabulating data, or performing

other mechanical, repetitive, recurrent or routine work."  *Id*.  In the accounting profession,

"accounting clerks, bookkeepers and other employees who normally perform a great deal of

routine work" are not exempt professionals.  29 C.F.R. § 541.301(e)(5).

   The audit work that First-Year Associates most frequently or commonly[6] perform is not

intellectual.  Their work most often involves performing routine, mechanical exercises—

counting, observing, comparing, and documenting—that are not intellectual.  *See, e.g.*, SOF ¶¶

140-44, 149, 152, 181, 198-200.  *See also* U.S. Dep't of Labor Opinion Letter, 2007 WL 506578

(Feb. 1, 2007) (radiology technologists, whose duties involved administering radiology

chemicals to patients, analyzing equipment, setting technical factors on equipment, evaluating

the adequacy of film for readings, and assisting the radiologist in understanding particular cases,

performed work "more in the character of routine mental, manual, mechanical and physical

processes than intellectual work requiring the consistent exercise of discretion and judgment").

KPMG's expectations for First-Year Associates also make clear that their work first and

foremost is not intellectual: they are expected to be "accurate," "organized," and "detailed."

SOF ¶¶ 243-44, 246.

   KPMG also cannot prove that First-Year Associates consistently exercise discretion and

judgment.  Most of their tasks are laid out for them in audit steps describing procedures to be

completed.  SOF ¶¶ 140-44, 149, 155-56, 298-302.  It is not First-Year Associates' role to make

judgments regarding the objectives of the audit procedures or alternatives that were considered

---

[6]    The regulations do not define "predominantly."  The dictionary defines "predominant" to
mean: "being most frequent or common."  Merriam-Webster Online Dictionary, available at
http://www.merriam-webster.com/dictionary/predominant (last visited June 7, 2012).

by the partner or manager in selecting the procedures that they are assigned.  Those judgments were already made during the planning process when they determined the audit plan.  SOF ¶¶ 155-56.

It is also not First-Year Associates' role to make judgments as they perform audit procedures because they are required to bring any error or anomaly that they encounter to the attention of the in-charge or manager who tells them what to do.  *Id.* ¶ 231.  KPMG itself has labeled many of the procedures that First-Year Associates regularly perform as "non-judgmental."  *Id.* ¶¶ 181-86, 250, 261, 277.

First-Year Associates also do not perform their audit work "free from immediate direction or supervision."  They are supervised throughout the audit, from assignment of work through completion.  SOF ¶¶ 119, 147-48, 170, 173.  All of their work is reviewed by at least two sets of reviewers—a Senior Associate and then a Manager.  SOF ¶¶ 97, 136, 202, 204-05.

First-Year Associates are comparable to the staff accountants in *Brock v. National Health Corp.*, 667 F. Supp. 557 (M.D. Tenn. 1987), whom the court held did not exercise discretion and judgment.  *Id.* at 567.  The staff accountants' primary duty was auditing nursing home books prepared by bookkeepers.  *Id.* 561.  Like First-Year Associates, they were supervised and followed procedures.  *Id.* at 560-61.  They were also required to bring errors they identified to their supervisors' attention.  *Id.* at 560, 566.  The court rejected the argument that the responsibility to identify errors was "a discretionary matter" because "[a]ny ordinary bookkeeper would make inquiries about abnormalities" that they found.  *Id.* at 567.  *See also Hendricks*, 677 F. Supp. 2d at 553 ("it is unclear whether" the responsibility to investigate discrepancies within financial statements "constitutes 'discretion and judgment' within the meaning of the professional exemption").  The professional exemption does not apply to "employees with

professional training who are working in professional fields, but whose primary duty consists of the performance of sub-professional or routine work." *See* U.S. Dep't of Labor Opinion Letter, 1999 WL 33210909, at *1 (Nov. 2, 1999) (draftsmen in an architecture firm who hold architecture degrees not exempt if their primary duty is "drafting done in connection with the professional work of someone else).

Although KPMG's corporate witnesses repeated the mantra that all Associates are required to use "professional judgment" and "professional skepticism," this does not bear on KPMG's professional exemption defense.  "Professional judgment" and "professional skepticism," as KPMG uses these terms, are not the same as "discretion and judgment" under the FLSA.  At KPMG, "professional judgment" essentially means using good common sense— knowing when to ask a question, for example.  SOF ¶¶ 227, 230, 233, 238.  Under the FLSA, however, the exercise of discretion and judgment is much more than the "simple application of 'common sense' as to the propriety of a certain action." *Cotten v. HFS-USA, Inc.*, 620 F. Supp. 2d 1342, 1353 (M.D. Fla. 2009).

"Professional skepticism" has even less to do with the professional exemption.  KPMG defines it as "a mindset"—thinking objectively and critically.  SOF ¶¶ 234-36.  This is not the same as "discretion," which requires "the authority to make basic decisions . . . without seeking guidance from superiors as a matter of course." *Hashop v. Rockwell Space Operations Co.,* 867 F. Supp. 1287, 1298 (S.D. Tex. 1994) (aerospace personnel not exempt professionals because they made decisions "only within a well-defined framework" that was "inconsistent with 'discretion and judgment'").

B.    **Prolonged Specialized Intellectual Instruction Is Not Required to Perform First-Year Associates' Primary Duty.**

1.    **First-Year Associates Learn Their Primary Duty On the Job.**

First-Year Associates learn how to apply KPMG's most basic audit procedures on the job, not through prolonged, intellectual instruction. The first year at KPMG is essentially an apprenticeship – a "learning experience." SOF ¶¶ 239-41. First-Year Associates do not know how to perform audit procedures when they arrive at the firm. During the first year, they are taught basic auditing skills and how to apply them during Audit Fundamentals and on the job, through demonstration and explanation. *See* Part VI. A&B. *supra*.

The professional exemption does not apply to employees who acquire the skills necessary to do the job through employer-based training, rather than through academic training. *See* 29 C.F.R. § 541.301 (Jobs "that customarily may be performed with . . . knowledge acquired through an apprenticeship, or with training in the performance of routine mental . . . processes" are non-exempt). *See also Solis*, 656 F.3d at 1088 ("The requirement of a degree or sufficient coursework in any of several fields broadly related to a position suggests that only general academic training is necessary, with the employer relying upon apprenticeship and experience to develop the advanced skills necessary for effective performance[.]") Even job skills learned through intense, specialized in-house training are not covered by the professional exemption. *See* U.S. Dep't of Labor Opinion Letter, 2000 WL 34444354, at *1-2 (July 14, 2000) (field service technicians who received intense, specialized in-house training on the employer's systems are not exempt professionals because on-the-job training, not a specialized course of intellectual instruction, was necessary to do the job). First-Year Associates learn the skills they need to perform their jobs in Audit Fundamentals training and on the job. KPMG covers basic auditing topics in Audit Fundamentals in sufficient detail that new Associates who do not

remember the concepts or who never studied the concepts can get up to speed to do the job.  SOF ¶¶ 250-51, 258, 265-80.  Audit Fundamentals also teaches what an actual audit involves, because new Associates have never seen an actual audit or performed audit procedures. SOF ¶¶ 250-53, 257, 260.  First-Year Associates learn to execute the procedures they learn in Audit Fundamentals on the job during their first year.  They learn to understand what they are doing, why they are doing it, and, eventually, how to perform higher-level tasks.  SOF ¶ 296.

### 2.      The Coursework that KPMG Requires Is Not "Specialized."

KPMG cannot show that the academic background it requires First-Year Associates to have is "specialized."  *See* 29 C.F.R. § 541.301.  "The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree."  29 C.F.R. § 541.301(d).  KPMG does not make this prima facie showing because it does not require First-Year Associates to have an accounting degree or any specific type of academic degree at all.

KPMG could potentially meet the "specialized" requirement if it required a specific enough course of instruction that was directly related to the job.  *Solis* 656 F.3d at 1085. "Whether a position requires a degree in a specialized area, . . . or merely a specific course of study, . . . a 'prolonged course of specialized intellectual instruction' must be sufficiently specialized and relate directly to the position."  *Solis*, 656 F.3d at 1087-88 (citations omitted). KPMG cannot meet this standard because the coursework it requires to be hired as a First-Year Associate is not specialized enough and bears little connection to the actual duties that First-Year Associates perform.

The coursework is not specialized enough because KPMG requires only a minimal number of accounting courses—too few to be anything more than general.  *See* Part VII.A. *supra*.  In most states, CPA-eligibility also requires a number of general business classes and non-business classes.  SOF ¶ 311.  This requirement is even less specialized.  KPMG does not

30

"examine" any of applicant's coursework once it determines that he or she has a bachelor's degree in any area and is CPA-eligible or near-CPA eligible. *Solis*, 656 F.3d at 1088; *see* SOF ¶¶ 303, 342. In addition, none of the required coursework "relate[s] directly" to the First-Year Associate position because KPMG does not require First-Year Associates to have taken particular accounting courses—not even an auditing course. SOF ¶ 313. This "suggests that only general academic training is necessary" and that KPMG "rel[ies] upon apprenticeship and experience to develop the advanced skills necessary for effective performance" on audits. *See Solis*, 656 F.3d at 1088.

### C.   Audit Associates Do Not Perform Work Similar to that of KPMG's Licensed CPAs.

Not only do First-Year Associates not need a particular academic degree, they also do not need to be licensed. The rule that CPAs "generally meet the duties requirements for the learned professional exemption," 29 C.F.R. § 541.301(e)(5), therefore, does not apply to First-Year Associates. First-Year Associates do not fit within the exception to the CPA rule because they do not perform job duties that are "similar" to CPAs. *See id*. Rather, their duties are akin to those of "accounting clerks, bookkeepers and other employees who normally perform a great deal of routine work" who "generally will not qualify as exempt professionals." *Id*.

Here, KPMG cannot dispute that First-Year Associates' work is not similar to the work that team members who are required to be licensed perform. Manager is the least senior position on the engagement team that is required to be licensed. There can be no dispute that Associates' duties are not similar to Managers' duties. *See* Part II.B. *supra*.

**III.     KPMG Cannot Prove that Associates' Primary Duty Is Directly Related to Management or General Business Operations of KPMG or Its Customers With Respect to Any Associates.[7]**

To prove that Associates are exempt administrators, KPMG must establish that Associates' "primary duty is the performance of office or non-manual work directly related to the management or general business operations of [KPMG] or [KPMG's] customers." 29 C.F.R. § 541.200(a)(2). Because Associates' primary duty does not meet this requirement as a matter of law, the Court should grant summary judgment to Plaintiffs.

**A.     Associates Are Production Workers Whose Primary Duty Is Not Directly Related to Management or General Business Operations.**

To prove the "directly related" requirement, KPMG must show that Associates' primary duty is "administrative," not "production" work. *See Davis* 587 at 531-32. Employees perform "administrative" work when their work is directly related to "assisting with the running or servicing of the business." 29 C.F.R. § 541.201(a). Administrative work is the type that "must be performed no matter what the business produces," including "functions such as management of employees through a human resources department or supervising a business's internal financial activities through the accounting department." *Davis*, 587 F.3d at 535; *see also* 29 C.F.R. § 541.201(b).

Employees perform "production" work when they are engaged in producing or generating "the good or service that is the primary output of [the] business[.]" *Davis*, 587 F.3d at

---

[7]     In a May 9, 2012 letter, KPMG informed Plaintiffs that it intended to move to amend its Answer to eliminate its administrative exemption affirmative defense on a class-wide basis but would reserve the right to assert it with respect to "certain individual members within the putative class or collective." Swartz Decl. Ex. EEE. To date, KPMG has not moved to amend its Answer. Even if KPMG does amend its Answer, however, the Court should still grant summary judgment to Plaintiffs on the administrative exemption affirmative defense because the reason it fails applies generally to all Associates and is not based on the individual circumstances of any Associate.

535.  *See also Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 107 (2d Cir. 2010)

(advertising salespersons were production workers).

> ### B.      Associates Are Directly Involved in Producing Financial Statement Audits and Audit Opinions.

Associates' primary duty is performing day-to-day audit work.  Part III.B. *supra*.

Independent financial statement audits and the resulting audit opinions are what KPMG's Audit

function offers to its clients and from which it derives its fees.  SOF ¶¶ 4, 5, 60.  Associates'

work is one step "in [KPMG]'s day-to-day business" of providing independent audits.  *Bollinger*

*v. Residential Capital, LLC*, No. 10 Civ. 1123, 2012 WL 1945033, at *7 (W.D. Wa. May 30,

2012).  Associates' work is not of the sort that "must be performed no matter what the business

produces."  *Davis*, 587 F.3d at 535.  Rather, Associates "directly participate[]" in the "principal

service" that KPMG's Audit function provides.  *Smith v. Frac Tech Servs., LLC*, No. 09 Civ.

679, 2011 WL 96868, at *22 (E.D. Ark. Jan. 11, 2011).  Employees involved in the production

of the "fundamental service provided by" the employer do not fall within the administrative

exemption.  *Davis*, 587 F.3d at 534.

> ### C.      KPMG Evaluates Associates Based on Their Productivity.

The fact that KPMG evaluates Associates based on their productivity – or "utilization

rates" – is another indication of their status as production workers.  SOF ¶¶ 47-49.  The

underwriters in *Davis* were evaluated based on their productivity in terms of the number of

actions taken per day.  *Davis*, 587 F.3d at 53.  Associates' work is similarly quantifiable: they are

evaluated on whether they bill an adequate percentage of their time to clients.  SOF ¶¶ 50-51.

**D.** **Associates Do Not Determine the Strategy or Direction of KPMG's Business or Its Clients' Business.**

Employees are properly exempt administrators only when they perform "substantial advisory duties." *Davis*, 587 F.3d at 534. Associates play no role in determining the strategy of KPMG's Audit function. SOF ¶ 42. They also cannot participate in the management of the clients that they audit, in their operations, or in the running of their businesses. SOF ¶¶ 20-27, 29-30.

## IV.   KPMG Cannot Prove its Good Faith Defense to Liquidated Damages.

If Plaintiffs prevail, they are entitled to 100% liquidated damages because KPMG cannot prove that it acted in good faith.[8] *See* Ans. Fifth and Sixth Defenses, ECF No. 140. An employer that commits an FLSA overtime violation is ordinarily liable for the unpaid overtime and liquidated damages "in an additional equal amount." 29 U.S.C. § 216(b). Double damages are the "norm," not the "exception." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999). FLSA liquidated damages provide redress for the "delay in receiving wages due caused by the employer's violation." *Id.* at 142.

An employer may avoid liquidated damages by proving that it "acted in subjective 'good faith' and had objectively 'reasonable grounds' for believing that the acts or omissions giving rise to the failure did not violate the [Act]." *Id.* (quoting 29 U.S.C. § 260). This issue is susceptible to summary judgment for the employee. *See, e.g., Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 316-17 (S.D.N.Y. 2011). KPMG's own corporate testimony precludes it from proving good faith. "Good faith" requires an employer to prove that it took "active steps

---

[8]   The Court should decide this issue in Plaintiffs' favor regardless of whether it grants summary judgment to Plaintiffs on KPMG's affirmative defenses. If this case goes to trial, good faith should not be an issue because KPMG's admissions preclude a reasonable jury from finding in its favor.

to ascertain the dictates of the FLSA and then move[d] to comply with them." *Reich v. S. New Eng. Telecomm'ns. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997).  In short, KPMG never even *considered* whether classifying Associates as exempt was legal or not, *see* Part IX *supra*, so it cannot avoid liquidated damages.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for partial summary judgment on KPMG's exemption and good faith affirmative defenses.

Dated:        New York, New York
              June 8, 2012

                                    Respectfully submitted,

                                    **OUTTEN & GOLDEN LLP**
                                    By:

                                    /s/ Justin M. Swartz
                                    Justin M. Swartz
                                    Rachel Bien
                                    Elizabeth Wagoner
                                    Dana Sussman
                                    3 Park Avenue, 29th Floor
                                    New York, New York 10016
                                    Telephone:  (212) 245-1000

                                    **SHAVITZ LAW GROUP, P.A.**
                                    Gregg Shavitz (admitted *pro hac vice*)
                                    Keith Stern (admitted *pro hac vice*)
                                    Susan H. Stern (admitted *pro hac vice*)
                                    1515 S. Federal Highway, Suite 404
                                    Boca Raton, Florida 33432
                                    Telephone: (456) 447-8888

                                    **Attorneys for Plaintiffs**