**OUTTEN & GOLDEN LLP**
Justin M. Swartz
Rachel Bien
Elizabeth Wagoner
Dana Sussman
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000

**SHAVITZ LAW GROUP, P.A.**
Gregg Shavitz (admitted *pro hac vice*)
Keith Stern (admitted *pro hac vice*)
Susan H. Stern (admitted *pro hac vice*)
1515 S. Federal Highway, Suite 404
Boca Raton, Florida 33432
Telephone: (456) 447-8888

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KYLE PIPPINS, JAMIE SCHINDLER, and EDWARD LAMBERT, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>KPMG LLP,<br><br>      Defendant. | No. 11 Civ. 0377 (CM) (JLC) |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S <u>MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 1

I.   Associates Are Entry-Level Employees at the Bottom of the Engagement
     Team Hierarchy.......................................................................................................... 1

II.  Audit Associates Learn to Do Audit Tasks in KPMG Training and On the Job ......... 6

III. KPMG Requires a Very Limited Accounting Background ........................................... 8

ARGUMENT ...................................................................................................................... 9

I.   KPMG Faces a Particularly High Procedural Hurdle ................................................. 9

II.  A Reasonable Jury Could Find in Plaintiffs' Favor on Essential Elements of
     the Professional Exemption ....................................................................................... 11

     A.   A Jury Could Find that Associates' Primary Duty Is Not Work
          Requiring Advanced Knowledge ..................................................................... 13

          1.   A Jury Could Find that Associates' Primary Duty Is Not
               Predominantly Intellectual in Character ............................................... 13

          2.   A Jury Could Find that Associates' Primary Duty Does Not
               Involve the Consistent Exercise of Discretion and Judgment ........... 13

               a.   A jury could find that Associates' primary duty involves the
                    use of skill in applying well-established techniques,
                    procedures or specific standards......................................................... 14

               b.   A jury could find that Associates' primary duty does not involve the
                    comparison and evaluation of possible courses of conduct, and acting
                    or making decisions after considering various possibilities .............. 16

               c.   A jury could find that Associates' primary duty is routine work ...... 18

               d.   A jury could find that due professional care, professional skepticism,
                    and professional judgment are not the same as discretion and
                    judgment under the FLSA ................................................................. 20

     B.   A Jury Could Find that the Associate Job Does Not Require
          Knowledge Customarily Acquired by a Prolonged Course of
          Specialized Intellectual Instruction ............................................................... 22

i

1.   A Jury Could Find that the Associate Job Requires Only a Few Accounting Courses, If That .............................................................. 22

2.   A Jury Could Find that KPMG's Educational Requirements Are Not "Specialized" Enough .......................................................... 23

3.   A Jury Could Find that Associates Learn How to Perform Their Primary Duties On The Job .................................................................. 24

CONCLUSION .......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                            **PAGE(S)**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................9

*Birkemose-Hansen v. Zwanenberg Food Group (USA), Inc.*,
    No. 09 Civ. 0203, 2010 WL 2854128 (S.D. Ohio July 19, 2010) ..........................................23

*Brock v. National Health Corp.*,
    667 F. Supp. 557 (M.D. Tenn. 1987)................................................................................15, 16

*Christopher v. SmithKline Beecham Corp.*,
    -- S. Ct. --, 2012 WL 2196779 (June 18, 2012)................................................................10, 11

*Coach Leatherware Co. v. AnnTaylor, Inc.*,
    933 F.2d 162 (2d Cir. 1991)..........................................................................................9

*Cotten v. HFS-USA, Inc.*,
    620 F. Supp. 2d 1342 (M.D. Fla. 2009)................................................................................21

*De Jesus-Rentas v. Baxter Pharmacy Servs. Corp.*,
    400 F.3d 72 (1st Cir. 2005)..........................................................................................14

*Donovan v. Burger King Corp.*,
    675 F.2d 516 (2d Cir. 1982)..........................................................................................16

*Foster v. Nationwide Mut. Ins. Co.*,
    695 F. Supp. 2d 748 (S.D. Ohio 2010) ................................................................................17

*Galasso v. Eisman, Zucker, Klein & Ruttenberg*,
    310 F. Supp. 2d 569 (S.D.N.Y. 2004) (McMahon, J.)................................................................12

*Hendricks v. J.P. Morgan Chase Bank, N.A.*,
    677 F. Supp. 2d 544 (D. Conn. 2009)....................................................................... *passim*

*Klinedinst v. Swift Invs., Inc.*,
    260 F.3d 1251 (11th Cir. 2001) ..........................................................................................11

*Lazoda v. Maggy*,
    900 F. Supp. 596 (N.D.N.Y. 1995)......................................................................................10

*Martin v. Malcolm Pirnie, Inc.*,
    949 F.2d 611 (2d Cir. 1991)..........................................................................................9

*Nat'l Union Fire Ins. Co. v. Turtur*,
    892 F.2d 199 (2d Cir. 1989)..........................................................................................10

*In re Novartis Wage and Hour Litig.*,
    611 F.3d 141 (2d Cir. 2010)....................................................................................10, 11

*Piscione v. Ernst & Young, LLP*,
    171 F.3d 527 (7th Cir. 1999) ...............................................................................20

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir.1991).....................................................................................9

*Rausch v. Wolf*,
    72 F. Supp. 658 (N.D. Ill. 1947) ..........................................................................12

*In re RBC Dain Rauscher Overtime Litigation*,
    703 F. Supp. 2d 910 (D. Minn. 2010)...................................................................25

*Reich v. Wyoming*,
    993 F.2d 739 (10th Cir. 1993) ..............................................................................24

*Rutlin v. Prime Succession, Inc.*,
    220 F.3d 737 (6th Cir. 2000) ...............................................................................24

*Schaefer-LaRose v. Eli Lilly & Co.*,
    679 F.3d 560 (7th Cir. 2012) ...............................................................................16

*Solis v. Washington*,
    656 F.3d 1079 (9th Cir. 2011) ...................................................................23, 24, 25

*Thompson v. Gjivoje*,
    896 F.2d 716 (2d Cir. 1990)..................................................................................10

**REGULATIONS**

29 C.F.R. § 541.202 ..................................................................................... *passim*

29 C.F.R. § 541.301 ..................................................................................... *passim*

29 C.F.R. § 541.700(a)..........................................................................................11

**OPINION LETTERS**

U.S. Dep't of Labor Opinion Letter, 1986 WL 1171119 (Aug. 11, 1986)....................................23

U.S. Dep't of Labor Opinion Letter, 1999 WL 33210909 (Nov. 2, 1999)....................................23

U.S. Dep't of Labor Opinion Letter, 2000 WL 34444354 (July 14, 2000) ...................................25

U.S. Dep't of Labor Opinion Letter, 2006 WL 2792440 (July 24, 2006) ....................................11

U.S. Dep't of Labor Opinion Letter, 2007 WL 506578 (Feb. 1, 2007)........................................13

**OTHER AUTHORITIES**

Merriam-Webster Online Dictionary, available at http://www.merriam-webster.com/dictionary/predominant (last visited June 29, 2012) ..........................................13

## PRELIMINARY STATEMENT

The Court should deny KPMG's motion for summary judgment that its entry-level Audit Associates ("Associates") are exempt professionals.  KPMG requires no prior work experience, no particular academic degree, no professional license, and as few as four (or possibly fewer) college courses in accounting in order to be hired.  It hires Associates at the bottom level of its audit teams, assigns them routine procedures that they spend most of their first two years learning how to perform through KPMG's in-house audit training programs and by on-the-job instruction from more senior employees.  KPMG bases its motion almost completely on the mantra that Associates are subject to certain professional standards and hardly even argues that elements of the professional exemption apply.  A jury could easily find in Plaintiffs' favor.

On June 8, 2012, Plaintiffs moved for summary judgment that the professional exemption does not apply to First-Year Associates as a matter of law because KPMG's documents and admissions conclusively establish that the first year of an Associate's career is a training year during which their duties are limited.  KPMG's motion should fail for the same reasons with respect to First-Years.  It should also fail with respect to First-Year Associates and Second-Year Associates because Plaintiffs present plenty of evidence for a jury to find in their favor.

## STATEMENT OF FACTS

I.    **Associates Are Entry-Level Employees at the Bottom of the Engagement Team Hierarchy.**

KPMG admits that the Associate job is an entry-level job.  *See* Def. KPMG LLP's Statement of Undisputed Material Facts in Supp. of its Motion for Summ. J. ("Def. SOF"), ECF No. 266, ¶ 5.  KPMG does not require Associates to have any prior work experience in order to be hired and most are hired right out of college.  Pls.' Additional Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(a) ("ASF") ¶ 288.  KPMG audit engagement

teams are leveraged operations with a few decision-makers at the top of the pyramid and many workers below them.  Some audit teams have over a hundred members.  *Id*. ¶ 44.  Partners are at the top of the hierarchy and Associates are at the bottom, Def. SOF ¶ 5, unless the engagement also has interns.  ASF ¶¶ 38-39.  Between them are three levels of management and supervision – Senior Managers, Managers, and Senior Associates.  *Id*. ¶ 37.  Associates perform the "front-line audit fieldwork."  Def. SOF ¶ 51.

Every audit has an Engagement Partner who is responsible for the audit from before the client hires KPMG until the Auditor's Report is issued, ASF ¶¶ 54-57, 59, 66-67, 79-80, 90, and who is the final decision-maker in all respects, including with respect to planning the audit.  *Id*. ¶¶ 59, 70, 79-80, 90.  The Engagement Partner is responsible for planning the engagement from beginning to end.  *Id*. ¶¶ 70-71, 76-79, 87.  Partners also review and approve all deliverables and form the audit opinion.  *Id*. ¶¶ 7-10, 54-57, 59, 128, 202.

Managers are responsible for ensuring that the audit plan is appropriately carried out by the engagement team.  *Id*. ¶¶ 60, 91.  Managers are often present in the field to supervise the work and determine which team members should be present during certain procedures.  *Id*. ¶¶ 101-103.  KPMG requires Managers to review all of the working papers that are drafted during an audit.  *Id*. ¶¶ 60, 93-95, 208.  Managers keep the Partner informed on the progress of the engagement, resolve issues with team members as they arise and discuss them with the Partner, and supervise and direct the engagement team.  *Id*. ¶ 60.

Senior Associates' primary duty is executing audit procedures.  Like Associates, they are expected to perform tasks assigned to them, prepare work papers and inform the Partner or Manager of issues or problems.  *Id*. ¶ 62.  Senior Associates also provide on the job training to Associates, including walking them through procedures that they are assigned.  *Id*. ¶¶ 109-114.

The core role of Associates is to execute audit procedures learned in KPMG training and on the job.  Associates perform the lowest-level tasks on the audit team.  *See id.* ¶¶ 37, 39, 131, 132, 135, 148-150, 215, 229, 231, 233; Plaintiffs' Counter-Statement of Material Facts Pursuant to Local Rule 56.1(b) ("Counter-Statement") ¶ 4.  Most of the tasks that Associates perform are set out for them in steps that describe the procedures that they must complete to gather audit evidence.  Counter-Statement ¶ 3.  It is not their role to spend time determining the problem and objectives of the audit procedures they are assigned or the possible alternatives that were considered by the partner or manager in selecting the particular procedures that they are assigned.  *Id.* ¶ 46.  *See also* ASF ¶ 261 (Associates are responsible for performing the tasks that are assigned to them); ¶ 262 (Pippins did whatever tasks the manager wanted him to do); ¶ 269 (Schindler did not make adjustments to procedures unless she was told to do so).

One procedure that Associates frequently perform is an inventory observation.  *Id.* ¶¶ 136-37.  An inventory observation generally involves: (1) physically counting the client's inventory; (2) evaluating the results; and (3) observing and reviewing "cutoff."  *Id.*  Physically counting inventory means re-counting the client's inventory at the client's premises or watching the client's personnel count it.  *Id.* ¶ 138.  Evaluating the results means comparing the results of the count with the information on the client's records and looking for any discrepancies.  *Id.* ¶ 139.  The "observation of cut-off" means observing whether inventory has been received or removed from the client's premises during the physical count of inventory and obtaining the client's records to make sure that inventory was accurately counted.  *Id.* ¶ 140.

Another procedure that Associates frequently perform on audits is a walkthrough.  A walkthough generally involves: (1) obtaining the client's documentation of the controls that they have in place; (2) asking the client's personnel to explain what they do to carry out their controls;

(3) comparing what the client's personnel says to what their documentation says; (4) asking the client's personnel about any variances that their controls identified and for documentation to cite as audit evidence; and (5) documenting the steps in work papers.  *Id*. ¶ 146.

Consistent with its obligations under professional standards, KPMG supervises Associates throughout the audit, from the assignment of work through its completion.  *Id*. ¶¶ 127, 129-30, 134.  All of the work that Associates perform is first reviewed by a more experienced team member and then by the manager.  *Id*. ¶¶ 92, 133, 214, 216-17.  KPMG provides Associates with a "WorkPaper Review Checklist" to use as a tool as they complete their work.  *Id*. ¶ 211. Associates' primary duties do not include making the decisions that are part of the planning process.  *Id*. ¶¶ 70, 73, 76-77, 81-85, 89; Counter-Statement ¶ 3.  In fact, Associates are not necessarily even invited to attend engagement planning meetings, including the "kick off" meeting at which "key" engagement members discuss their perspectives on how the audit should be approached.  ASF ¶¶ 80, 82-86.  Associates do not make important decisions regarding the nature, timing, and extent of the audit procedures that they are assigned.  *Id*. ¶¶ 173, 175-76, 178-81, 183-84, 186, 188-89; Counter-Statement ¶ 3.  When Associates encounter a difference from the expectation, they are required to bring it to the attention of the in-charge or Manager.  ASF ¶¶ 114, 145, 182, 185; Counter-Statement ¶ 3.

Associates do not review audit evidence that has been compiled for each section of the audit, analyze the evidence, or draw conclusions from it regarding the overall audit.   Counter-Statement ¶¶ 11, 14, 63.  This is done by Senior Associates, Managers, and Partners.  ASF ¶ 202. Associates also perform a host of clerical tasks related to their primary duty of executing audit procedures.  They make copies, compile binders, organize and fax documents, populate spreadsheets, update working papers by inserting client information.  *Id*. ¶ 149.

KPMG has labeled certain procedures as "non-judgmental," including confirmations, reconciliations, recalculations, and certain procedures over financial statements. *Id.* ¶¶ 193-98. All of these are tasks that Associates are likely to perform. *Id.* ¶¶ 288, 299, 317. Associates do not play a major role after the audit evidence has been gathered and documented. Senior members of the engagement team are responsible for evaluating findings, finalizing adjustments, conducting the client exit interview, and producing the Auditor's Report. *Id.* ¶ 202. Associates typically make sure that all audit documentation has been signed off by more senior team members, clear review comments, and complete checklists. *Id.* ¶ 201.

KPMG's goals for audit team members illustrate important differences in the responsibilities of each job level. For example, Associates are expected to "work with my senior associates/managers to complete my assignments within established timelines and deadlines." *Id.* ¶ 106. Senior Associates are expected to "[c]onduct the audit" and Managers are expected to "[m]anage, review and document the audit[.]" *Id.* ¶¶ 207-08. Associates are expected to "[p]repare clear and concise audit documentation;" while Senior Associates are expected to "review audit documentation prepared by others[,] and [e]nsure review comments are appropriately cleared." *Id.* ¶¶ 209, 216. Managers are expected to "[e]nsure audit documentation has been reviewed . . . and all outstanding comments have been cleared before submission to partners." *Id.* ¶ 217. The goals for both Managers and Senior Associates – but not Associates – involve taking ownership of certain issues on audits, although Managers' goals are far more extensive. For example, Senior Associates: "Take responsibility for issue identification and resolution[,]" "Proactively suggest improvements or refine the current process to continually raise the level of quality service and deliverables[,]" "Research, address, or demonstrate a proactive response or action plan to issues[,]" and "Communicate circumstances that will

jeopardize deadlines." *Id*. ¶ 232.  Managers: "Take responsibility for comments/issues identified as a result of partner or senior manager review[,]" "Oversee identification and resolution of accounting issues with engagement and reviewing partners[,]" and "Create engagement plan[s]." *Id*. ¶¶ 218, 220, 236.  None of these is a goal for Associates.  *Id*. ¶¶ 215, 233.

Associates are discouraged from exercising judgment and discretion.  They are told to consult with more senior team members when they encounter anything out of the ordinary, when they lack experience or expertise, when they do not understand why a procedure is being performed, or when "something just does not 'feel right.'"  *Id.* ¶ 243.  KPMG believes that professional judgment is acquired with experience.  *Id.* ¶ 244.

## II.   Audit Associates Learn to Do Audit Tasks in KPMG Training and On the Job.

Associates learn the basics of being a KPMG employee and an audit team member during their first year through formal trainings and on the job training.  The first year is a "learning experience."  ASF ¶¶ 277-279.  Associates take two mandatory training courses, one before they begin working called "Audit Fundamentals," and the other near the end of their first year called "Advanced Auditing for Associates."  *Id.* ¶¶ 286, 329.  These two trainings are the entry-level installments in KPMG's training series, and are designed to teach Associates what they will need to know during the following year.  *Id.* ¶¶ 288-289, 329.  At the end of their second year, Associates take mandatory In-Charge Auditor ("ICA") training, which teaches them the procedures they are likely to perform as Senior Associates.  *Id.* ¶ 329.  Associates require this extensive training because otherwise they will not be able to perform their primary duty of performing audit procedures.  *Id*. ¶¶ 288-329.  It would be "negligent" to send a new Associate into the field to perform audit procedures without Audit Fundamentals training.  *Id*. ¶¶ 319-320.

Audit Fundamentals provides training on audit concepts, such as what an audit is, what "GAAP" stands for, what audit working papers are, and why companies need to undertake audits, as well as training on how to apply the concepts to the audit procedures that Associates are most likely to perform during their first year. *Id*. ¶¶ 288-89, 296, 303-318. KPMG re-trains Associates on audit concepts to refresh the memories of some new hires and to introduce the concepts to other new hires who do not know what is involved in an audit or what financial statements look like before they take Audit Fundamentals. *Id*. ¶¶ 288-91, 295, 298, 305-16, 320. Although most new Associates begin their employment with "at least a perception" of what an audit is, KPMG provides training because it would not be "realistic" to assume that all new hires remember what an audit is before taking Audit Fundamentals. *Id*. ¶¶ 305-312.

Associates are also taught to use KPMG's proprietary software program, eAudit, which is a computer program that is used to execute audits. eAudit consists of a series of screens that walk users through the audit steps that must be completed for each area of the audit. eAudit embeds guidance from KPMG's Audit Methodology ("KAM") through "Knowledge" buttons that users can click to show them how to apply KAM and other KPMG manuals and guidance to the audit steps they are assigned. *Id*. ¶¶ 322-28. eAudit walks Associates through the substantive approach of the audit and guides them through making judgments and through the execution of procedures. *Id*. ¶¶ 324-27.

Associates also receive extensive on the job training at KPMG. On the job training enables Associates to understand everything that is required to do their job, including what they are doing, why they are doing it, how to evaluate audit evidence, how to evaluate the results of audit procedures, how to identify exceptions, and how to document the results of their work. *Id*. ¶ 334. More senior team members show more junior members how to do particular procedures

7

that they have not performed before by walking them through the procedures.  *Id*. ¶¶ 336-340.

Associates learn to perform the tasks described in Audit Fundamentals from more experienced

team members while they are "on-the-job."  *Id.* ¶ 363.  Other procedures that Associates are

assigned are so simple that they can learn how to perform them by reading a written description

of the steps they are supposed to take.  For example, Associates would not need to be walked

through an inventory count or counting cash because their task is simply to count.  *Id*. ¶ 300.

### III.    KPMG Requires a Very Limited Accounting Background.

KPMG does not require Associates to have any particular degree.  *Id.* ¶¶ 341-42.  KPMG

does require an undergraduate degree but does not require that it be in accounting or any

particular major.  *Id.* ¶¶ 341, 348.  Of the 1,096 individuals who had joined this case as of mid-

May, almost 19% did not have accounting degrees when they were hired.  *Id.* ¶ 364.

KPMG does not require Associates to have a CPA license to be hired or promoted.  *Id.* ¶¶ 380-

81.  KPMG does not even require new Associates to be *eligible to take* the CPA exam.   KPMG

only requires new recruits to be "near CPA-eligible" with a "clear plan" to become CPA-

eligible.[1]  *Id.* ¶¶ 341, 384.  The minimum qualification to be hired as an Associate is the fewest

number of credits necessary to be CPA-eligible or near CPA-eligible *in any state*.  *Id.* ¶ 353.

Some states require very few credits to be CPA-eligible.  For example, New Hampshire requires

12 hours (4 courses) of accounting credits.  Maine requires 15 hours (5 courses).  *Id.* ¶ 346.

The accounting knowledge that KPMG hopes Associates have is "foundational"

knowledge.  *Id.* ¶¶  344-45.  KPMG does not require Associates to have taken a course in

auditing to be hired.  *Id.* ¶ 348.  Associates who have not taken auditing can obtain the skills they

---

[1]     KPMG's 30(b)(6) witness on hiring criteria could not explain what a "clear plan to become CPA-eligible" is or provide an example of one.  KPMG does not have a specific policy with respect to how long an Associate can be near CPA-eligible and still be employed at KPMG. *Id.* ¶ 330.

need through the training that KPMG provides and through experience on the job.  *Id.* ¶ 349.

Even Associates who have taken coursework in auditing require KPMG training and on the job

experience in order to perform their duties.  *Id.* ¶ 350.

KPMG does not require employees to have a CPA license until they are promoted to

Manager.  *Id.* ¶¶ 378, 381-82.  Under the professional standards, having a license is necessary to

be qualified to practice public accountancy.  *Id.* ¶ 385.  KPMG requires Managers to be licensed

because of the functions they perform, including reviewing all work papers, supervising all staff

members, and working directly with the Partner.  *Id.* ¶ 378.  KPMG does not prohibit Associates

who fail the auditing section of the CPA exam from being promoted.  *Id.* ¶ 377.

## ARGUMENT

### I.    KPMG Faces a Particularly High Procedural Hurdle.

KPMG faces difficult procedural roadblocks in moving for summary judgment on its

professional exemption affirmative defense.  Because KPMG is the moving party, it can prevail

only if "no reasonable jury could return a verdict" for Plaintiffs.  *Coach Leatherware Co. v.

AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991).  In making this determination, the Court must

accept Plaintiffs' version of the facts, make all reasonable inferences from those facts in

Plaintiffs' favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and resolve all

ambiguities in Plaintiffs' favor.  *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991).  KPMG's

motion cannot succeed because it bases much of its case on conclusory pronouncements and

references to vague "professional standards" that do not compel a finding in KPMG's favor.

The summary judgment standard holds added significance here because KPMG bears the

ultimate burden of proof at trial.  The professional exemption is an affirmative defense and the

burden of proving it is on KPMG.  *See Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d

Cir. 1991). "Where the movant shoulders the burden of proof, it must establish that there is no genuine issue of material fact to be decided regarding *any essential element* of that party's claim." *Lazoda v. Maggy*, 900 F. Supp. 596, 601 (N.D.N.Y. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (emphasis added). "[I]f the party opposing summary judgment generates uncertainty as to the true state of any material fact" summary judgment is inappropriate. *Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir. 1989). Plaintiffs need not conclusively negate any element of KPMG's claim in order to avoid summary judgment, they must only show that any element "may reasonably be decided in favor of either party." *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citation omitted).

  Here, Plaintiffs do more than "generate uncertainty" about KPMG's purportedly undisputed facts. They directly contradict them using KPMG's own corporate documents and corporate representative testimony, and Plaintiffs' deposition testimony. In doing so, Plaintiffs demonstrate that a reasonable jury could decide that KPMG has not established several elements of its defense.

     Finally, the Court should decline KPMG's invitation to stretch the bounds of the professional exemption to include the Audit Associate job. Because the FLSA is a "remedial law," its exemptions are "narrowly construed against the employers seeking to assert them and their application limited to [employees] plainly and unmistakably within their terms and spirit." *In re Novartis Wage and Hour Litig.*, 611 F.3d 141, 150 (2d Cir. 2010), *abrogated on other grounds by Christopher v. SmithKline Beecham Corp.*, -- S. Ct. --, 2012 WL 2196779, at *7 (June 18, 2012).[2] KPMG, therefore, bears the burden of proving by "clear and affirmative

---

[2]     The Supreme Court did not do away with the narrow construction of FLSA exemptions. Rather, the Court determined that the meaning of "sales" was not entitled to a narrow

evidence," *Klinedinst v. Swift Invs.*, *Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001), that Associates

are "plainly and unmistakably" exempt. *In re Novartis Wage and Hour Litig.*, 611 F.3d at 150.

A jury could easily determine that KPMG has not done so.

## II.     A Reasonable Jury Could Find in Plaintiffs' Favor on Essential Elements of the Professional Exemption.

The professional exemption requires KPMG to prove three things with respect to

Associates' "primary duty":  (1) that they "perform work requiring advanced knowledge;" (2)

that the knowledge is "in a field of science or learning;" and (3) that the knowledge is

"customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. §

541.301.  The term "primary duty" means "the principal, main, major or most important duty

that the employee performs." 29 C.F.R. § 541.700(a); *Hendricks v. J.P. Morgan Chase Bank,*

*N.A.*, 677 F. Supp. 2d 544, 552 (D. Conn. 2009) ("'the major emphasis [is] on the character of

the employee's job as a whole'") (quoting 29 C.F.R. § 541.700(a)).

Although the regulations suggest that accounting is a field of science or learning, *see* 29

C.F.R. § 541.301(e)(5), they make clear that not all workers who work in the accounting field are

exempt professionals.  *Id.* (certified public accountants only "generally" meet the duties

requirements of the professional exemption and other accountants who are not certified public

accountants "may qualify" only if they perform "similar job duties" to certified public

accountants and if they do not "perform a great deal of routine work"); U.S. Dep't of Labor

Opinion Letter, 2006 WL 2792440, at *2 (July 24, 2006) ("an individual may work in 'a field of

science or learning' but still not meet the requirements for the learned professional exemption"

because of the nature of the individual's job).  For example, "accounting clerks, bookkeepers and

construction because it is not contained within an exemption itself but elsewhere in the statute.
*SmithKline*, 2012 WL 2196779, at *13-14.

other employees who normally perform a great deal of routine work generally will not qualify as

exempt professionals."  29 C.F.R. § 541.301(e)(5); *see Hendricks*, 677 F. Supp. 2d at 552

(denying employer's motion for summary judgment, in part, because there was a question of fact

as to whether the plaintiffs "primarily 'perform[ed] similar job duties' to those of a CPA, or

whether they 'normally perform[ed] a great deal of routine work'").  Here, the dispute is not over

whether accounting qualifies as a field of science or learning, but over Associates' "*roles* within

the larger field of accounting," *Hendricks*, 677 F. Supp. 2d at 555, and with respect to the field of

auditing in particular.

 Thus, it is not true, as KPMG claims, that an employee is exempt merely because she

works on an audit.  Def. Br. at 20.  The cases that KPMG cites all involve licensed accountants

who performed high level duties.  *See Galasso v. Eisman, Zucker, Klein & Ruttenberg*, 310 F.

Supp. 2d 569, 575 (S.D.N.Y. 2004) (McMahon, J.) (CPA "represented clients before the United

States Internal Revenue Service, gave clients professional advice regarding tax and accounting

matters, prepared tax returns, conducted and issued opinions on certified audits, performed

review and compilation engagements, and responded to tax correspondence from state and

federal agencies"); *Rausch v. Wolf*, 72 F. Supp. 658, 661 (N.D. Ill. 1947) (CPA's primary duties

included "auditing and examining clients' records, books and other documents in order to

determine whether State and Federal laws had been complied with; . . . preparing Federal and

State Tax Returns and Securities and Exchange Commission Reports for clients; . . . handling

accounting matters connected with recapitalization of corporate clients; [and] preparing reports

to stockholders, balance sheets and other financial statements and documents for clients").

**A.      A Jury Could Find that Associates' Primary Duty Is Not Work Requiring
Advanced Knowledge.**

Plaintiffs present sufficient evidence on which a jury could base a finding that Audit

Associates' primary duty is not performing work requiring "advanced knowledge."  Under the

FLSA, "advanced knowledge" must be: (1) "predominantly intellectual in character," and (2)

involve "the *consistent* exercise of discretion and independent judgment."  29 C.F.R. §

541.301(b) (emphasis added).  The regulations are clear that work that involves the performance

of "[r]outine mental . . ." tasks does not require "advanced knowledge."  *Id.*

**1.      A Jury Could Find that Associates' Primary Duty Is Not
Predominantly Intellectual in Character.**

KPMG presents no evidence that the work that Associates most frequently or commonly[3]

perform is intellectual.  As discussed in Section II.A.2.c, *infra*, their work most often involves

performing routine, mechanical exercises – counting, observing, comparing, and documenting –

that are not intellectual.  *See* U.S. Dep't of Labor Opinion Letter, 2007 WL 506578, at *1, 3

(Feb. 1, 2007) (administering radiology chemicals to patients, analyzing equipment, setting

technical factors on equipment, and evaluating the adequacy of film for readings, is non-exempt

"routine mental, manual, mechanical and physical" work).

**2.      A Jury Could Find that Associates' Primary Duty Does Not Involve
the Consistent Exercise of Discretion and Judgment.**

Plaintiffs present evidence that Audit Associates rarely, much less "consistent[ly],"

exercise discretion or judgment as part of their primary duty.  A reasonable jury could conclude

that Audit Associates' job involves using skill to apply well-established procedures and the

performance of routine audit tasks that do not involve "the comparison and the evaluation of

---

[3]       The regulations do not define "predominantly."  The dictionary defines "predominant" to
mean: "being most frequent or common."  Merriam-Webster Online Dictionary, available at
http://www.merriam-webster.com/dictionary/predominant (last visited June 29, 2012).

possible courses of conduct, and acting or making a decision after the various possibilities have

been considered," as required by the FLSA.  29 C.F.R. § 541.202.[4]

> a.   **A jury could find that Associates' primary duty involves the use of skill in applying well-established techniques, procedures or specific standards.**

KPMG's own documents and testimony allow a finding that the Associate job requires

"no more than the use of skill in applying well-established techniques, procedures or specific

standards described in manuals or other sources."  *See* 29 C.F.R. § 541.202(e).  Most of

Associates' tasks are laid in audit steps describing procedures to be completed.  Counter-

Statement ¶ 3.  These procedures are summarized in an audit program, which is a list of

procedures that the audit team carries out on the audit.  *Id.*  In performing their assigned

procedures, Associates follow templates contained in working papers in which they document

the performance of each step.  *Id.* ¶ 19(b).  KPMG also provides Associates with a "WorkPaper

Review Checklist" to use as a tool or reference as their complete their work.  ASF ¶ 211.  In

addition, Audit Associates use eAudit, a computer program, which takes them through the audit

steps that must be completed for each area of the audit.  *Id.* ¶¶ 322-27.

Plaintiffs testified that they followed a set of standard procedures established by KPMG

to perform their primary duty.  For example, Plaintiff Pippins described performing "substantive

procedures" as "taking a template that was created by KPMG and populating numbers."  *Id.* ¶

152.  He also testified that Associates rarely, if ever, deviate from KPMG's guides or templates.

*Id.* ¶ 148.  Plaintiff Lambert described his work doing "risk of failure" document preparation as

inputting numbers provided by a Senior Associate to update an existing spreadsheet.  *Id.* ¶ 142.

---

[4]      Because the phrase "discretion and judgment" is not specifically defined in the
professional exemption regulations, courts look to the administrative exemption's definition of
"discretion and judgment."  *See De Jesus-Rentas v. Baxter Pharmacy Servs. Corp.*, 400 F.3d 72,
74 n.4 (1st Cir. 2005).

14

He also described his work on a balance sheet as typing information into a spreadsheet.  *Id*. ¶ 143.  Opt-In Bradley described updating work papers from the previous year's work papers by inputting numbers into a prepared worksheet.  *Id*. ¶ 151.

Even the complicated-sounding audit tasks simply require carefully following established procedures.  For example, "testing operating effectiveness" means following a procedure and filling information into a template.  *Id*. ¶ 155. "Performing substantive procedures" involves following steps on a guide or a template.  *Id*. ¶ 152.  "Expense analytics" means comparing previous data to current data and providing that information to more senior team members.  *Id*. ¶ 163.  "Testing internal controls" involves obtaining a list of the client's controls and redoing the steps.  Counter-Statement ¶ 59(c).  Preparation of audit work papers means updating or entering information and proofreading it.  ASF ¶ 159.  "Conducting an inventory observation" generally involves: performing a physical count of inventory, comparing the results of the count with information from the client's records to see if there are any differences, and personally observing whether inventory has been received or removed from the client's premises during the physical count of inventory and obtaining the client's records to see whether the inventory was accurately counted.  *Id*. ¶¶ 137-140.  A "walkthrough" involves having the client's personnel walk through the steps they take with respect to their internal controls, and transcribing everything.  *Id*. ¶ 160.

Associates are comparable to the staff accountants in *Brock v. National Health Corp.*, 667 F. Supp. 557 (M.D. Tenn. 1987), whom the court held did not exercise discretion and judgment.  *Id*. at 567.  The staff accountants' primary duty was auditing nursing home books prepared by bookkeepers.  *Id*. at 561.  Like Associates, they were supervised and followed procedures.  *Id*. at 560-61.  They were also required to bring errors they identified to their supervisors' attention.  *Id*. at 560, 566.  The court rejected the argument that the responsibility to

15

identify errors was "a discretionary matter" because "[a]ny ordinary bookkeeper would make inquiries about abnormalities" that they found.  *Id*. at 567.

*Schaefer-LaRose v. Eli Lilly & Co*., 679 F.3d 560 (7th Cir. 2012), is not on point for several reasons, including that the plaintiffs in that case "spen[t] the vast majority of their time entirely unsupervised."  *Id*. at 581.   Here, Associates perform their work under close supervision.  *Donovan v. Burger King Corp*., 675 F.2d 516 (2d Cir. 1982), is inapposite because it analyzes whether an employee has "managerial duties" under the executive exemption, which is a different standard than the "discretion and judgment" standard under the professional or administrative exemptions.  *See id*. at 521-22.

> **b.     A jury could find that Associates' primary duty does not involve the comparison and evaluation of possible courses of conduct, and acting or making decisions after considering various possibilities.**

Plaintiffs present sufficient evidence that Associates do not compare and evaluate possible courses of conduct and act or make a decision after considering the various possibilities. *See* 29 C.F.R. § 541.202(a).  For example, Associates do not determine whether sufficient data has been obtained to support the reasonableness of the audit team's conclusions, determine whether the work papers they complete contain sufficient data to support the conclusion reached in the work paper, ASF ¶¶ 272-73,[5] or determine what an appropriate control sample size is.  *Id*. ¶ 276.

Even KPMG's claims that Associates' primary duty involves "resolving discrepancies," "documenting discrepancies," "price test work where discrepancies were noted," "evaluating . . .

---

[5]     There is no dispute that Associates' primary duty does not include determining the objectives of the audit or the procedures to be performed.  More senior members of the engagement team generally determine the objectives of the audit during the planning stage. Counter-Statement ¶ 46.

additions and deletions," "analyzing accuracy," and "investigating and documenting," Def. Br. at

10-11, do not establish that Associates exercise discretion and judgment.  In *Hendricks*, the court

held that "it is unclear whether" using "discretion and judgment to investigate discrepancies"

"constitutes 'discretion and judgment' within the meaning of the professional exemption."  677

F. Supp. 2d at 553 ("[t]he fact that mistakes might appear in ... ledgers or that there might be

apparent mistakes about which the staff accountant should make inquiry, is not a discretionary

matter.  Any ordinary bookkeeper would make inquiries about abnormalities in the ledgers")

(internal citation and quotation marks omitted).

Similarly, KPMG's argument that professional standards require all audit team members

to "bring to the attention of appropriate persons, disagreements or concerns . . . with respect to

accounting and auditing issues," Def. Br. at 24, is unmoored to the Associate job itself.  KPMG

presents no evidence that Associates actually "disagree" or express "concerns," and no evidence

that this is the primary duty of the Associate job.

Although discretion and judgment "may consist of recommendations for action rather

than the actual taking of action," 29 C.F.R. § 541.202(c), Plaintiffs present evidence that

Associates' primary duty does not require them to do either.  Associates collect and report facts

and communicate them to others who make decisions based on them.  ASF ¶ 271 (Associates

passed on information that they obtained and documented to more senior team members who

reached conclusions and made determinations with respect to the information); *Id*. ¶ 267

(Associates write down each step that they perform and the information obtained for each step so

that more senior team members know which steps the Associate completed); *see id*. ¶ 214

(Senior Associates review Associates' work papers and take ownership of the work papers that

they review).  *See Foster v. Nationwide Mut. Ins. Co.*, 695 F. Supp. 2d 748, 760-61 (S.D. Ohio

17

2010), *recons. denied*, No. 08 Civ. 0020, 2010 WL 1404596 (S.D. Ohio Apr. 7, 2010) (finding issue of fact as to whether insurance investigators are fact-gatherers working within the constraints of the insurance auditing system or whether they are, according to the defendants, "insurance fraud experts").

> c.    **A jury could find that Associates' primary duty is routine work.**

KPMG's argument that "it does not matter if some portion of what Associates do is routine," Def. Br. at 25, assumes a fact that KPMG cannot prove.  Plaintiffs present evidence that *almost all* (not "some") of Associates' primary job duty is "routine."  ASF ¶ 156 (a common Associate task is to "roll forward" work papers by updating them with data and dates from the current year); *id*. ¶ 166 (Associates' work often involves comparing or matching numbers on two documents, for example, comparing figures in the client's invoices with the figures in the client's financial statements); *id*. ¶ 160 (Associates perform "walk throughs" which involve having the client's personnel walk through the steps that they do, and then transcribing what they said); *see also id*. ¶ 191; Counter-Statement ¶ 59(c).

Associates' tasks also include comparing numbers, inputting numbers into spreadsheets, taking detailed notes, and filling information into templates.  Counter-Statement ¶¶ 39(b), 59(c). *See also* ASF ¶¶ 136-140 (Associates perform inventory observations which involve the physical counting of the client's inventory, evaluating the results by comparing the results of the count with the information in the client's records, and looking for any differences); ¶ 146 (Associates perform walk-throughs which involve comparing what the client's personnel describes as the client's controls and what the client's documentation states about the controls, and documenting the results); ¶ 149 (Associates perform administrative tasks like making copies); ¶ 317

(Associates perform "non-judgmental procedures"); ¶¶ 209-211 (Associates prepare audit documentation in accordance with firm and professional standards).

In *Hendricks*, the plaintiff did enough to avoid summary judgment by presenting some of the same evidence that Plaintiffs present here. This included evidence that "a significant portion of his job involved data entry, rather than work requiring accounting knowledge," that he "was 'micro manage[d]' by his supervisors," that he "followed day-to-day 'checklists' and had no authority to change such checklists." *Hendricks*, 677 F. Supp. 2d at 553. In fact, the court denied the employer's motion for summary judgment in the face of the plaintiff's own testimony that "he independently performed investigations of [financial] statements if he determined that they might contain inaccuracies," that "this process involved the application of accounting principles . . . and that it was his decision when to investigate," and that "he had to know 'what [U.S. GAAP] is' to perform his job." *Hendricks*, 677 F. Supp. 2d at 553.

There is no such testimony here. Plaintiffs are clear that they did not work independently, ASF ¶ 114, that they did not apply accounting principles, *id*. ¶ 354, and that they did not need to know U.S. GAAP, *id*. ¶ 355.

In *Hendricks*, the court also held that there was a question of fact as to whether the plaintiffs "primarily 'perform[ed] similar job duties' to those of a CPA, or whether they 'normally perform[ed] a great deal of routine work.'" *Hendricks*, 677 F. Supp. 2d at 552; 29 C.F.R. § 541.301(e)(5) (distinguishing exempt accounting jobs from non-exempt accounting jobs). Here, a jury could find that Associates do not perform similar job duties to Managers, the lowest-level audit team members who must have a CPA license at KPMG. ASF ¶¶ 377, 379-380. For example, Managers, not Associates or even Senior Associates, are responsible for creating an engagement plan including a detailed budget, project scope, and fee collection

schedule, *id*. ¶ 220, and for supervising and overseeing the engagement team's project

management activities, *id*. ¶ 225.

       *Piscione v. Ernst & Young, LLP*, 171 F.3d 527 (7th Cir. 1999), is not on point because

the consultant position there did not involve routine work.  The plaintiff "helped to improve

client services, acted as a supervisor for several employees, and was responsible for several

clients."  *Id*. at 536; *see Hendricks*, 677 F. Supp. 2d at 556 (distinguishing *Piscione*).

> **d.**    **A jury could find that due professional care, professional skepticism, and professional judgment are not the same as discretion and judgment under the FLSA.**

       In attempting to support its many conclusory statements about the Associate job, KPMG

repeatedly hangs its hat on the mantra that "professional standards" require Associates to display

"due professional care," "professional skepticism," and "professional judgment."[6]  Although

KPMG claims (without citing any supporting evidence) that "skepticism" is a "higher level of

discretion and judgment," Def. Br. at 24, this is not a substitute for competent evidence that the

Associates job itself requires the "consistent exercise of discretion and judgment," and does not

meet KPMG's burden to prove its exemption.

       It certainly does not entitle KPMG to summary judgment because a reasonable factfinder

could conclude that "due professional care," "professional skepticism," and "professional

judgment" are not the same as "the comparison and the evaluation of possible courses of

conduct, and acting or making a decision after the various possibilities have been considered."

29 C.F.R. § 541.202.  Even KPMG describes these concepts very differently than the FLSA

defines discretion and judgment.  According to KPMG, for Associates, "due professional care"

means understanding the purpose of the audit procedure that they were assigned and following

---

[6]     *See* Def. Br. at 5-7, 12-13, 15, 23-24.

the procedure correctly and carefully.  Counter-Statement ¶ 10.  KPMG summarizes its

discussion of "professional judgment" as follows: "In brief, Audit Associates are expected to

'exercise sound judgment regarding when to refer issues outside of [their] authority to more

senior staff.'"  Def. Br. at 15.  KPMG defines "professional skepticism" as "a state of mind" –

thinking objectively and critically.  *Id*.; *see also* ASF *id*. ¶¶ 247-48; Counter-Statement ¶ 10

(having a "questioning mind" and not blindly trusting that information is correct without

verifying it).  According to its 30(b)(6) witness, when an Associate comes across something

inconsistent with expectations, the Associate exercises "professional skepticism" by noting the

inconsistency (instead of just accepting it).  Counter-Statement ¶ 14; *see also* ASF ¶ 263 ("if we

saw errors or mistakes or anything we should bring it to the attention of the seniors"); *id*. ¶ 115

(raise every exception in documents with the senior).  None of these amounts to discretion and

judgment under the FLSA.  29 C.F.R. § 541.202(b), (c).  Discretion and judgment is much more

than the "simple application of 'common sense' as to the propriety of a certain action," *Cotten v.*

*HFS-USA, Inc.*, 620 F. Supp. 2d 1342, 1353 (M.D. Fla. 2009).

Moreover, to the extent the auditing concepts of "care," "skepticism," and "judgment"

factor in to the Associate job at all, a reasonable jury could find that they do not play a

significant role in Associates' day-to-day tasks.  *See* ASF ¶ 255 (Plaintiff could not could not

recall exercising professional skepticism as an Audit Associate); *id.* ¶ 254 (Plaintiff used

common sense, not professional judgment, on inventory observations); *id*. ¶ 257 (Plaintiff

understood professional skepticism to mean bringing any errors to the attention of more senior

team members and taking care in performing his work); *id.* ¶ 258 (Plaintiff understood exercising

professional skepticism to mean not doing something "mindlessly" and asking questions); *id*. ¶

275 (acting in a "conservative and ethical" manner); *id.* ¶¶ 257, 260 ("taking care" in performing

work and "being professional in [his] communication").

> **B.     A Jury Could Find That the Associate Job Does Not Require Knowledge Customarily Acquired by a Prolonged Course of Specialized Intellectual Instruction.**

A reasonable jury could find that Associates' primary duty does not "require" knowledge

acquired by a "prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.301(a).

> **1.     A Jury Could Find that the Associate Job Requires Only a Few Accounting Courses, If That.**

Plaintiffs present evidence from which a reasonable jury could conclude that a

"prolonged" course of study is not "required."  *See* Counter-Statement ¶ 20; ASF ¶¶ 340-52.  A

reasonable jury could draw this inference from KPMG's own hiring criteria and find that it does

not meet the "prolonged" requirement.  KPMG admits that it does not require new hires to have

accounting degrees, to have taken any specific number of accounting courses in college, or to

have ever taken an auditing course.  *Id.*  KPMG only requires new hires to be "near CPA-

eligible" in "any state."  *Id.*  This is a very low bar because some states require as few as four or

five accounting courses to be CPA-eligible.  *Id.*  "Near CPA-eligible" could mean even fewer.

Because Associates' primary duty does not vary from state to state, ASF ¶¶ 124, 204, the

minimum qualification necessary to do the Associate job is the fewest number of credits

necessary to be CPA-eligible (or near CPA-eligible) in the state with the lowest requirements.

*Id.* ¶ 353.   KPMG cites no case holding that coursework that can be completed in less than a

semester is "prolonged."  KPMG also admits that almost nineteen percent of the Audit

Associates who joined this case as opt-in plaintiffs as of mid-May did not have an accounting

degree.  *Id.* ¶ 363.

KPMG's claim that some incoming Associates have a "concentration" in accounting is unsupported and not relevant.  KPMG presents no evidence as to what a "concentration" is or how many courses it requires.

The fact that many new Associates have taken more than four or five accounting courses does not raise the bar for what is actually *required* to do the job and is not relevant to the exemption determination.  *See* 29 C.F.R. § 541.301(a)(1).  Although KPMG may *prefer* that new Associates take more accounting courses, and most states require at least eight courses (24 semester hours) in accounting, Def. Br. at 9, a reasonable jury could find that the additional coursework is not required to perform the primary duty of an Associate.  "[A]n overqualified employee will not be exempt based solely on his academic . . . history." *Birkemose-Hansen v. Zwanenberg Food Group (USA), Inc.*, No. 09 Civ. 0203, 2010 WL 2854128, at *6 (S.D. Ohio July 19, 2010); *see* U.S. Dep't of Labor Opinion Letter, 1986 WL 1171119, at *1-2 (Aug. 11, 1986) (agricultural inspectors with bachelor's degrees in agriculture or biological science, but whose primary duties include inspections, compliance audits, and enforcement of regulatory standards, are not exempt).  The professional exemption does not apply to "employees with professional training who are working in professional fields, but whose primary duty consists of the performance of sub-professional or routine work." *See* U.S. Dep't of Labor Opinion Letter, 1999 WL 33210909, at *1 (Nov. 2, 1999).

### 2. A Jury Could Find that KPMG's Educational Requirements Are Not "Specialized" Enough.

A jury could find that KPMG's requirements are not "specialized" enough to qualify under the professional exemption.  A required course of study must be "*sufficiently specialized and relate directly* to the position." *Solis v. Washington*, 656 F.3d 1079, 1087-88 (9th Cir. 2011) (emphasis added).  Hiring criteria that "bear little relation to the actual duties" of the position in

question do not satisfy the professional exemption. *Id*. at 1087. Here, KPMG's hiring criteria allow hires with a broad range of educational backgrounds, including business, finance, economics, political science, and biology. ASF ¶¶ 365-71. KPMG does not require a degree in accounting. *Id*. ¶ 351. It does not examine the particular coursework that any Associate candidate takes in college, no matter what their major. *Id*. ¶ 342. Although some non-accounting majors take "finance" or "business management/administration" classes, a jury could determine that even these are not "sufficiently specialized" and do not "relate directly" to the primary duties of an Associate.

KPMG is wrong that its hiring criteria "go well beyond" what courts have found sufficient to satisfy the "specialized" course of study requirement. Def. Br. at 21. In *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737 (6th Cir. 2000), the minimum educational requirement for the job was a year of mortuary science school. *Id*. at 742. In *Reich v. Wyoming*, 993 F.2d 739 (10th Cir. 1993), the minimum educational requirement was a Bachelor's degree in wildlife management, wildlife biology, or a closely related field, and there was no evidence that the employer hired candidates who did not have the requisite degree. *Id*. at 741, 743.

### 3.   A Jury Could Find that Associates Learn How to Perform Their Primary Duties On The Job.

A jury could find that Associates learn most of what they need to know through KPMG training and extensive on the job training. Plaintiffs present evidence that Associates learn how to apply KPMG's most basic audit procedures on the job, not through prolonged, intellectual instruction. *See* Statement of Facts Part II *supra*. "The requirement of a degree or sufficient coursework in any of several fields broadly related to a position suggests that only general academic training is necessary, with the employer relying upon apprenticeship and experience to develop the advanced skills necessary for effective performance" of the job. *Solis*, 656 F.3d at

24

1088.  Even job skills learned through intense, specialized in-house training are not covered by the professional exemption.  *See* U.S. Dep't of Labor Opinion Letter, 2000 WL 34444354, at *1-2 (July 14, 2000).

In *In re RBC Dain Rauscher Overtime Litigation*, 703 F. Supp. 2d 910 (D. Minn. 2010), the court denied a motion for summary judgment because there was an issue of fact as to whether a securities broker who held an M.B.A. was exempt because the plaintiff presented evidence that "much of the specialized knowledge that [he] use[d] in conducting his primary work duties [was] customarily acquired through on-the-job training and experience."  *Id.* at 925.  Plaintiffs present similar evidence here.  *See* Counter-Statement ¶ 40; ASF ¶¶ 333-39, 362.

KPMG's bald statement that its "training is not a substitute for the advanced knowledge that Audit Associates are expected to have obtained through their . . . coursework," Def. Br. at 11, does not meet its summary judgment burden because a jury could find that it is rebutted by evidence that Audit Fundamentals and on the job training are what "teach [Associates] how to apply [auditing] concepts," *see* Counter-Statement ¶ 40, and evidence that Plaintiffs did not use what they learned in school in performing their Audit Associate duties, ASF ¶¶ 359, 361-63.  A reasonable jury could also infer that this allows Associates to understand everything that is required to do their job and more.  *See* Counter-Statement ¶ 40.  The fact that Plaintiffs did not use what they learned in college to perform their tasks, demonstrates that an advanced accounting background might have been preferred, and maybe even "expected," but not required.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment and grant Plaintiffs' Motion for Partial Summary Judgment.

Dated:        New York, New York
              June 29, 2012

Respectfully submitted,

**OUTTEN & GOLDEN LLP**
By:

/s/ Justin M. Swartz
Justin M. Swartz
Rachel Bien
Elizabeth Wagoner
Dana Sussman
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000

**SHAVITZ LAW GROUP, P.A.**
Gregg Shavitz (admitted *pro hac vice*)
Keith Stern (admitted *pro hac vice*)
Susan H. Stern (admitted *pro hac vice*)
1515 S. Federal Highway, Suite 404
Boca Raton, Florida 33432
Telephone: (456) 447-8888

**Attorneys for Plaintiffs**