UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

KYLE PIPPINS, JAMIE SCHINDLER, and EDWARD
LAMBERT, Individually and on Behalf of all Others
Similarly Situated,

                    Plaintiffs,

      -against-                              No. 11 Civ. 0377 (CM) (JLC)

KPMG LLP,

                    Defendant.

—————————————————————————x

**DECISION GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT, DISMISSING PLAINTIFFS' FLSA CLAIMS WITH
PREJUDICE, DISMISSING PLAINTIFFS' STATE LAW CLAIMS WITHOUT
PREJUDICE**

McMahon, J.:

    Plaintiffs Edward Lambert, Kyle Pippins, Jamie Schindler, Opt-In Plaintiffs Samuel

Bradley and Keeley Young, other declarant Mark Litchfield, and various other Opt-In Plaintiffs

who have elected to become part of this action (collectively, "Plaintiffs") brought this action

under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201 *et seq.*, and under the New

York Labor Law, Article 19, §§ *et seq.*, against Defendant KPMG LLP ("KPMG"). Plaintiffs,

all of whom are or were employed as Audit Associates by KPMG, allege that Defendant violated

the overtime pay requirements of the FLSA and the NYLL by failing to compensate them for

hours worked in excess of forty per week. It is stipulated that KPMG did not pay overtime pay

to Audit Associates and Senior Associates.

On January 3, 2012, this Court granted Plaintiffs' motion for conditional certification of a collective action under section 16(b) of the FLSA, which permits employees to bring actions seeking recovery of unpaid overtime wages on behalf of "themselves and other employees similarly situated." *Pippins v. KPMG LLP*, 11 CIV. 0377 (CM), 2012 WL 19379, at *1 (S.D.N.Y. Jan. 3, 2012) (citing 29 U.S.C. § 216(b)). I also directed that the parties conduct expedited discovery limited to "the issue of why all Audit Associates are classified as exempt, without regard to their personal situations," with an eye to having one side or the other move for summary judgment on the issue. *Id.* at *15. In particular, the issue is "whether *all* Audit Associates are, by virtue of either their educational attainments or job expectations," exempt from the FLSA, either because they qualify as learned professionals or as administrators. *Id.*

The parties have filed cross-motions for summary judgment, limited to the claims asserted under federal law. KPMG argues that it is entitled to summary judgment on its affirmative defense that all Audit Associates are exempt because they qualify as "professionals" under the FLSA. Plaintiffs assert that they are entitled to summary judgment on their claims that (1) all Audit Associates are non-exempt under the administrative exemption, (2) at the very least, first-year Audit Associates are not exempt under the professional exemption, and (3) KPMG did not act in "good faith" when it classified all Audit Associates as exempt. Neither party has moved for summary judgment on the NYLL claims.

For the reasons discussed below, I conclude that Audit Associates are exempt as "learned professionals," and so need not be paid overtime. It is not necessary to discuss the applicability of the administrative exemption, since the professional exemption disposes of Plaintiffs' federal claims. The state law claims are dismissed without prejudice; if Plaintiffs choose to pursue them, they should do so in the New York State Supreme Court.

## FACTUAL BACKGROUND

### I.      Plaintiffs

Plaintiffs in this suit were employed by KPMG as Audit Associates.  Plaintiffs worked at

KPMG offices in various states, including (among others) Florida, Nebraska, New Jersey, New

York, Texas, and Washington.

### II.     Defendant KPMG

KPMG provides audit, tax, and advisory services to public and private clients in the U.S.

(Def.'s Rule 56.1 Stm't in Supp. of Def.'s Mot. for Summ. J., June 8, 2012 ("Def.'s 56.1 Stm't")

¶ 1.)  The most common services KPMG provides in its audit practice are financial statement

audits and integrated audits.  (*Id.* ¶ 2.)  In the former, KPMG conducts audits of its clients'

financial statements and expresses an opinion on whether those statements conform in all

material respects with Generally Accepted Accounting Principles ("GAAP"), the authoritative

accounting principles on financial statements for public and private companies.  (*Id.* ¶ 2a.)

KPMG is also engaged by public companies for integrated audits, which include both a financial

statement audit and a report on the client's internal control over financial reporting.  (*Id.* ¶ 2b.)

Both financial statement audits and integrated audits are conducted in conformity with

certain professional standards.  (*Id.* ¶¶ 2a-b.)  For private companies, the applicable auditing

standards are the Generally Accepted Auditing Standards ("GAAS"), and for public companies,

the applicable auditing standards are the standards of the Public Company Accounting Oversight

Board (the "PCAOB") (together, the "professional audit standards" or the "professional

standards").  (*Id.* ¶ 7.)  The GAAS standards, cited as "AU" sections, are promulgated and

codified by the Auditing Standards Board (the "ASB"), the senior technical body of the

3

American Institute of Certified Public Accountants (the "AICPA"). (*Id.*) The PCAOB promulgates its own auditing standards, cited as "AS" sections, and has also adopted the GAAS (with various additions and modifications). (*Id.*) Both the ASB and the PCAOB have also adopted Quality Control Standards for quality control systems at audit firms, such as training for audit employees, which provide reasonable assurance to clients that audits are performed in accordance with auditing standards applicable to particular audits. (*Id.*)

KPMG audits are conducted by "engagement teams," which typically include (in order of seniority) one or more Partners, Senior Managers, Senior Associates, and Audit Associates. (*Id.* ¶ 4.) As of June 5, 2012, KPMG employed approximately 6,700 auditing employees, who provided client services in the firm's 87 U.S. offices, approximately 2,500 of whom held the position of Audit Associate. (*Id.* ¶ 1.) Audit Associates are the most junior members of the team, other than interns. (*Id.* ¶ 5; Pls.' Rule 56.1 Stm't in Supp. of Pls.' Mot. for Partial Summ. J., June 8, 2012 ("Pls.' 56.1 Stm't") ¶ 40.) Each engagement team generally has an individual, often referred to as the "in-charge," who is responsible for running the day-to-day management of the audit. (Pls.' 56.1 Stm't ¶¶ 120-21.) Senior Associates serve as the in-charge approximately 80% of the time, but Audit Associates occasionally fill that role. (*See id.* ¶¶ 122-23.)

Audit Associates are typically considered for promotion to Senior Associate after two years in that role. (*Id.* ¶ 36.) Senior Associates are typically considered for promotion to Manager after three years. (*Id.* ¶ 37.)

### III.    Audit Associates: Educational Requirements and Training

Audit Associates (and Senior Associates, for that matter) are not required to be licensed Certified Public Accountants ("CPAs"). (*Id.* ¶¶ 338-39.) However, KPMG does not hire Audit

4

Associates who lack an educational background in accounting or related fields.  In fact, KPMG's general policy is to hire as Audit Associates only individuals who are "CPA-eligible" in the state in which they will work.  (Def.'s 56.1 Counterst. ¶ 318; Dep. of David J. Butler, Apr. 25, May 11, and June 1, 2012 ("Butler Dep.") 481:14-482:21.[1])  The "Audit Associate Role Description," an internal human resources document describing the position, lists as a "typical" qualification "Must be CPA eligible in home-state.  If individual has not passed CPA exam, there should be a short-term plan in place to pass the CPA exam."  (Decl. of David Butler in Supp. of Def.'s Mot. for Summ. J., June 7, 2012 ("Butler Decl.") Exs. C and D.)

The education requirements for CPA-eligibility vary from state to state, but nearly all states require a Bachelor's degree in some field and a significant number of courses in accounting, within a course of study totaling at least 150 semester hours of college-level education.  (Def.'s 56.1 Stm't ¶ 29.)  Many states require at least 24 semester hours in accounting courses and at least 24 additional semester hours in business courses, as required by the Uniform Accountancy Act Model Rules, issued by the National Association of State Boards of Accountancy.  (*Id.*)  States may require more than this:  New York requires 33 semester hours of accounting courses and 36 semester hours of general business courses; Texas requires 30 semester hours of upper-level accounting courses and 24 semester hours of upper-level general business courses; and Florida requires 36 semester hours in upper-division accounting courses and 39 semester hours in general business courses.  (*Id.* ¶ 30.)  Plaintiffs point out that several states, including New Hampshire, Maine and Delaware, require very few credit hours in accounting for CPA-eligibility, but KPMG does not have offices in those states.  (*See* Pls.' Rule

---

[1] Pages from the various depositions taken in this action are attached as exhibits to numerous declarations that have been submitted in connection with both Plaintiffs' and KPMG's motions for summary judgment.  Throughout this opinion, the Court cites directly to the deposition transcripts.

56.1 Counterst. and Corrected Stm't of Add'l Facts in Opp. to Def.'s Rule 56.1 Stm't, July 10, 2012 ("Pls.' 56.1 Counterst.") ¶ 28.)

In addition to requiring a Bachelor's degree and CPA or near CPA-eligibility, KPMG's Audit Associate Role Description also lists the following "typical" qualifications: "Bachelor of Accountancy or Masters of Accountancy"; "Strong understanding of US GAAP, US GAAS, and preferably, PCAOB auditing standards"; "Strong writing and communication skills"; "Understanding and knowledge of testing both the design and effectiveness of internal controls." (Butler Decl. Exs. C and D.)

The vast majority of KPMG's Audit Associates have at least a Bachelor's degree with majors in the fields of accounting, finance, or business management/administration. (Def.'s 56.1 Stm't ¶ 28.) Approximately 40% of KPMG's incoming Audit Associates have Master's degrees in accounting, finance, or business administration. (*Id.* ¶ 32.)

Occasionally (the record does not reveal how frequently), KPMG hires an individual who is not CPA-eligible into the position of Audit Associate. (*Id.* ¶ 31.) KPMG asserts that these recruits are "near CPA-eligible," meaning that they have satisfied nearly all of the educational requirements to be eligible, and that they are hired with a specific plan in place for them to become eligible in "short order." (*Id.*) Plaintiffs offer no evidence to the contrary, but challenge this claim by asserting that KPMG has not presented evidence that it has a specific policy about how much time an Audit Associate who is not CPA-eligible will be given to become CPA-eligible, or of what constitutes a "clear plan" to become CPA-eligible. (Pls.' 56.1 Counterst. ¶ 31.) Plaintiffs also invoke Rule 56(f) and ask that the Court allow them additional time to obtain discovery about KPMG's hiring of "near CPA-eligible" Audit Associates. (*Id.*) In view of the conclusion I reach on the motions, additional discovery is not necessary – especially because

6

Plaintiffs agree with KPMG that the coursework Audit Associates take in college provides them with knowledge of accounting standards, including U.S. GAAP, U.S. GAAS, and PCAOB auditing standards. (Pls.' 56.1 Stm't ¶ 305; Def.'s Rule 56.1 Counterst. to Pls.' 56.1 Stm't, June 29, 2012 ("Def.'s 56.1 Counterst.") ¶ 305.) The parties disagree about whether that knowledge is properly characterized as "advanced" for FLSA purposes, but about the basic requirement that incoming Audit Associates not be neophytes where accounting standards are concerned there is no dispute whatsoever. (Pls.' 56.1 Stm't ¶ 305; Def.'s 56.1 Counterst. ¶ 305.)

New Audit Associates at KPMG are required to attend an in-person initial training course called "Audit Fundamentals." (Def.'s 56.1 Stm't ¶ 39.) The course, which lasts about one week, includes (1) an overview of what an audit is[2]; (2) an introduction to KPMG's audit methodology for a variety of audit procedures that Audit Associates may perform in their first year, including auditing payroll, auditing accounts receivable, auditing accounts payable, auditing inventory, auditing fixed assets, and auditing debt; (3) training on eAudit, KPMG's proprietary audit tool, which is used to execute an audit; and (4) simulations of real-life situations that Audit Associates are likely to encounter in the field in their first year. (Pls.' 56.1 Stm't ¶¶ 266, 283-84; Def.'s 56.1 Stm't ¶¶ 39a-b.) Plaintiffs argue that the training course teaches Audit Associates everything they need to know to perform audit procedures as first-year Audit Associates. (Pls.' 56.1 Counterst. ¶¶ 40-41.) KPMG, on the other hand, asserts that in order to do their jobs and to apply the content from the short course of training they receive at the commencement of their employment, Audit Associates need advanced knowledge in accounting and auditing concepts, developed from college and graduate level coursework. (Def.'s 56.1 Stm't ¶¶ 34, 42.) These observations are in the nature of argument and will be treated as such.

---

[2] KPMG asserts, without contradiction, that this aspect of the course was abandoned in 2008. It would make no difference to the outcome if it had not been.

7

Like many professional organizations, KPMG has an extensive continuing education program for its employees, and Audit Associates continue to receive training throughout their tenure at the firm. They are required to take additional training courses, including a course at the end of their first year that covers audit procedures they are likely to perform in their second year, and In-Charge Auditor training near the end of their second year, which covers procedures they are likely to perform if they are promoted to Senior Associates. (Pls.' 56.1 Stm't ¶¶ 291-94.) Audit Associates also receive on-the-job instruction and supervision from more senior members of the audit engagement teams. (Pls.' 56.1 Stm't ¶¶ 296, 298.)

## IV.    The Role of an Audit Associate

The primary job responsibility of Audit Associates is to perform audit work for audits of clients' financial records. (Def.'s 56.1 Stm't ¶ 49.) As part of a larger audit engagement team, Audit Associates perform various auditing procedures and summarize the results in audit work papers, which are later used to issue an audit report for the client. (*Id.* ¶¶ 49-50.) All of the work they perform must be conducted in accordance with KPMG's methodology and professional standards, and any work papers must meet U.S. GAAS and PCAOB documentation requirements. (*Id.* ¶¶ 49-50, 59e.) Professional auditing standards apply to every member of the audit team, whether licensed or unlicensed, and so apply to all Audit Associates. (*Id.* ¶ 16.)

### A.    KPMG Guidance Materials

In the KPMG Audit Manual ("KAM") and other guidance materials, KPMG provides its audit employees with guidance on various audit procedures and audit areas. These materials give guidance on audit objectives, KPMG's audit methodology, and KPMG's internal policies. (Def.'s 56.1 Stm't ¶ 19a.) In some instances, the guidance is general, and in other instances, it outlines the procedures an audit employee might perform when doing some particular task. (*Id.*)

8

Additionally, all significant audit procedures for a particular audit are summarized in an "audit program" or "audit plan", which is a list of procedures that an engagement team intends to perform during the audit. (Pls.' 56.1 Stm't ¶ 34.) The plan describes the nature, timing, and extent of audit procedures to be performed. (*Id.* ¶¶ 82-83, 85.)

Audit employees also use a computer program, eAudit, which incorporates KPMG's audit methodology and helps employees (of various levels) to perform and document audit procedures in a fully professional manner. (*See id.* ¶ 287.) For each significant audit procedure, eAudit guides the user through the audit steps that must be completed and helps document the work performed. (*Id.* ¶ 285.) The program takes the user through various screens and prompts them to respond to specific questions or take specific actions. (*Id.* ¶ 286.) The program reminds the user about the relevant accounting standards, so that audit employees can identify how the requirements apply to the task they are working on. (*Id.* ¶ 289.) The program also provides links to KAM and other guidance materials, so that audit employees can access additional information on relevant professional standards, the audit area, or audit procedure to assist in completing their work. (*Id.* ¶¶ 289-90.)

Audit employees are expected to document the results or conclusions of procedures in "work papers." (Def.'s 56.1 Stm't ¶ 59e.) Some standard work papers follow a template format, in which engagement teams are instructed to document the performance of all procedures, in addition to conclusions. (Pls.' 56.1 Stm't ¶ 103; Decl. of Justin M. Swartz in Supp. of Pls.' Mot. for Partial Summ. J., June 8, 2012 ("Swartz Decl.") Ex. MM.) KPMG also provides its Audit Associates with a "WorkPaper Review Checklist." (Pls.' 56.1 Stm't ¶ 200.) The exhibit itself reveals that the checklist is merely a tool to assist new Associates in "self review" of their work, stating that "in the beginning, it may be helpful" for them to use it. (Swartz Decl. Ex. II.)

9

The parties disagree about the implications of the use of these guidance materials by Audit Associates. Plaintiffs take the position that reliance on these tools limits an audit employee's discretion and argue that most (if not all) of an Audit Associate's work consists of following specific audit steps specified in these materials and inputting information into templates provided by KPMG (which are described in greater detail below). (*See e.g.*, Pls.' 56.1 Stm't ¶ 151). KPMG views these tools as self-protective precautions that are designed to ensure compliance with professional auditing standards, enhance the quality of its work papers, and limit the firm's exposure to claims that it failed to comply with GAAP and/or GAAS during an audit – claims frequently asserted in, for example, securities fraud litigation in this very court. (*See* Butler Dep. 610:4-611:13, 611:19-612:15.)

The audit program that is devised for a particular audit provides a list of procedures that must be completed, but it does not necessarily instruct the employee on how to perform those procedures. (Pls.' 56.1 Stm't ¶¶ 34, 117.) For example, when assessing the competence of a corporation's internal audit personnel, the audit program might direct the audit employee to obtain certain documents and assess certain factors, but it would not indicate how to go about doing those tasks; and once the necessary materials were obtained, according to KPMG, the Audit Associate would have to review them, make a judgment about the internal employees' competence, and document their judgment. (Def.'s 56.1 Counterst. ¶¶ 285-88; *see also* Pls.' 56.1 Stm't ¶¶ 301-02.) Depending on the audit evidence obtained during a procedure and whether it was consistent with the "expectations" of the audit, an audit team member (including an Audit Associate) might need to make decisions about which of several individual procedures ought to be performed. (*See* Pls.' 56.1 Stm't ¶ 117.) The eAudit screens guide the user through the process of making those sorts of judgments and decisions and then help the user document

10

his/her conclusions. (Pls.' 56.1 Stm't ¶ 285-89; Def.'s 56.1 Counterst. ¶¶ 285-89.) For example, according to KPMG, in connection with procedures to test fixed asset additions, the audit team member would need to make judgments about what sampling methodology to use. (Def.'s 56.1 Counterst. ¶ 285.)

Plaintiffs do not dispute that decisions need to be made about how to carry out certain audit steps, and about which individualized procedures to perform. But they note that Senior Associates help Audit Associates decide which steps to take where the audit program does not provide specific information, or where eAudit requires a decision as to which individual procedures to perform. (*See* Pls.' 56.1 Stm't ¶ 117.)

**B.     Audit Associate Responsibilities**

Audit Associates are generally involved in performing some of the following auditing procedures and tasks: testing internal controls over financial reporting, which include interviews of client representatives (referred to as "walkthroughs"); auditing inventory, including performing inventory observations; substantive analytical procedures; preparation of audit work papers; updating of work papers from the prior year; research and consultation; confirmations; reconciliations; recalculations; and certain procedures over financial statements. (Def.'s 56.1 Stm't ¶¶ 59c, 59d, 59e, 59f; Pls.' 56.1 Stm't ¶¶ 138, 140, 153, 158, 250, 261, 279.) As noted above, many of the tasks that Audit Associates perform are laid out in audit steps describing the procedures to be completed in gathering audit evidence. (Pls.' 56.1 Stm't ¶ 155.)

Audit Associates are responsible for performing much of the audit fieldwork on site at the client's location, which includes testing internal controls and inventory observations. (Def.'s 56.1 Stm't ¶ 51.) At times, an Audit Associate may be the only member of the engagement team present. (*Id.*) In conducting a walkthrough to test a client's internal controls, an Audit Associate

11

will (1) obtain the client's documentation on its process and controls, (2) ask the client's personnel to explain what they do to follow their controls, (3) compare the responses to the client's documentation, (4) ask for examples of any variances that the client's controls have identified and for supporting documentation to cite as audit evidence, (5) and document the results in work papers. (Pls.' 56.1 Stm't ¶ 149.) During this process, Audit Associates are expected to modify their prepared interview questions if necessary, follow up on any inconsistencies in a client's responses, note and interpret body language, and summarize the responses. (Def.'s 56.1 Stm't ¶ 59c.) According to KPMG's human resources materials regarding audit employees' "skills," Audit Associates are also expected to draw conclusions from interviews and determine the sufficiency of audit evidence. (Butler Decl. Exs. A-B.) Plaintiffs disagree with the latter; they testified at their depositions that they merely followed templates and applied the procedures that were assigned to them. (Pls.' 56.1 Counterst. ¶ 59c.)

Audit Associates may also conduct procedures to test controls, which includes following the steps provided in a list of the client's controls and documenting the results. (Def.'s 56.1 Stm't ¶ 60f.) KPMG asserts that the process requires Associates to identify risk points with respect to a client's accounting activities and the relevant controls in place; select which controls to test; "evaluate" the controls; and reach and document conclusions about the effectiveness of those controls (among other things). (Id.) The parties agree that when Associates come across control deviations, they are expected to discuss the issue with the in-charge (after they have independently considered which element of the control does not work, according to KPMG). (Pls.' 56.1 Counterst. ¶ 60f; Def.'s 56.1 Counterst. ¶ 173.) Plaintiffs also do not deny that Audit Associates identify the relevant client controls (by gathering the appropriate documents) and select which controls to test, although they assert the latter is accomplished with the assistance of

12

the in-charge. (Pls.' 56.1 Counterst. ¶ 60f.) Plaintiffs also testified at their depositions that, with respect to evaluating controls, "reviewing the effectiveness" of a client's controls entails filling out a template form located on KPMG's system, and that "testing the operating effectiveness" of controls means following a procedure set by KPMG and filling information into a template form. (*Id.* ¶ 59c.)

In performing inventory observations, Audit Associates also conduct walkthroughs and test internal controls. An inventory observation generally involves (1) physically re-counting the inventory and comparing it with client records (or watching client personnel do the same), (2) looking for any differences in the physical count and the client's records, and (3) monitoring inventory being received and removed from the client's premises during the physical count and comparing it to client records. (Pls.' 56.1 Stm't ¶¶ 141-44.) The observations may include dealing with a variety of kinds of inventory (*e.g.*, slow-moving or obsolete) and comparing that inventory against client records. (Def.'s 56.1 Stm't ¶ 42a.) In KPMG's first-year course on auditing inventory, Audit Associates are instructed that they must follow up on any discrepancies that are identified during the physical count, which includes notifying the client's inventory supervisor, recounting the items, determining if the error is isolated, and notifying the in-charge if the discrepancy is significant. (Def.'s 56.1 Counterst. ¶ 143.)

Other inventory-related procedures that Audit Associates may perform include "vouching" a sample of purchases and sales to inventory to determine whether they were properly recorded; performing "pricing tests" to ensure proper calculation of inventory costs; and determining whether inventory is properly valued. (Def.'s 56.1 Stm't ¶ 42a.) Plaintiffs, of course, characterize these procedures – selecting purchases and sales and vouching them back to the invoices; "agreeing" numbers over a sample of inventory; and checking whether numbers on

13

the client's inventory listing are recorded correctly, respectively – as simple tasks. (Pls.' 56.1
Counterst. ¶ 42a.)

Audit Associates perform "substantive audit procedures," which include "substantive
analytical procedures" and "tests of details." (Def.'s 56.1 Stm't ¶ 59d.) An inventory
observation like the one just described is a substantive procedure. (Pls.' 56.1 Stm't ¶ 139.)
According to KPMG's human resources materials, when performing substantive analytical
procedures, Audit Associates are expected to (1) investigate and analyze the relationships, (2)
identify key factors, (3) determine precision based on assessment of RoSM (the risk of
significant misstatement), (4) set and corroborate expectations, (5) compare the actual amounts
obtained during the procedure (for example, a year-end balance) to the "expectations" for the
audit, and (6) evaluate the results. (*See* Def.'s 56.1 Stm't ¶ 59d.)

Plaintiffs do not dispute that Audit Associates are supposed to compare the figures
obtained during substantive procedures to the "expectations." (Pls.' 56.1 Counterst. ¶ 59d.)
Plaintiffs claim, however, that Audit Associates are not involved in identifying key factors,
determining the assessment of RoSM, or setting and corroborating expectations; those issues are
determined by more senior team members during the planning stage of the audit. (Pls.' 56.1
Counterst. ¶ 59d.) They also assert, based on their own personal work histories, that the primary
duty of Audit Associates is not to investigate and analyze relationships, but to perform the audit
steps that are assigned to them. (Pls.' 56.1 Counterst. ¶ 59d.) I assume that, by this, they mean
that investigating and analyzing relationships is not an audit task to which they were assigned.
Plaintiff Pippins testified that "most of the time," performing substantive procedures involved
following steps on a guide or template, although he only discussed one procedure – price testing
on inventory. And rather than deny that he ever did more than simply follow steps, Pippins

14

swore that he could not recall one way or the other whether he had done more than follow steps. (Dep. of Kyle Pippins, May 6, 2011 ("Pippins Dep.") 112:8-113:11.)

When performing tests of details, Audit Associates are expected to employ an appropriate audit sampling technique and know how to determine which technique to use (even if someone else makes that determination). (Def.'s 56.1 Stm't ¶ 59d; Pls.' 56.1 Counterst. ¶ 59d.) According to KPMG's human resources materials, they are also supposed to determine if audit evidence is sufficient and appropriate for the test performed. (Def.'s 56.1 Stm't ¶ 59d.) Plaintiffs testified that they did not make such determinations, or that when they did, they did not use their own judgment and simply followed steps. (Pls.' 56.1 Counterst. ¶ 59d; *see, e.g.*, Dep. of Samuel Bradley, June 2, 2011 ("Bradley Dep.") 218:4-10, 218:21-219:4; Pippins Dep. 130:14-131:17; Dep. of Edward Lambert, May 16, 2011 ("Lambert Dep.") 194:25-195-10.)

Audit Associates also update work papers prepared for clients in the prior year. (Pls.' 56.1 Stm't ¶ 153.) Plaintiffs testified that they were frequently tasked with such work, and that it only involved "rolling forward" or updating client names and numbers for the current year. (*See, e.g.*, Dep. of Jamie Schindler, May 3, 2011 ("Schindler Dep.") 188:5-19; Pippins Dep. 76:5-18, 79:7-12; Lambert Dep. 148:15-20.) However, KPMG instructs its Audit Associates to conduct an independent review of the documents, rather than simply following the prior year's file and updating the data to create current work papers. (Def.'s 56.1 Counterst. ¶ 153.) Some of the Plaintiffs testified that they followed this instruction. (Dep. of Keeley Young, May 12, 2011 ("Young Dep.") 181:21-183:17 and Decl. of Jennifer Altfeld Landau in Supp. of Def.'s Opp. to Pls.' Mot. for Summ. J., June 29, 2012 ("Landau Decl.") Ex. J (engagement review stating "I took the time to understand . . . as opposed to merely rolling forward prior year documents.");

15

Schindler Dep. 188:20-189:11 (confirming that in "rolling forward" or updating work papers KPMG tells Associates to "read it through to make sure that's actually what you did").

Audit Associates may also perform confirmations, reconciliations (including bank reconciliations), recalculations, and certain procedures over financial statements. (Pls.' 56.1 Stm't ¶ 158, 250, 261, 279.) A bank reconciliation, as one example, involves comparing the balance received from the client's bank and the balance on the client's books and records. (Butler Dep. 401:5-16.) There is no dispute that Audit Associates do not always perform these tasks; in fact, they are included in a list of procedures that are sometimes assigned to the firm's Global Delivery Center ("GDC") located in India. (Pls.' 56.1 Stm't ¶¶ 181-86.) On the record before the Court, it would be impossible to conclude that this type of work constitutes the bulk of what an Audit Associate does. Of course, KPMG denies that all such work is "non-judgmental," as characterized by Plaintiffs; according to Defendant, employees at the GDC are only to perform the routine portions of these procedures, while anything that requires judgment is assigned to Audit Associates or Senior Associates. (Def.'s 56.1 Counterst. ¶ 181.) However, it appears to be uncontroverted that Audit Associates (as well as Senior Associates) review the work that is done at the GDC. (Def.'s 56.1 Counterst. ¶¶ 181-86; Swartz Decl. Ex. Y.)

When accounting or auditing questions that require independent research arise during an audit, Audit Associates are tasked with conducting research on the relevant topic and documenting the issues and their conclusions in a work paper. (Def.'s 56.1 Stm't ¶ 59f.) At the conclusion of an audit, Audit Associates also typically make sure that all audit documentation has been signed off by more senior team members, as well as clear review comments and complete checklists. (Pls.' 56.1 Counterst. ¶ 201.)

16

As part of their work on an audit, Audit Associates perform clerical tasks, such as making copies, stuffing envelopes, compiling binders, organizing documents, or faxing documents. (Pls.' 56.1 Stm't ¶ 152.) There is very little evidence in the record about how much time Audit Associates spend on clerical work, and the motion must be evaluated on that basis.[3]

Finally, and importantly, Audit Associates must prepare audit work papers summarizing the audit work they performed and perform quality review of their own work. (Def.'s 56.1 Stm't ¶ 59e.) In some cases, they perform quality review of the work of more junior Audit Associates and interns. (*Id.*) All work papers must be prepared in compliance with applicable U.S. GAAS or PCAOB documentation requirements. (*Id.*) Audit Associates are expected to take responsibility for preparing and completing work papers in accordance with firm and professional standards in the areas to which they are assigned. (*Id.* ¶ 62.) The preparation of these work papers is critically important to the audit process because audit documentation, as outlined by professional standards, "Provides the principal support for the representation in the auditor's report that the auditor performed the audit in accordance with [GAAS]" and "Provides the principal support for the opinion." (*Id.* ¶ 62a.); AU § 339.03.

Plaintiffs asserted at their depositions that performing procedures and preparing work papers does not *require* the use of "advanced" accounting knowledge, including U.S. GAAP and other accounting principles, because they merely follow template forms or perform routine work comparing numbers. (Pls.' 56.1 Stm't ¶ 319; Pls.' 56.1 Counterst. ¶ 355.) Plaintiffs' testimony establishes that templates are used and that some "routine" work is involved in preparing work papers – facts that, as I understand it, KPMG does not contest. Whether the use of templates and

---

[3] Only Opt-In Plaintiff Bradley gave an estimate in his testimony, stating that in one year, he spent approximately 30-40% of his time making copies and preparing binders in connection with an assignment to update work papers from prior years, and something less than that the following year, when two new Audit Associates joined his audit team. (Bradley Dep. 81:12-82:11; 84:8-85:17.)

17

the like negates the need to employ advanced accounting knowledge is a conclusion, and Plaintiffs' testimony in this regard qualifies as argument. It will be treated as such.

The template working paper suggests that in preparing work papers, Audit Associates document both the work done and "conclusions." (*See* Swartz Decl. Ex. MM.) Plaintiffs take contradictory positions about this assertion by Defendant. Plaintiffs do not controvert KPMG's assertion that Audit Associates must "writ[e] conclusions that clearly state the results of work performed and conclusions reached." (Pls.' 56.1 Counterst. ¶ 59e; Def.'s 56.1 Stm't ¶ 59e.) Elsewhere in Plaintiffs' Rule 56.1 counter-statement, however, they dispute that Audit Associates reach conclusions, either in more general statements regarding their use of judgment or with respect to particular procedures. And at least one of the plaintiffs contends that he personally never reached any conclusion during the course of carrying out auditing duties; Plaintiff Lambert testified, "We didn't reach conclusions. We prepared whatever we were told to prepare and pass it on to seniors or above, and they would make conclusions and determinations." (Lambert Dep. 122:2-5.)

Plaintiff Pippins also testified that on one of his audits, he did not reach any "personal" conclusions regarding whether the counting and recording of inventory was properly performed and reviewed by the client's management personnel, or whether the management's control over the inventory reconciliation appeared to be operating effectively. (Pippins Dep.152:4-23, 153:8-15.) But this does not appear to be his contention with respect to all procedures he performed. For example, in describing his work on substantive analytic procedures, Pippins testified that he used his own judgment to come to conclusions as to whether the actual balance reported by a company was reasonable in comparison to the "expectations," and he documented those conclusions in the work papers he prepared. (Pippins Dep. 129:13-131:17, 136:17-25.)

18

More important, Plaintiffs take the position that Audit Associates do not exercise their own judgment to reach those conclusions. Plaintiffs testified that they did not exercise independent judgment in connection with the preparation of their work papers because the work papers they created as Audit Associates were simply the product of the performance of audit steps assigned to them, or because the work papers conformed to templates, or because the work papers and any conclusions contained therein were subject to review by more senior members of the audit team, who could alter any preliminary conclusions an Audit Associate might have reached. (*See, e.g.*, Pls.' 56.1 Counterst. ¶ 59d, 60a, 63.) Plaintiffs argue that this renders their work nothing more than the performance of rote tasks. (*See id.*)

Indeed, Plaintiffs frequently describe the work they did as "rote". For example, they assert that their work often involves "comparing or matching numbers on two documents" (for example, "comparing figures in the client's invoices with the figures in the client's financial statements"), "inputting numbers into spreadsheets", or "taking detailed notes". (Pls.' 56.1 Counterst. ¶ 39b, 59c, 166.) KPMG, of course, asserts that characterizing these audit tasks as "rote" greatly oversimplifies the matter, since much of what auditors do is compare numbers with a skeptical eye.

## C.     First-Year Audit Associate Responsibilities

Plaintiffs have moved separately to have brand new Audit Associates recognized as non-exempt employees. The basis for their motion is their wholly unsurprising assertion that first-year Audit Associates are more likely to perform the less complicated auditing procedures than are their contemporaries who have a year or more of auditing experience. (*See* Pls.' 56.1 Stm't ¶ 187.) These procedures include inventory observation, control testing (including testing the

19

design and effectiveness of controls; and walkthroughs), cash and cash equivalents; accounts receivable and related bad debts analysis; unrecorded liabilities; and confirmations. (*Id.* ¶ 159.)

As brand new employees, first-year Audit Associates are not responsible for assessing the risk of material misstatement on their audits. (*Id.* ¶ 164.) Nor do first-year Audit Associates typically review the work papers of more senior engagement team members. (*Id.* ¶ 154.) Plaintiffs also contend that, in their first year, Audit Associates are unlikely to perform certain kinds of analytical procedures with respect to inventory – these involve an analysis of gross profit, "shrinkage ratio," inventory levels, and various other aspects of reporting inventory. (*Id.* ¶ 161.) Many of the tasks that first-years perform are laid out in audit steps describing the procedures to be completed in gathering audit evidence.[4] (*Id.* ¶ 155.)

Although KPMG insists that first-year Audit Associates are likely to perform "substantive analytic" procedures as part of their work, and adds that Plaintiffs' compendium of tasks commonly performed by first-years is far from complete, the firm does not deny that the less complicated auditing tasks fall disproportionately to first-year Audit Associates. (*See* Def.'s 56.1 Counterst. ¶ 159.) That is hardly surprising, because no reasonable trier of fact would or could conclude that KPMG turns over every function, or the most complicated functions, to a neophyte auditor.[5] It is uncontroverted that, unless they are acting as the in-charge (which, as noted above, can happen but generally does not), first-year Audit Associates do not usually: determine the suitability of using substantive analytical procedures; design substantive analytical procedures; determine the acceptable amount of difference when performing a test of details; decide which sampling method to use; make decisions relating to how to test the operating effectiveness of controls; determine which control deficiencies are "material" and require

---

[4] This also appears to be the case with second-year Audit Associates.

[5] I rather imagine that KPMG would lose a great many clients if it did so.

reporting to management; or make the decision whether a walkthrough should be conducted. (Pls.' 56.1 Stm't ¶¶ 167-69, 171-72, 174.) When testing controls, they are also expected to consult with the in-charge about what to do when they find control deviations. (*Id.* ¶ 173.)[6] Eileen Walsh, KPMG's expert witness on its training programs, testified that the audit issues addressed in the training course for second-year Associates were more complex than those addressed in the first-year training course. (Dep. of Eileen M. Walsh, May 22-23, 2012 ("Walsh Dep.") 104:5-105:4.) KPMG also admits that its training courses on the topics of "professional skepticism" and "judgment" focus on more or less complex areas of an audit, depending on the experience level of the audit employees attending, which applies to the training of Senior Associates and Audit Associates, respectively. (Def.'s 56.1 Counterst. ¶ 187.)

In other words, first-year Audit Associates are less experienced than second-year Audit Associates, and all Audit Associates are less experienced than Senior Associates – and they are treated as such.

### D.    Supervision of Audit Associates

More senior KPMG employees supervise Audit Associates throughout audit engagements, from the assignment of the work through the completion of the work, and all of their work is reviewed by a more senior member of the engagement team. (Pls.' 56.1 Stm't ¶ 133.) This kind of supervision and review is required by professional standards. (*Id.* ¶ 131.) Section AU 311.31 of the GAAS standards states that "the work performed by each assistant, including the audit documentation, should be reviewed to determine whether it was adequately performed and documented and to evaluate the results, relative to the conclusions to be presented in the auditor's report." "Assistants" are defined in section AU 311.02 as any "firm personnel other than the auditor with final responsibility for the audit." At KPMG, this means any audit

---

[6] This is all also true of second-year Audit Associates who are not tasked with being the in-charge.

employees that are not the lead "engagement" Partner, including Audit Associates, Senior

Associates, Managers, Senior Managers and other Partners. (Def.'s 56.1 Counterst. ¶ 133.)

Most of Audit Associates' audit tasks are assigned to them by a Senior Associate (usually

the in-charge), who monitors the status of their work, helps them decide which individual

procedures to perform with respect to the audit program steps they have been assigned, and

generally provides on-the-job training. (Pls.' 56.1 Stm't ¶¶ 114-18.) Senior Associates are

supposed to make sure that Audit Associates understand the audit procedures they are assigned,

including the reason that the procedure is being performed. (*Id.* ¶ 134.) KPMG tells its Audit

Associates to raise any concerns that arise while performing audit procedures, such as

inconsistencies or mistakes, with their in-charge. (*Id.* ¶ 119.) KPMG asserts that, in many cases,

Audit Associates are expected to take independent follow-up steps with the client prior to

elevating an issue, as well as propose solutions to the in-charge. (Def.'s 56.1 Counterst. ¶ 119.)

### E. Professional Standards

Throughout all of the audit procedures, Audit Associates are expected to be on the

lookout for errors in the client's reporting or records, misstatements, and indications of fraud.

(Def.'s 56.1 Stm't ¶ 60b.) Professional standards require that all auditors, whether licensed as

CPAs or not, (1) have the adequate technical training and proficiency as an auditor, (2) maintain

"an independence in mental attitude" throughout all matters relating to an audit assignment, and

(3) exercise "due professional care" in the performance of the audit and the preparation of the

report. (Def.'s 56.1 Stm't ¶¶ 8-9; AU § 150.02.) "Due professional care requires the auditor to

exercise professional skepticism." (Def.'s 56.1 Stm't ¶ 11; AU § 316.13.) Professional

skepticism "is an attitude that includes a questioning mind and a critical assessment of audit

evidence" and "requires an ongoing questioning of whether the information and evidence

obtained suggests that a material misstatement due to fraud has occurred." (Def.'s 56.1 Stm't ¶ 11; AU § 316.13.)

Although more senior members of the team are ultimately responsible for the risk assessment on an audit, KPMG instructs its Audit Associates that they personally should be on the lookout for fraud risk factors throughout their work on an audit, and should not only rely on more senior auditors to ferret out these concerns. (Pls.' 56.1 Stm't ¶ 84; Def.'s 56.1 Stm't ¶ 45.) Plaintiffs and Defendant agree on this point.

The professional standards prescribe other tasks and duties, and in the interest of brevity, I highlight only one additional standard here. According to KPMG, while gathering and objectively evaluating evidence, Audit Associates are expected to consider the competency and sufficiency of the evidence. (Def.'s 56.1 Stm't ¶ 63.) KPMG explains that this guidance is derived from professional standards, which prescribe that each member of the engagement team "use[] the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the *gathering and objective evaluation of evidence*." AU § 230 (emphasis added). This requires "a questioning mind and a *critical assessment of audit evidence*." *Id.* (emphasis added). KPMG also instructs its Audit Associates to consider audit quality, which includes (among other things), "the quality of audit documentation placed on file and the support for conclusions reached," "the pervasiveness of audit evidence gathered," and "compliance with professional standards and KAM in completing audit engagements." (Def.'s 56.1 Stm't ¶ 60a.)

Although (as has been chronicled above), Plaintiffs characterize their work as rote and non-judgmental, they do not dispute that the professional standards apply no less to Audit Associates than they do to more senior members of the engagement team.

## DISCUSSION

### I.    Standard of Review

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are

24

predestined to result in directed verdict. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907

(2d Cir.1997).

## II.     The FLSA and Exemptions Thereto

Under the FLSA, certain employees must be compensated "at a rate not less than one and

one-half times" their regular wages for every hour worked over forty in a single workweek. 29

U.S.C. § 207(a)(1). Certain categories of employees, however, are exempt from this

requirement, including employees employed in a "bona fide executive, administrative or

professional capacity." 29 U.S.C. § 213(a)(1). If an employee falls within one of these three

categories, he or she is not eligible for overtime pay.

The United States Supreme Court recently explained why Congress chose to exempt

certain classes of employees from the FLSA's overtime requirements:

> The exemption is premised on the belief that exempt employees
> "typically earned salaries well above the minimum wage" and
> enjoyed other benefits that "se[t] them apart from the nonexempt
> workers entitled to overtime pay." It was also thought that exempt
> employees performed a kind of work that "was difficult to
> standardize to any time frame and could not be easily spread to
> other workers after 40 hours in a week, making compliance with
> the overtime provisions difficult and generally precluding the
> potential job expansion intended by the FLSA's time-and-a-half
> overtime premium." Petitioners—each of whom earned an
> average of more than $70,000 per year and spent between 10 and
> 20 hours outside normal business hours each week performing
> work related to his assigned portfolio of drugs in his assigned sales
> territory—are hardly the kind of employees that the FLSA was
> intended to protect. And it would be challenging, to say the least,
> for pharmaceutical companies to compensate detailers for overtime
> going forward without significantly changing the nature of that
> position.

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2173, 183 L. Ed. 2d 153 (2012)

(quoting Preamble 22124) (other internal citations omitted). Although *SmithKline* dealt with a

different exemption than the ones at issue in this case (the exemption for sales personnel), the

25

principles it announces are equally applicable to the FLSA's other exemptions. Executive, administrative and professional employees typically earn well above the minimum wage and often perform types of work that can neither be standardized into a time frame nor easily passed off to others if not completed within eight hours a day or forty hours a week (as contrasted with, say, a waiter or an assembly line worker). The Secretary's guidance on the issue, on which the Supreme Court relied, applied uniformly to all of those exemptions.

KPMG asserts that Audit Associates qualify for both the "professional" and the "administrative" exemptions, although it moves for summary judgment only under the "professional" standard. Plaintiffs cross-move for summary judgment on the administrative exemption issue, but since any one exemption removes an employee from the ambit of the statute – and since I conclude that Audit Associates are exempt from the FLSA as "learned professionals" – it is unnecessary to reach the issue of whether they also qualify for the administrative exemption. Plaintiffs' cross motion on this issue is, therefore, denied as moot.

## III.   The Professional Exemption

Congress did not define the term "professional," but delegated authority to the Secretary of Labor to do so by regulation. 29 U.S.C. § 213(a)(1). The Secretary's regulations have the force of law and are to be given "controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute." *Freeman v. Nat'l Broad. Co., Inc.*, 80 F.3d 78, 82 (2d Cir. 1996).

Because the FLSA is a remedial law, its exemptions are to be "narrowly construed against the employers seeking to assert them and their application limited to those [cases] plainly and unmistakably within their terms and spirit." *SmithKline*, 132 S. Ct. at 2172 (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 456, 4 L. Ed. 2d 393 (1960)); *Reiseck v.*

26

*Universal Comm'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). As a result, "The

employer has the burden of proving that the employee clearly falls within the terms of the

exemption." *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009).

A job title is not determinative of whether an employee is exempt under the FLSA.

*Kadden v. Visualex*, No. 11 Civ. 4892, 2012 WL 4354781, at *5 (S.D.N.Y. Sep. 24, 2012); 29

C.F.R. § 541.2. Also, "Whether an employee is exempt is determined by the employee's actual

work activities, not by the employer's characterization of those activities through a job title or job

description." *Cooke v. Gen. Dynamics Corp.*, 993 F. Supp. 56, 61 (D. Conn. 1997) (citing

*Goldstein v. Dabanian,* 291 F.2d 208, 209 (3d Cir. 1961), *cert. denied,* 368 U.S. 928, 82 S.Ct.

364, 7 L.Ed.2d 191 (1961)). The determination of exempt or nonexempt status turns on two

factors: the employee's salary and his/her actual duties at work. *See* 29 C.F.R. § 541.2. "The

question of how [an employee] spent [his] working time . . . is a question of fact." *Icicle*

*Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S. Ct. 1527, 1530, 89 L. Ed. 2d 739

(1986). However, whether an employee's "particular activities exclude [him] from the overtime

benefits of the FLSA is a question of law." *Id.*

There is no dispute that Plaintiffs earn far more than is needed to fall within the

professional exemption. To qualify for that exemption, an employee must be compensated, on a

salary or fee basis (rather than an hourly basis), at a rate of not less than $455 per week. 29

C.F.R. § 541.300(a)(1). Audit Associates were paid in an amount substantially in excess of the

statutory minimum, at a rate of approximately $41,000 to $64,000 per year. (Def.'s 56.1 Stm't

¶¶ 22-23.) Plaintiffs say that that they do not know whether Audit Associates were compensated

on a "salary basis" – by which I assume they mean, not on an hourly wage basis – but that is

nonsense, since Plaintiffs were themselves Audit Associates and know perfectly well whether

27

they were paid on a salaried as opposed to hourly rate basis. *See* CFR § 541.602; (Pls. 56.1 Counterst. ¶¶ 22-23.) But the issue is of little moment, since the gross amount of money earned by Plaintiffs puts them well outside the ambit of persons the FLSA was intended to protect – at the lowest end they earned $800 a week.

So the only question before the court is whether it is undisputed that the "primary duty" of Audit Associates is the "performance of exempt work." *See* 29 C.F.R. § 541.300, 541.700(a).

KPMG asserts that Audit Associates are exempt employees under the "learned professional" exemption. To qualify as a "learned professional," an employee's "primary duty" must be the performance of (1) "work requiring advanced knowledge" (2) "in a field of science or learning" (3) that is "customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a).

"Primary duty" means "the principal, main, major or most important duty that the employee performs" and is determined based on "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Factors to consider in determining an employee's primary duty include, but are not limited to (1) "the relative importance" of exempt duties compared to other types of duties; (2) "the amount of time spent performing exempt work"; (3) "the employee's relative freedom from direct supervision"; and (4) the employee's salary as compared to the wages of other employees for performing the same kind of nonexempt work as the employee. *Id.*

The first two factors tend to conflate, because when an employee performs both exempt and non-exempt work (as Audit Associates plainly do, see below), the amount of time spent performing exempt work can be a "useful guide" in deciding whether the exempt work is in fact the employee's "primary duty." *See* 29 C.F.R. § 541.700(b). "Employees who spend more than

28

50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.* However, the opposite is not necessarily true; employees "who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.*

Plaintiffs do not dispute that accounting qualifies as a "field of science and learning," the second prong of the primary duty test. Nor could they, since Section 541.301 of the Secretary's regulations provides that the phrase "field of science or learning" includes the "traditional professions of law, medicine, [and] accounting" (among others).

Plaintiffs do, however, urge that Audit Associates are not required to have "*advanced knowledge*" of accounting that is "customarily acquired by a prolonged course of specialized intellectual instruction" in order to perform their jobs. *See* 29 C.F.R. § 541.301(a)(1), (a)(3) (emphasis added). I will discuss these criteria in reverse order.

Pursuant to the regulations:

> The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree.   However, the word "customarily" means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. Thus, for example, the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry. However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes.

29 C.F.R. § 541.301(d).

Although the Second Circuit has not opined on the issue, other circuits have made it clear that "specialized academic training" is necessary to meet the educational requirements of the learned professional exemption, and that knowledge – even advanced knowledge – derived from a general education is not sufficient. *See, e.g.*, *Fife v. Harmon*, 171 F. 3d 1173, 1177 (8th Cir. 1999); *Dybach v. State of Florida Dept. of Corrections*, 942 F. 2d 1562, 1565-66 (11th Cir. 1991) (holding that probation officers who were required to have a bachelor's degree in any field, including "nuclear physics" or "basketweaving" did not qualify for the "learned professional exemption").

However, "in situations in which applicants are required to complete a particular course of instruction directly related to a position, even if they do not have a specific degree, courts have concluded that the 'learned professional exemption' is applicable." *Solis v. Washington*, 656 F. 3d 1079, 1085 (9th Cir. 2011); *see also Owsley v. San Antonio Indep. Sch. Dist.*, 187 F. 3d 521, 525 (5th Cir. 1999), *cert. denied*, 510 U.S. 1020, 120 S. Ct. 1423, 146 L. Ed. 2d 314 (2000) (state-licensed athletic trainers were exempt professionals, where they were required to have a bachelor's degree in any field and to complete fifteen credit-hours in specific courses related to their professional duties); *Reich v. Wyoming*, 993 F. 2d 739, 741, 743 (10th Cir. 1993) (game wardens who were required to have a bachelor's degree in wildlife management, wildlife biology, or a closely related field, as well as basic law enforcement training, were "learned professionals").

No reasonable trier of fact could possibly conclude that Audit Associates do not meet the requirements of the regulation.

Plaintiffs argue that Audit Associates do not meet the requirement of "specialized academic training" because (1) KPMG does not require every incoming Audit Associate to be CPA-eligible and (2) Audit Associates learn everything they need to know to perform audit work through KPMG's training programs and on-the-job training.

The first argument is belied by both the language of the regulation and by the evidence in the record, which is so overwhelmingly in KPMG's favor that Plaintiffs fail to raise any genuine issue of fact. It is undisputed that the vast majority of persons who are hired by KPMG to be Audit Associates hold a Bachelor's degree in accounting or a related business field. Almost half of those hired to the position of Audit Associate have a *Master's* degree in one of those fields! And nearly everyone hired as an Audit Associate – even those who did not major in accounting or business – has taken enough accounting and business courses to be eligible to sit for the Certified Public Accounting examination in his/her state of employment. In other words, as a matter of corporate policy, KPMG routinely requires Audit Associates to have the same, or almost the same, educational background as fully licensed CPAs – and CPAs are considered to be "learned professionals" under the regulations. *See* 29 C.F.R. § 541.700(e)(5).

It is true that KPMG on occasion hires Audit Associates who are close to CPA-eligibility. The record does not reveal how frequently KPMG waives its normal requirement that new Audit Associates be immediately eligible to sit for the CPA exam in their state of employment, but Plaintiffs submit no evidence to contradict KPMG's assertion that these instances are the exception rather than the rule. More important, nothing in the record suggests that an individual who, say, majored in History and took only a single, basic accounting or business course at college has ever been hired into the position of Audit Associate.

31

Plaintiffs themselves prove that KPMG does not take its stated requirements lightly. Of the 1,096 Audit Associates who chose to opt into this lawsuit as plaintiffs, almost 82% had already earned either undergraduate or graduate degrees in accounting, while another 14% held undergraduate or graduate degrees in Business, Finance or Economics (which, in conjunction with a concentration in accounting, make someone CPA-eligible). (*See* Swartz Decl. Ex. LL.) Of the remaining plaintiffs (46 out of 1,096 opt-ins), 43 had a minor, emphasis or certificate in accounting, which means they had taken a significant number of accounting courses; 2 had degrees in other fields without such a minor or emphasis, but were nonetheless CPA-eligible; and 1 had a degree in another field but was actually a licensed CPA before coming to work at KPMG. (*See id.*) In other words, not a single opt-in plaintiff fails to meet the stringent educational requirements that KPMG "customarily" applies to its new Audit Associate hires.

The regulations make it clear, by their use of the word "customarily," that KPMG does not forfeit exempt status for Audit Associates by occasionally hiring individuals who are not yet ready to sit for the CPA examination – especially since, as a matter of corporate policy, KPMG expects those individuals to burnish their credentials and become CPA-eligible in short order. *See* 29 C.F.R. § 541.301(d). Because it is undisputed that KPMG "customarily" restricts entry into the job of Audit Associate to individuals who have taken at least enough specialized academic coursework to satisfy state standards for the CPA examination, I conclude, as a matter of law, that the third regulatory prong is satisfied.

We are left, then, with the question of whether Audit Associates' "principal duty" involves work requiring "advanced knowledge," which means work that is "predominantly intellectual in character," and requires the "consistent exercise of discretion and judgment." 29 C.F.R. § 541.301(b). This type of work is distinguished from the "performance of routine

32

mental, manual, mechanical or physical work." *Id.* "An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." *Id.* The requirements of the employee's job, not his/her educational attainments, determines whether his/her primary duties *require* advanced knowledge. *Dybach*, 942 F.2d at 1565; *see also Kadden*, 2012 WL 4354781, at *9.

First things first. There is no question that Audit Associates are required to perform some fairly mundane tasks in the course of performing an audit. In that they do not differ from young doctors or young lawyers or young architects or young engineers or other young professionals who are just embarking on their careers. Nothing in the record suggests, however, that Audit Associates spend the bulk of their time performing such obviously non-exempt work – certainly nothing approaching the magic "50%" figure – and Plaintiffs do not argue as much.

Plaintiffs do argue that many of Associates' audit tasks are routine, and that their performance is dictated by rules and templates; but it is undisputed that the *primary* duties of Audit Associates involve performing the various tasks that are associated with performing audits – not doing clerical chores. And therefore the question is whether those tasks require Audit Associates to exercise discretion and judgment.

The FLSA regulations provide guidance on the meaning of the words "discretion" and "judgment," but not in the context of the learned professional exemption. Instead, the Secretary has defined this term in connection with the administrative exemption, which applies when an employee's primary duty includes the "exercise of discretion and *independent* judgment" with respect to "matters of significance." 29 C.F.R. § 541.202 (emphasis added). In connection with the administrative exemption, the Secretary notes that, "[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of

33

conduct, and acting or making a decision after the various possibilities have been considered," 29 C.F.R. § 541.202(a), and that it, "implies the employee has authority to make an independent choice, free from immediate direction or supervision," 29 C.F.R. § 541.202(c).

However, even in connection with the administrative exemption, "Employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." *Id.* "The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." *Id.*

At the same time, the "exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. . . . The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a 'statistician'." 29 C.F.R. § 541.202(e).

Several courts have applied the definition used in administrative exemption cases to cases involving the professional exemption. *See, e.g.*, *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 743 (6th Cir. 2000); *Barth v. Wolf Creek Nuclear Operating Corp.*, 125 F.Supp.2d 437, 442 (D.Kan.2000); *Debejian v. Atl. Testing Labs., Ltd.*, 64 F.Supp.2d 85, 89-90 (N.D.N.Y.1999). Others, however, have not; and at least one, and arguably two, Circuit Courts of Appeal have

34

concluded that the standard for the administrative exemption, which requires discretion and *independent* judgment, is more stringent than the "discretion and judgment" requirement for the professional exemption to apply. For example, in *De Jesus-Rentas v. Baxter Pharmacy Services Corp.*, 286 F. Supp. 2d 235, 241 (D.P.R. 2003), *aff'd De Jesus-Rentas v. Baxter Pharmacy Services Corp.*, 400 F.3d 72 (1st Cir. 2005), the district court referred to the discretion required for the professional exemption as "a lesser standard" than the discretion required under the administrative exemption; while in *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 536 (7th Cir. 1999), the Seventh Circuit implied the same (although noting that, in that case, the plaintiffs met the higher, "independent judgment" standard).

Of greater significance, it appears that the courts that have applied the more stringent "discretion and independent judgment" outside the administrative context did so before the Secretary of Labor most recently opined on the subject. All the cases cited above were decided prior to the issuance of the Department of Labor's 2004 revisions to the professional exemption regulations. In the preamble to that revision, the Department noted that "the 'consistent exercise of discretion and judgment' standard under the learned professional exemption is less stringent than the 'includes work requiring the exercise of discretion and independent judgment' standard of the administrative exemption." *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, the Preamble to the 2004 Final Rule*, 69 Fed. Reg. 22122, 22151 (April 23, 2004) (hereinafter "Preamble").

Although it does not appear that the Second Circuit has spoken to this precise issue, I have no reason to believe that our Court of Appeals would not defer to the Secretary's understanding that the term "discretion and judgment" does not require the same level of

35

independent judgment in the professional context as it does in the administrative context. I will,

therefore, conform my analysis to the Secretary's statement.

The regulations make it clear that both CPAs and non-certified accountants who perform

functions similar to CPAs are generally considered to be learned professionals by virtue of their

duties as well as their education:

> Certified public accountants generally meet the duties
> requirements for the learned professional exemption. In addition,
> many other accountants who are not certified public accountants
> but perform similar job duties may qualify as exempt learned
> professionals. However, accounting clerks, bookkeepers and other
> employees who normally perform a great deal of routine work
> generally will not qualify as exempt professionals.

29 C.F.R. § 541.301(e)(5).

However, both the regulations and the case law distinguish between *bona fide*

professional accountants, on the one hand, and mere clerks or bookkeepers, on the other. If

Audit Associates are bona fide professional accountants, they will be exempt under the FLSA

even though they are not required to possess a CPA license. *See id.*; *Galasso v. Eisman, Zucker,*

*Klein & Ruttenberg,* 310 F. Supp. 2d 569, 575 (S.D.N.Y. 2004); *In re KPMG Wage & Hour*

*Litig.*, CV 07-4396-JFW CWX, 2012 WL 5416939 (C.D. Cal. Oct. 19, 2012); *Rausch v. Wolf,* 72

F. Supp. 658, 662 (N.D. Ill. 1947). On the other hand, if Audit Associates are simply accounting

clerks or bookkeepers, then by the terms of the regulations, the professional exemption generally

would not apply. 29 C.F.R. § 541.301(e)(5); *cf. Brock v. Nat'l Health Corp.*, 667 F. Supp. 557,

565-67 (M.D. Tenn. 1987) (holding that the administrative exemption did not apply to "staff

accountants" whose primary duties were to check reports and tabulate numbers by following the

prescribed steps in a manual).

36

The most salient case from KPMG's perspective is, of course, *In re KPMG Wage & Hour Litigation*, in which Judge John F. Walter recently granted KPMG's motion for summary judgment and ruled (on an individual basis) that one of the firm's Senior Associates – that is a member of the audit team one rung above Audit Associates in KPMG's hierarchy – was exempt from the FLSA as a learned professional. *In re KPMG Wage & Hour Litig.*, 2012 WL 5416939. In that action, the plaintiff, Michelle Garcia, sought overtime pay for the period of time between the date when she passed her CPA exam and the date when she received her license; during that period, she worked as a Senior Associate at KPMG. *Id.* at *2. As a Senior Associate, and often as the in-charge, Garcia performed substantive testing in higher-risk, more complex audit areas; prepared work papers; supervised and trained associates; assigned responsibilities to junior members of the engagement team; reviewed associates' work papers; tracked staff time; interacted with the client; coordinated manager and partner reviews; ensured that work was performed on time; anticipated and resolved issues; and researched KPMG guidance and technical issues. *Id.*

Like Audit Associates, Garcia had to exercise "professional skepticism" and be alert to the possibility of fraud at all times during the audit, and to "challenge and probe the information and documents provided by the client." *See id.* Like Audit Associates, she was supervised by Managers and Partners and required to follow their instructions. *Id.* In performing her duties, Garcia followed the audit plan that had been prepared by the partner and manager, and she had to follow KAM. *Id.* at *3. Judge Walter noted that the audit plan described the nature, timing and extent of the audit procedures to be performed by the engagement team, and that KAM provided Garcia with guidance on specific audit activities, "including the judgment calls that she might need to make during an audit." *Id.*

Garcia argued that the audit plan, KAM and instructions from her supervisors prevented her from exercising discretion and judgment. But the court found otherwise, noting that KAM itself counsels KPMG employees that the guidance is general and not intended necessarily to address the specific circumstances of a particular entity that is being audited. *Id.* at *8-9. In particular, Judge Walter reviewed the KAM guidance on "one of the more routine substantive procedures" performed by Garcia (and one frequently performed by Audit Associates) – determining the existence and amounts of inventory – and found that while KAM discusses a multitude of factors and related guidance, the manual emphasized that judgment needed to be exercised in "selecting the nature and extent" of information recorded. *Id.*

The tasks that KPMG Audit Associates perform are similar to the tasks that KPMG Senior Associates perform (albeit with more supervision) – and both are similar to tasks performed by a "bona fide professional accountant," in that they require "advanced knowledge" of accounting. An Audit Associates' primary duty is to perform audit procedures and prepare audit work papers in accordance with U.S. GAAP and U.S. GAAS and PCAOB documentation requirements. Audit Associates participate in a variety of audit procedures, including tests of internal controls, walkthroughs, inventory observations, substantive analytic procedures and tests of details (among others), which require them to apply different tests and accounting techniques.

Of great significance is the fact that Audit Associates frequently conduct interviews of clients and are responsible for performing much of the fieldwork on site at the client's location (sometimes on their own, other times under supervision). *Henderson v. Transportation Group, Ltd.*, No. 09 Civ. 7328, 2010 WL 2629568 (S.D.N.Y. July 1, 2010), which Plaintiffs cite, is not persuasive authority to the contrary for two reasons. First, it involves the administrative, not the learned professional, exemption, and there were genuine issues of fact about whether the

38

financial analyst plaintiff exercised the sort of discretion and independent judgment required to qualify for that exemption – a standard that need not be met in the context of the professional exemption. Second, and of equal importance, in that case, the employee's client contact was in the form of routine marketing telephone calls and emails, which the court deemed to be matters of insignificance. *See id.* at *7. An Audit Associate's client contact can in no way be characterized as concerned with matters of insignificance.

Most important, as required by professional standards, Audit Associates, no less than Senior Associates or any other individual on an audit team, are expected to exhibit "professional skepticism" throughout all aspects of their audit work and be on the constant lookout for indications of fraud or misstatements as they perform audit procedures. In other words, they are expected to act like *bona fide* accountants in everything they do.

Plaintiffs assert that the audit work that Associates perform does not *require* them to apply "advanced" knowledge of accounting, including U.S. GAAP and other accounting principles, because they merely follow audit steps or complete templates. They insist that much of their work involves thing like comparing figures in various financial reports, inputting information into spreadsheets, and raising errors to the attention of more senior members of the team. Insisting that, at a minimum, KPMG's motion for summary judgment should be denied because of disputed issues of material fact, they rely heavily on *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 677 F. Supp. 2d 544 (D. Conn. 2009), where the court denied the defendant's motion for summary judgment due to disputed issues of fact concerning the nature of the plaintiffs' primary duties. *Id.* at 553. In that case, plaintiffs Hendricks and Minzie worked at JPMorgan in the "hedge fund services" business, which appears (from the limited facts available in the opinion) to be a division of JP Morgan that provided bookkeeping services for the bank's hedge

fund clients on an outsourcing basis. As "fund accounting" employees, they prepared financial statements, balance sheets, and regular financial reports for the bank's hedge fund clients. *Id.* at 549-50. Judge Hall had to decide whether it was undisputed that Hendricks' and Minzie's primary duties were more like those of a bookkeeper or more like those of an accountant; she concluded that there were genuine issues of fact on that score, and the matter was never finally adjudicated because the parties settled.

*Hendricks* is a case decided by a court of coordinate jurisdiction, so it is not binding on this court; and without knowing more facts than my esteemed colleague Judge Hall needed to report in order to dispose of the motion before her, I cannot say whether I would have reached the same result. But there are certainly critical differences that render it unpersuasive as precedent.

The most critical of those differences is that Judge Hall concluded that a significant portion of the work performed by the plaintiffs in her case could fairly be characterized as bookkeeping. Plaintiffs here have never suggested that they were mere bookkeepers – indeed, in his CPA application, one of the Audit Associate plaintiffs in this case swore that he had obtained experience at KPMG (his only listed accounting employer) in "accounting," including "develop[ing] documentation and sufficient data to support analysis and conclusions," "assess[ing] the appropriateness of conclusions based on sufficient relevant data," "mak[ing] appropriate decisions about the nature, timing and extent of procedures that support an analysis or conclusion" and "assess[ing] the risk of misstatements of the underlying data." (Landau Decl. July 12, 2012, Ex. U, at PRR 2012-013 at 000006-7). On the record before me, I have no reason to conclude that these statements to the relevant governmental licensing Board were untrue.

40

It is true that, like the Audit Associates in this case, the plaintiffs in *Hendricks* were required to perform their duties consistent with U.S. GAAP, and had to follow up when they encountered inconsistencies in financial reporting. *Id.* at 553-54. But the "fund accounting" employees in *Hendricks* were doing the sort of internal bookkeeping work that an Audit Associate from KPMG or some other outside auditor would subsequently review to make sure it complied with professional standards. *Id.* at 549. Indeed, one of their job responsibilities was to "prepare[] responses to questions about financial statements posed by outside auditors" – that is, they responded to questions put by outside auditing personnel like the Audit Associates who are plaintiffs here. The plaintiffs in *Hendricks* had significantly less "client contact" with the bank's hedge fund clients (Judge Hall's opinion describes their level of client contact as either none at all or "sporadic") than do Audit Associates, who come in from the outside and put questions to client employees (like Hendricks and Minzie) for the purpose of applying professional skepticism to the work performed by those in-house employees or their outside contractors (as was the case with the hedge funds in *Hendricks*). *See id.* at 549-50.

It is also true that the plaintiffs in *Hendricks* used a computer program to help them generate financial reports, *see id.* at 553-54 – just as Plaintiffs in this case use eAudit, a computer program, when they work – but that is of little help in resolving the question of professionalism, since everyone today, including (perhaps especially) learned professionals, uses computer programs for a variety of tasks.

Plaintiffs also rely heavily on *Brock*, where the court concluded that being on the alert for fraud was not enough to warrant the conclusion that "staff accountants," whose primary duties involved checking reports according to step-by-step instructions, fell under the administrative exemption. *Brock*, 667 F. Supp. at 560-62, 565-67. But they are wrong to do so. Once again,

41

the exemption at issue in *Brock* was the administrative exemption, requiring judgment and discretion to relate to "matters of significance" such as "management policies or operating practices" or "major assignments in conducting the operations of the business" (among other things). *Id.* at 550; 29 C.F.R. § 541.202(b). The staff accountants in *Brock* were not involved in such matters; they were deemed by the court to be akin to bookkeepers. They were expected to look for abnormalities when they checked reports, but the court noted that any "ordinary bookkeeper would make inquiries about abnormalities in the ledgers," thus rendering such duties insufficient to trigger the administrative exemption. Of far greater importance, the staff accountants in *Brock* were not even required to have college-level degrees in accounting or a related field – several of the seventeen staff accountants did not have degrees in accounting, and at least two of them did not possess a college-level degree at all – so they could not have qualified as learned professionals in any event. *Id.* at 560.

Plaintiffs also call the Court's attention to the Second Circuit's decision in *In re Novartis Wage & Hour Litigation*, 611 F.3d 141 (2d Cir. 2010) *cert. denied*, 131 S. Ct. 1568, 179 L. Ed. 2d 473 (U.S. 2011), *abrogated on other grounds by SmithKline*, 132 S. Ct. 2156. There the Circuit concluded – again in the context of the administrative exemption, which is inapplicable here – that pharmaceutical representatives' meetings with physicians did not involve any exercise of discretion and judgment because what they could say to the doctors about the company's products (pharmaceuticals) was strictly circumscribed by company training and guidance materials. *See id.* at 156-57.

It is, of course, open to question whether any of the *Novartis* decision survives the Supreme Court's ruling in *SmithKline*. Since the Supreme Court, unlike the Second Circuit, concluded that the pharmaceutical representatives qualified for the sales exemption, it never

42

reviewed the Circuit's alternative conclusion that they did not fall under the administrative

exemption, rendering that aspect of the Court of Appeals' decision pure dictum. *See Picard v.*

*HSBC Bank PLC*, 454 B.R. 25, 35-36 (S.D.N.Y. 2011) *amended sub nom. In re Bernard L.*

*Madoff Inv. Sec. LLC*, ADV. 08-1789 BRL, 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011)

(amended with respect to other issues); *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 101-04

(S.D.N.Y. 2011).

However, even without focusing on the fact that it deals with the wrong exemptions,

*Novartis* has little to teach in the context of this case.

First, nothing in the record suggests that Audit Associates are circumscribed, by any

KPMG manuals or policies, in what they can say to clients while out on an audit, or in the kind

of questions they can ask. They are not given a script to follow in their contact with clients, as

was the case with Novartis representatives who were trying to convince physicians to prescribe

Novartis drugs to their patients. Trying to equate Audit Associates with Big Pharma sales

representatives because they are required to follow company policies is like trying to equate

Audit Associates with the employees who prepare in the first instance the very financial

materials that Plaintiffs were retained to review for compliance with GAAP.

Second, and the more important from this Court's perspective: in the field of accounting,

there is a particular reason to require employees – even (perhaps especially) professional

employees – to use standardized procedures and training when they perform their unique and

critical role of serving as a second set of eyes on financial statements and business accounting

practices. Accountants are required, by law and by professional rules, to follow particular

procedures and to apply set standards in carrying out their work. Even the most senior and

experienced CPAs, who unquestionably qualify as learned professionals, do not have discretion

43

to vary from those standards or to follow different procedures; it would violate their professional duties, as well as expose them and their employers to significant liability, if they were to "exercise their judgment" to do so. Clients, the public, and even the Government all rely on a professional accountant's slavish devotion to audit procedures that have become institutionalized, precisely because they have proven effective when they are followed by professional skeptics – which outside accountants at every level are supposed to be.

Plaintiffs insist that requiring Audit Associates to follow templates and apply certain procedures renders their work "rote;" but one cannot divorce KPMG's insistence that Audit Associates adhere to set procedures from the nature of the work the firm is retained by its clients to do. Indeed, in *SmithKline*, the very case that effectively overturned *Novartis*, the Supreme Court directed courts to look to the mores of particular industries when evaluating the applicability of FLSA exemptions: "The statute's emphasis on the 'capacity' of the employee counsels in favor of a functional, rather than formal, inquiry, one that views an employee's responsibilities in the context of the *particular industry* in which the employee works." *SmithKline*, 132 S. Ct. at 2170 (emphasis added). The fact that Audit Associates (1) follow procedures that are outlined in guidance materials, including KAM, the audit plan and eAudit, (2) are supervised by more senior members of their audit teams, and (3) have their audit work reviewed by multiple layers of more experienced auditors does not, *in the context of the accounting industry*, mean that Audit Associates do not exercise the (lesser) level of discretion and judgment required of learned professionals (not administrators). It means that the industry's professional standards require *both* that certain procedures be followed *and* that everyone's work be extensively supervised and reviewed – at every level, from the bottom up.

44

The factors on which Plaintiffs rely to argue that Audit Associates are not professionals are factors that, according to the Secretary, do not necessarily negate application of the learned professional exemption. For example, FLSA regulations do not provide that following procedures set forth in manuals automatically disqualifies an employee from exercising discretion and judgment. Quite the contrary:

> The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part. Such manuals provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status.

29 C.F.R. § 541.704. Case law similarly provides that following established procedures in a manual or guideline does not preclude an employee's use of discretion or judgment. *See In Re KPMG Wage & Hour Litig.*, 2012 WL 5416939, at \*8 (citing *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) ("[T]he requirement that Allstate adjusters must consult with manuals or guidelines does not preclude their exercise of discretion and independent judgment.")). In *Owsley*, the court found that athletic trainers exercised discretion and judgment, even though they followed standard procedures and guidelines, because in some instances, trainers operated independently of the guidelines to assess an athlete's injury and make decisions about whether an athlete needed further medical attention. *Owsley*, 187 F.3d at 526-27.

Of particular relevance, the preamble to the 2004 regulations notes that "the final rule recognizes that some learned professionals in the modern workplace are required to comply with national or international standards or guidelines. Certified Public Accountants have not under current law, and will not under the final rule, lose the learned professional exemption because they follow the Generally Accepted Accounting Principles (GAAP)." Preamble 22152.

45

The regulations also make it clear that supervision of an employee, or review of an employee's work or decisions at a higher level, does not preclude the exercise of discretion and judgment. *See* 29 C.F.R. § 541.202. Professional standards applicable to the accounting industry require that all audit work performed by Audit Associates is reviewed by a more senior member of the team, but this kind of review in no way precludes the use of discretion and judgment while performing that work. It is hard to see what sort of societal good would be achieved by insisting that young professionals who are just starting to work in their fields – be they architects, engineers, lawyer, doctors, or accountants – be unsupervised in order to be treated as non-exempt "learned professional" employees.

Plaintiffs cite to two tasks in particular that Audit Associates frequently perform – walkthroughs and inventory observations – to bolster their argument that these are simply rote exercises performed by young accountants in accordance with procedures set by KPMG, and so do not require Audit Associates to exercise any discretion or judgment at all. But that is simply wrong. Both of these procedures require Audit Associates to exercise discretion and judgment. In conducting client interviews during walkthroughs, Audit Associates are not limited to a script; they are expected to modify their questions if necessary, follow up on any inconsistencies in a client's responses, and summarize (not parrot back) the responses, ferreting out the material portions of the information given to them. During inventory observation, Audit Associates must follow up on any discrepancies they notice, notify the client's inventory supervisor, and elevate the issue to the in-charge if they deem it necessary to do so. Like the athletic trainers in *Owsley*, Audit Associates are expected to be able to use their discretion and judgment to follow up on any issues that arise at the moment they surface. Simply deciding whether an issue warrants the attention of a more senior member of the team indicates an exercise of discretion and judgment;

it also requires application of standards learned through education (at school and in the workplace), and it requires more than a basic understanding of applicable rules and procedures.

Plaintiffs have also pointed to Audit Associates' performance of procedures like confirmations, reconciliations, recalculations, and certain procedures over financial statements to demonstrate that their work does not require judgment. It is undisputed that these sorts of tasks can be performed by employees at the GDC, the KPMG offshore center that handles certain "non-judgmental" work. But the very exhibit on which Plaintiffs rely also reveals that all of that work must be reviewed by a member of an audit team in the U.S. It is the members of the U.S. audit team – all of them, down to the lowliest Audit Associate – who are ultimately responsible for ensuring that the work performed by the GDC complies with professional standards. Indeed, the exhibit provides that those primarily responsible for reviewing the work done by the GDC – Audit Associates and Senior Associates – are required to "determine whether additional audit procedures are needed" and "[d]raw conclusions on the results." (*See* Swartz Decl. Ex. Y.) Furthermore, even assuming that these tasks do not require any exercise of judgment (which KPMG vigorously disputes), the record does not suggest that Audit Associates spend most of their time on them. *See* 29 C.F.R. § 541.700(b). Plaintiffs themselves insist that they spend a great deal of time on walkthroughs and inventory observations, no portion of which is tasked to the GDC; they cannot have it all ways.

Audit Associates undoubtedly spend a great deal of time doing things that are tedious and unglamorous, like comparing numbers or inputting numbers into a spreadsheet. But the fact that the work is tedious and unglamorous does not make it unimportant or non-professional. While Audit Associates are (unsurprisingly) not allowed to do everything associated with an audit, or to be the final word on any procedure, the work they do is vital to the process. Far from rendering

47

Audit Associates' tasks (or those of senior members of the audit team, for that matter) "rote" or mindless, KPMG's extensive guidance materials (like KAM, eAudit, and any "audit plan") were designed and are intended to promote consistency across audits, especially with respect to audit quality and compliance with professional auditing standards. (Butler Dep. 610:4-611:13, 611:19-612:15.)

Significantly, the work performed by Audit Associates fits squarely within criteria that were cited approvingly by the Supreme Court in *SmithKline* to describe work that was not intended to be qualify for overtime under the FLSA. Members of an outside audit team perform work that is "difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's overtime provision." Preamble 22124. Outside auditors do work that is often anything but exciting, but it is not the same as working on an assembly line or as a file clerk or bussing tables at a restaurant. It would be impossible for a professional member of an audit team – even at the lowest rung of professionalism – to pass his work off to someone else at the end of a 40 hour work week; successful auditing requires continuity of operations and personnel and considerable teamwork.

Finally, Plaintiffs argue that the position of Audit Associate was "traditionally" an overtime eligible position at KPMG. (Pls.' 56.1 Stm't ¶ 344.) Unfortunately, the facts do not quite bear out Plaintiffs' argument. It is true that, until 1997, KPMG paid all of its Associates – Audit Associates and Senior Associates – using a compensation model that calculated "overtime" based on hours worked beyond 80 hours in a two-week pay period. (Def.'s 56.1 Counterst. ¶ 344; *see also* Swartz Decl. Ex. TT.) KPMG provided compensatory time off ("comp time") for the first 80 hours of "overtime" worked during a fiscal year; it paid Audit and

48

Senior Associates time-and-a-half pay for hours worked in excess of that. (Swartz Decl. Ex. TT.) But KPMG correctly notes that this has nothing to do with the FLSA; that statute does not authorize the substitution of "comp time" for wages when non-exempt employees in the private sector work more than 40 hours per week.[7] There is a limited exception to this for "time-off" plans that allow private sector employees to take compensatory time, at the rate of 1.5 hours for all hours over 40 worked, as long as they do so during the same pay period in which they worked the extra hours. Wage Hour Opinion No. 913 (December 27, 1968). The banking of overtime by private sector non-exempt employees, however, is not legal; and KPMG Audit Associates and Senior Associates could "bank" their comp time, *see* Swartz Decl. Ex. TT at L-0000979 ("For the first 80 hours of overtime you work during the fiscal year, you will earn one-and-a-half hours to be accumulated in your Leisure Bank.")

KPMG insists that these "overtime" payments were a form of "incentive-based" compensation designed to reward young professionals who worked extra long hours. (Def.'s 56.1 Counterst. ¶ 344.) But in the end, any issue of fact that might conceivably be raised by this ancient and long-abandoned practice does not matter. Even if at one time KPMG thought that Audit Associates were non-exempt, it is well settled that an employer's reclassification of employees for FLSA purposes is not a materially relevant factor in determining a particular employee's exempt status under a prior policy. *See, e.g.*, *Clarke v. JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400, 2010 WL 1379778, at *21-22 (S.D.N.Y. Mar. 26, 2010) (finding that plaintiff qualified for the computer employee exemption and rejecting plaintiff's contention that his employer's later reclassification of his position as non-exempt was relevant to determining exempt status); *Liger v. New Orleans Hornets NBA Ltd. P'ship*, No. 05 Civ. 1969, 2008 U.S.

---

[7] Under the FLSA, compensatory time is statutorily prescribed only for government-sector employees. 29 U.S.C. § 207(o).

49

Dist. LEXIS 9098, at *7 (E.D.La. Feb 6, 2008) (finding that "evidence of the [defendant's] post-lawsuit compliance with the FLSA is not relevant to determining whether the [defendant] can claim the exemption during the period of time before the lawsuit was filed"); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (holding, in denying plaintiff's motion for collective action certification, that "[t]he fact that Safeco decided to reclassify all Claims Representatives, including all Field Claims Representatives, does not provide the necessary common thread," and that "[t]he merits of [plaintiff's] claim will turn upon evidence relating to [his] day-to-day tasks, and not upon any Safeco company policy or decision"); *Black v. Comdial Corp.*, No. 92 Civ. 81, 1994 U.S. Dist. LEXIS 2457, at *7-10 (W.D.Va. Feb. 15, 1994) (finding administrative exemption inapplicable to plaintiff based on analysis of his job duties, not because defendant had reclassified plaintiff's position as nonexempt after a DOL audit).

Based on the evidence submitted by the parties, I conclude, as a matter of law, Audit Associates perform "work requiring advanced knowledge," including work requiring the "consistent exercise of judgment and discretion," that cannot easily be confined to a standardized work week or spread to other workers after 40 hours. Audit Associates are not bookkeepers or clerks and they should not be treated as anything less than the professionals they both are and aspire to be. They are well-educated and they are well-compensated. They are not the sort of employees the FLSA was intended to protect. As learned professionals, they are exempt from the overtime requirements of the FLSA.

## CONCLUSION

KPMG's motion for summary judgment dismissing this case is granted. All other pending motions are denied as moot. The Clerk of the Court is directed to enter judgment for defendant dismissing this action and to close the file.

Dated: November 29, 2012

_____

U.S.D.J.

BY E-MAIL TO ALL COUNSEL PENDING REVIEW
FOR USE OF CONFIDENTIAL MATERIAL